# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

| | | | |
|---|---|---|---|
| GARY WAYNE SUTTON | ) | | |
| | ) | | |
| *Petitioner*, | ) | | |
| v. | ) | No.: | 3:06-cv-388 |
| | ) | | (VARLAN/SHIRLEY) |
| RICKY BELL, WARDEN, | ) | | |
| | ) | | DEATH PENALTY |
| *Respondent*. | ) | | |

## MEMORANDUM OPINION

# Table of Contents

I.  PROCEDURAL BACKGROUND  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. FACTUAL BACKGROUND  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   A. Trial Proof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      1. Evidence Presented by State  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
         a.  Crime . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
         b.  Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
      2. Testimony Presented on Behalf of Sutton . . . . . . . . . . . . . . . . . . . . . 13
      3. Testimony Presented on Behalf of Both Defendants . . . . . . . . . . . . . 13
      4. Rebuttal Evidence Presented by State  . . . . . . . . . . . . . . . . . . . . . . . . 15
      5. Verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
   B. Sentencing Proof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
   C. Post-Conviction Proof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

III. STANDARDS OF REVIEW  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
   A. Habeas Claims Cognizable Under 28 U.S.C. § 2254 . . . . . . . . . . . . . . . . . 34
   B. Review of Habeas Claims on the Merits . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
   C. Factual Bases for Habeas Claims  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
   D. Procedural Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
   E. Miscarriage of Justice: Actual Innocence . . . . . . . . . . . . . . . . . . . . . . . . . 41
   F. Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

IV. ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
   A. Failure to Investigate and Present Evidence and State Court's Denial of
      Relief on This Claim was Objectively Unreasonable (Claim I) . . . . . . . . . . . 46
      1. Ineffective Assistance of Counsel  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
         a.  Brain Damage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
         b.  Dellinger's Corrupting Influence and Control  . . . . . . . . . . . . . 55
         c.  Sutton's Family History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
   B. Dr. Harlan Claim (Claim II)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70
   C. Trial Counsel's Irreconcilable Conflict of Interest (Claim III) . . . . . . . . . . . 72
   D. Lack of Prior Notice of Dr. Harlan's Testimony (Claim IV) . . . . . . . . . . . . 77
   E. Counsel Failed to Present Evidence to Challenge the Branam Homicide
      (Claim V) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81
   F. Denial of Severance Motion (Claim VI) . . . . . . . . . . . . . . . . . . . . . . . . . . . 85
   G. Admission of Evidence of Ms. Branam's Murder, Fight on Alcoa Highway,
      and Trailer Arson in Sevier County (Claim VII)  . . . . . . . . . . . . . . . . . . . . 89
   H. Confrontation Rights (Claim VIII) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95
   I. Sutton's Tape-Recorded Statement (Claim IX) . . . . . . . . . . . . . . . . . . . . . 97

i

J.  Biased Jury (Claim X) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99
K.  Revocation of Funding for Jury Consultant (Claim XI) . . . . . . . . . . . . . . . 103
L.  Limiting *Voir Dire* (Claim XII) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109
    1.  Restrictions on Death Penalty Questions . . . . . . . . . . . . . . . . . . . . . 109
    2.  Mitigating Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110
M.  Alleged Error For Failing to Excuse Juror Who Had Been Bribed
    (Claim XIII) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112
N.  Revelation of Sevier County Trial (Claim XIV) . . . . . . . . . . . . . . . . . . . . . 115
O.  Conviction-Prone Jury (Claim XV) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119
P.  Refusal to Instruct on Lesser Offense (Claim XVI) . . . . . . . . . . . . . . . . . . 120
Q.  Failure to Instruct Jury [Rebuttal Evidence & Last Person Seen]
    (Claim XVII) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124
    1.  Refusal of Rebuttal Instruction . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124
    2.  Last Person Seen Instruction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128
R.  Reasonable Doubt Instruction (Claim XVIII) . . . . . . . . . . . . . . . . . . . . . . 130
S.  Ineffective Assistance of Counsel (Claim XIX) . . . . . . . . . . . . . . . . . . . . . 134
T.  Jury's Misperception About Sutton's Release Eligibility Date (Claim XX)   138
U.  State's Closing Argument (Claim XXI) . . . . . . . . . . . . . . . . . . . . . . . . . . . 142
V.  Sentencing Instructions Reasonable Doubt and Aggravating Circumstance
    (Claim XXII) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145
    1.  Reasonable Doubt Sentencing Phase Jury Instruction . . . . . . . . . . . 146
    2.  Omission of Jury Instruction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147
    3.  Aggravating Circumstance [Insufficiently Supported and
        Manufactured] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150
W.  Refusal to Instruct on Non-Statutory Mitigation Evidence (Claim XXIII) . 154
X.  Other Constitutional Errors (Claim XXIV) . . . . . . . . . . . . . . . . . . . . . . . . 155
    1.  Mandatory Death Sentence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155
    2.  No Specific Findings as to Mitigating Circumstances . . . . . . . . . . . 158
    3.  The Death Penalty as Cruel and Unusual Punishment . . . . . . . . . . . 158
    4.  The Aggravator Did Not Narrow Class of Offenders . . . . . . . . . . . . 160
    5.  Double Jeopardy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162
    6.  Flawed Proportionality Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164
Y.  Cumulative Error Argument (Claim XXV) . . . . . . . . . . . . . . . . . . . . . . . . 164

V.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

GARY WAYNE SUTTON        )
       )
     *Petitioner*,     )
v.       )     No.:  3:06-cv-388
       )          (VARLAN/SHIRLEY)
RICKY BELL, WARDEN,     )
       )          DEATH PENALTY
     *Respondent*.     )

## MEMORANDUM OPINION

Gary Wayne Sutton ("Sutton" or "Petitioner")[1], a death-sentenced inmate at the Riverbend Maximum Security Institution in Nashville, Tennessee, brings this amended petition for writ of habeas corpus against the Warden, Ricky Bell ("Respondent"), pursuant to 28 U.S.C. § 2254, challenging the legality of his confinement for his 1996 conviction for first degree murder [Doc. 24]. Respondent has filed an Answer [Doc. 30] to the habeas corpus petition which conforms with Rule 5 but also contains an argument that the petition must be dismissed based upon procedural default and the deferential review standards set forth in § 2254(d) and *Williams v. Taylor*, 529 U.S. 362, 405 (2000). The Court construes the Answer as a Motion for Summary Judgment, to which Sutton filed a response to [Doc.

---

[1]Because there is an extensive cast of characters, where appropriate, all second and subsequent references will be to an individual's last name. Where there are two or more witnesses with the same last name, second and subsequent references will be to the first name, or the first and last name, of the witnesses.

1

86], and Respondent filed a reply to Sutton's response [Doc. 90]. Thus, the case is ripe for review.[2]

After carefully considering the arguments of counsel and the applicable law, the Court will **GRANT IN PART** Respondent's motion for summary judgment [Doc. 30]. Specifically, the Court will **RESERVE RULING** on the motion as to Claim II in its entirety (the issues pertaining to Dr. Harlan) and will permit those claims to proceed to an evidentiary hearing. In addition, the Court will **RESERVE RULING** on Petitioner's cumulative error claim pending the resolution of the Dr. Harlan issues. In all other respects, the motion for summary judgment [Doc. 30] will be **GRANTED**.

## I.  PROCEDURAL BACKGROUND[3]

On September 1, 1996, Petitioner Sutton and his co-defendant and uncle, James Dellinger, were convicted by a jury in Blount County, Tennessee of the 1992 first-degree murder of Tommy Griffin [Addendum No. 18, p. 5530]. After finding one aggravating circumstance—that Sutton was previously convicted of two felonies whose statutory elements involved the use of violence to the person—the jury determined death was the appropriate punishment for the premeditated murder [Addendum No. 18, p. 5512].

---

[2]All ECF filing citations are cited as they are currently assigned on ECF. The ECF upgrade on March 2, 2009, has resulted in the current attachment numbers in CM/ECF being one number lower than the original attachment numbers assigned at the time of filing, e.g., originally assigned Doc. 24-6 is currently numbered 24-5 in the ECF document numbering system.

[3]Respondent has provided the Court with copies of Petitioner's state court proceedings [Addenda 1-41; *see also* Doc. 10, Doc. 57].

Petitioner's conviction and sentence were affirmed on direct appeal. *State v. Dellinger & Sutton* (hereinafter "*State v. Sutton*"), No. #1997-00196-CCA-R3-DD, 2001 WL 220186 (Tenn. Crim. App. Mar. 7, 2001) [Addendum No. 22], *State v. Dellinger & Sutton* (hereinafter "*State v. Sutton*"), 79 S.W.3d 458 (Tenn. 2002), *cert. denied*, 537 U.S. 1090 (2002).

On direct appeal to the Tennessee Criminal Court of Appeals, Petitioner Sutton raised twenty-three issues—thirteen trial issues and ten sentencing issues. *State v. Sutton*, 2001 WL 220186, at *10-43.

Petitioner filed his original petition for post-conviction relief on March 3, 2003, in the Criminal Court of Blount County, Tennessee. Petitioner alleged twenty-three instances of ineffective assistance of counsel [Addendum No. 22]. Petitioner filed amended petitions on June 2, 2003, and March 29, 2004 [Addendum No. 34, pp. 6631-45 and 6660-61]. After an evidentiary hearing on May 25 and 26, 2004, the trial court denied relief [Addendum No. 34, pp. 6611-22].

On September 21, 2004, Petitioner filed a notice of appeal. Petitioner appealed to the Tennessee Court of Criminal Appeals raising ten claims. The Court of Criminal Appeals affirmed the denial of post-conviction relief. *Sutton v. State*, No. E2004-02305-CCA-R3-PD, 2006 WL 1472542 (Tenn. Crim. App. May 30, 2006). Petitioner's application for permission to appeal was denied by the Tennessee Supreme Court on October 2, 2006 [Addendum No. 40, p. 7385].

Petitioner initiated the instant habeas proceedings on or about October 5, 2006, and filed his initial habeas petition on May 11, 2007 [Doc. 14], and an amended habeas petition on July 6, 2007 [Doc. 24]. Respondent has filed an Answer [Doc. 30], which the Court construes as a motion for summary judgment, to which Petitioner has objected [Doc. 86].

During the course of this proceeding, Petitioner has filed numerous motions. A motion to appoint counsel to investigate and prepare and file a habeas petition was filed on Petitioner's behalf and was granted [Doc. 2]. Petitioner's first and second motions for discovery [Docs. 15; 40] were granted in part and denied in part [Doc. 41]. Petitioner's third motion for discovery [Doc. 54] was granted [Doc. 61], as was his motion to expand the record [Doc. 82].

## II. FACTUAL BACKGROUND

### A. Trial Proof

#### 1. Evidence Presented by State

##### a. Crime

According to the evidence presented at Sutton's Blount County trial by the State of Tennessee ("State"), on Friday, February 21, 1992, Jamie Carr was working at Howie's Hideaway Lounge ("Howie's") from 10:00 a.m. until 5:00 p.m. During the last two hours of her shift, she served beer to Sutton, Dellinger, and Griffin who had arrived at Howie's in a dark blue Firebird, Camaro, or Trans Am [Addendum No. 12, Vol. 1, pp. 2040-65].[4] Ms.

---

[4]Each page in the Addenda includes two numbers. To prevent confusion, the Court will refer to the number in the bottom right hand corner of the page.

4

Carr left when her shift ended and was replaced by Terri Newman. Ms. Newman served the men two or three drinks, and at about 7:00 p.m. the three men left the bar [Addendum No. 12, Vol. 1, pp. 2066-74].

At approximately 7:00 p.m., Cynthia Walker and her husband, who were driving on Alcoa Highway, observed a dark-colored Camaro parked on the side of the road with the passenger side door open and only one head light on [Addendum No. 12, Vol. 1, pp. 2079-99]. Ms. Walker saw a male outside the vehicle and some type of pulling and pushing activity going on inside the vehicle as though an altercation was taking place between the person outside and whoever was inside the car. Mr. Walker called the Blount County police station to report the fight [Addendum No. 12, Vol. 1, pp. 2083-88].

Also around 7:00 p.m., Sharon Davis and her family were driving on Alcoa Highway when she saw a lone shirtless man stumbling along the side of the road. They returned later and the man was no longer in that area. However, a short way beyond, past Hunt Road, Ms. Davis observed two men outside an older dark-colored Camaro who appeared to be looking for something [Addendum No. 12, Vol. 1, pp. 2106-12].

At 7:11 p.m., Blount County 911 dispatcher, Sandra Leone Hicks, received a call about a fight between people in a black or dark-colored Camaro [Addendum No. 12, Vol. 1, pp. 2132-33]. Within minutes, two City of Alcoa police officers separately responded. The first officer to arrive on the scene determined that the shirtless man was Griffin. According to the first officer, Griffin was nervously looking around as though he was waiting for someone to return, while explaining that some friends, who were not really his friends, had

5

pulled him out of the car, but he just could not tell the officer what happened [Addendum No. 12, Vol. II, p. 2172].  According to the second officer, Griffin would give no information, had no identification, was upset, had an artificial leg, and appeared to have been in a fight because "his back was skinned up and his neck – had some abrasions . . . like he had been fighting . . . [h]is bottom lip was quivering like he was scared . . . he smelled [strongly] of alcohol [and] had been drinking pretty heavily . . . ." [Addendum No. 12, Vol. 2, pp. 2153-54].

Although Griffin smelled of alcohol, the first officer did not think he was intoxicated. Nevertheless, the first officer arrested Griffin because "[s]omething ha[d] taken place that [was] not right," and the officer did not have anywhere else to take him.  Therefore, Griffin was charged with public intoxication and transported to the Blount County Jail, arriving at 7:35 p.m. [Addendum No. 12, Vol. 1, pp. 2132-42; Addendum No. 12, Vol. 2, pp. 2164-92].

Subsequently, Dellinger and Sutton came to the jail between 8:30 p.m. and 9:00 p.m. and asked to post bail for Griffin, but they were told to come back between 10:30 p.m. and 11:00 p.m. [Addendum No. 12, Vol. 3, pp. 2401-07].

About 9:00 p.m., Griffin's and Dellinger's neighbor, Alvin Lee Henry, was watching television when his dog began barking.  Mr. Henry looked out his window and saw someone entering the passenger side of Dellinger's truck, which then proceeded up the driveway to Dellinger's trailer.  Mr. Henry glanced back toward the road and saw that Griffin's trailer was on fire.  His wife called 911 [Addendum No. 12, Vol. 2, pp. 2224-28].

About 9:00 p.m., Jennifer Branam, Griffin's seventeen-year old niece, was awakened by her sister and advised that Griffin's trailer was on fire. Jennifer went to Dellinger's trailer looking for her uncle, but Dellinger's wife said Griffin was not there, and neither were Dellinger or Sutton. Immediately afterwards, Jennifer saw Dellinger and Sutton breathlessly walking down the hall wearing jackets and pants wet up to the knees, though it was not raining, snowing, or sleeting. She asked them if her uncle was in his trailer, and Sutton responded that he was in Blount County with someone else. Dellinger declined Jennifer's request to go down to her uncle's trailer explaining "they couldn't go down there because they was [sic] in enough trouble as it is." [Addendum No. 12, Vol. 2, pp. 2276-83].

Jennifer returned home and observed the two men leaving Dellinger's house. She observed Dellinger remove a sheet-wrapped object, two and a half to three feet in length, and place it in the trunk of his wife's car while Sutton waited in the car. She saw them drive off in the car [Addendum No. 12, Vol. 2, pp. 2285-89; 2230-31].[5]

Herman Lewis, who was in the vicinity, also saw someone whom he believed to be Dellinger leave his trailer carrying an object, which he placed in the backseat of his car. Two people then got in the car and just sat there until Mr. Lewis left [Addendum No. 12, Vol. 3, pp. 2336-41].

---

[5]The morning after the fire, Jennifer saw Dellinger, who was alone, remove the object she saw him put in the car the night before, and place it underneath the trailer. Jennifer thought the object looked like a shotgun, but she was not sure [Addendum No. 12, Vol. 2, pp. 2286-89].

At approximately 11:25 p.m., Dellinger and Sutton returned to the jail and were seen by two law enforcement officers. One of the officers saw either Dellinger or Sutton carrying a blue flannel-type shirt and heard one of them tell Griffin (who was shirtless when he was arrested), "we've go [sic] to get you back to Sevier County or something to that effect." [Addendum No. 12, Vol. 3, p. 2435].

At 11:55 p.m., Jason McDonald, who lived about 500 yards from the Blue Hole on the Little River,[6] was writing in his journal when he heard two or three gunshots coming from the bottom of the hill [Addendum No. 12, Vol. 3, pp. 2442-50]. His mother also heard the shots and discussed them with her son, who noted them in his journal [Addendum No. 12, Vol. 4, pp. 2473-90].[7]

The next day, Saturday, February 22, 1992, between 12:00 p.m. and 1:00 p.m., Connie Branam, Griffin's sister, who was concerned about Griffin's unexplained absence, prepared to go to Blount County to find him [Addendum No. 12, Vol. 3, pp. 2382-90]. Around 2:00 p.m., Ms. Branam arrived at Jerry Sullivan's grocery store carrying a picture of her brother. Sullivan agreed to let Ms. Branam leave her car in his parking lot. Later, he observed her talking to two men in a white Dodge truck [Addendum No. 12, Vol. 4, pp. 2491-96].

---

[6]The transcript reflects that the witness was asked whether he was familiar with a place known as "the Blue Springs or the Blue Hole on the Little River," which, presumably, is a body of water in the area [Addendum No. 12, Vol. 3, p. 2442].

[7]Three days later, McDonald learned Griffin's body had been found and called law enforcement the following day to report the gunshots he had heard [Addendum No. 12, Vol. 4, pp. 2453-62].

8

On that date, Ms. Carr was again working the day shift at Howie's when Dellinger and Sutton entered the bar with a woman who was crying. The woman introduced herself as Connie Branam and said she was there looking for her brother. As they discussed the previous day's events, Ms. Carr described the third person with Dellinger and Sutton as having "a real bad limp," whom Ms. Branam identified as her brother. During that conversation, Dellinger interrupted Ms. Carr several times asking if she remembered them and then asking if she was sure she remembered them. She acknowledged that she was sure she remembered them. Then Dellinger explained "we thought he would come back here because we got him out of jail yesterday and came in here and had a drink" [Addendum No. 12, Vol. 4, p. 2501]. Dellinger told Ms. Carr that he, Sutton, and Griffin returned to Howie's after they bailed Griffin out of jail and asked her if she knew with whom Griffin left the bar. Ms. Carr responded that, when she left work the day before, they were still at Howie's. Ms. Carr stated Dellinger told her the last time they had seen Griffin, he "was up the road with a woman, a short [,] dark-haired woman and she was ugly" and he asked her if they had come back to Howie's [Addendum No. 12, Vol. 4, p. 2501]. Ms. Carr informed him she had not seen them [Addendum No. 12, Vol. 4, pp. 2497-2501].

Ms. Carr served Dellinger, Sutton, and Ms. Branam several beers, and the trio remained at Howie's when Ms. Carr left around 5:00 p.m. Ms. Carr was concerned with Ms. Branam's level of intoxication, but Dellinger informed her that his companion was not driving [Addendum No. 12, Vol. 4, pp. 2491-2512]. Ms. Newman replaced Ms. Carr at the bar and continued to serve them beer. Ms. Branam asked her with whom Griffin had left the

day before, and Ms. Newman "got a little confused because he had left with the two gentlemen that she was sitting with." [Addendum No. 12, Vol. 4, pp. 2516-17]. Dellinger insisted they had come in after they picked Griffin up from jail, but according to Ms. Newman, in fact, they had not returned after they left at 7:00 p.m. While Ms. Branam and Dellinger were dancing, Sutton persistently, but unsuccessfully, tried to persuade Ms. Newman to go with them to find Ms. Branam's brother. After convincing Sutton she would not go, he asked her if she was married. When Ms. Newman told him "yes," he said, "Your husband is going to be surprised whenever you're missing one morning, when he wakes up and you're missing." [Addendum No. 12, Vol. 4, pp. 2516-19, 2534].

The three individuals left the bar at 7:00 p.m., with Ms. Branam walking between Sutton and Dellinger. Ms. Newman did not actually see them get in a vehicle but knew that a white truck similar to Dellinger's was in the parking lot. Frightened by Sutton's comment, Ms. Newman called her husband and asked him to come to Howie's and follow her home when she finished her shift at midnight [Addendum No. 12, Vol. 4, pp. 2532-36].

About 8:00 p.m., James R. Gordon and his wife heard a high-pitched whistle coming from the woods. They could not identify the noise but saw a fire through the trees. Friends suggested it probably was just a campfire. About a week later, Mr. Gordon and his foster-son drove a dune buggy over a large area of the woods looking for the source of the flames. He saw no evidence of a fire until he stumbled upon a burned automobile with a body inside (later identified as Branam). He concluded that this was the location of the fire he had seen on Saturday and called the police [Addendum No. 12 Vol. 4, pp. 2567-76; 2582-83].

On Monday, February 24, 1992, at approximately 3:00 p.m., a fisherman and his children discovered a man lying face down with the back of his head covered in blood at the Blue Hole. The fisherman called 911 [Addendum No. 12, Vol. 4, pp. 2536-43] and returned to the scene with law enforcement to show them the location of the body, which was later identified as Griffin.

### b.    Investigation

On February 24, 1992, Gary Alan Hamilton, a crime scene technician and latent fingerprint examiner with the Blount County Sheriff's Department, photographed the scene where the body of Griffin was found at the Blue Hole. Mr. Hamilton assisted the lead investigator, Detective Widener, and the lead technician, Larry Muncy, in taking measurements at the crime scene and sketching the crime scene. Mr. Hamilton observed the victim's body lying face-down on the ground angled downward toward the river. Two spent shotgun shells and two empty Budweiser cans were strewn nearby [Addendum No. 12, Vol. 4, pp. 2547-54].

On February 29, 1992, Dr. William Bass, the State forensic anthropologist,[8] traveled to the Foothills Parkway in Sevier County, where he saw an extensively-burned vehicle with a body lying on the front seat. Dr. Bass examined the burn pattern in the car and the degree of destruction of the body and concluded that an accelerant had been poured in the car. From

---

[8]A forensic anthropologist works with skeletal remains of individuals who have been deceased long enough that there is no remaining soft tissue on the body [Addendum No. 12, Vol. 5, pp. 2649-50].

11

her dental records, Dr. Bass positively identified the body as that of Connie Branam [Addendum No. 12, Vol. 5, pp. 2659-62]. Dr. Bass's assistant found a rifle cartridge in the front floorboard of the car [Addendum No. 12, Vol. 5, pp. 2693-2704].

Later that same day, the State arson investigator, Mr. Gary Clabo, concluded someone placed an accelerant in the vehicle and ignited it, thereby setting the vehicle on fire [Addendum No. 12, Vol. 5, pp. 2705-27]. Similarly, Mr. Clabo concluded Griffin's mobile home fire was also an incendiary fire in which an accelerant was used. Although the lab reports did not reveal an accelerant, Mr. Clabo explained that "[a] lot of time, we will have an accelerated fire and there will be no accelerants left due to evaporation and/or consumption of the product." [Addendum No. 12, Vols. 5 & 6, pp. 2728-68].

Dr. Eric Patrick Ellington, a pathologist, conducted the autopsy on the remains of Griffin. Although he was unable to give a time of death, he determined the cause of death was massive trauma or injury to the brain stem caused by a gunshot [Addendum No. 12, Vol. 6, pp. 2881-2901].

Detective James Widener of the Blount County Sheriff's department, along with several other officers, executed a search warrant at Dellinger's residence, recovering ballistic evidence that linked Dellinger to the shell casings that had been recovered at the scene where Griffin was found and the burned vehicle in which Ms. Branam was found [Addendum No. 12, Vol. 7, pp. 2915-29; 2973-98, 3020, 3031-39; Addendum No. 12, Vol. 9, p. 3261].

12

## 2.    Testimony Presented on Behalf of Sutton

Ms. Carolyn Weaver, Sutton's girlfriend at the time of the murders, gave a detailed accounting of Sutton's whereabouts during the weekend of the murders. She testified that, on Friday, February 21, 1992, Sutton picked her up at approximately 7:00 p.m. and that the only time she was not with Sutton on that evening was from 10:00 p.m. until midnight. She further testified that they were apart most of Saturday, February 22, 1992, until that evening when they watched movies at Dellinger's trailer [Addendum No. 12, Vol. 10, pp. 3490-3501; Vol. 11, pp. 3510- 11; 3530; 3604-10]. Ms. Weaver also presented evidence as to Sutton's close friendship with Griffin [Addendum No. 12, Vol. 11, pp. 3504-09; 3511-13].

Mr. Jack Sutton, who had described himself as "somewhat" of a relative of Sutton who had visited Sutton in the past, also testified at trial [Addendum No. 12, Vol. 13, p. 3845]. He stated that he had spoken with Mr. Bill Cogdill, whom Jack Sutton described as untrustworthy and a liar, before Ms. Branam's body was found. According to Jack Sutton, Mr. Cogdill said that "Connie would either be found in water or burned in a car." [Addendum No. 12, Vol. 13, pp. 3845-47; 3849-50].

## 3.    Testimony Presented on Behalf of Both Defendants

On February 21, 1992, at approximately 9:17 p.m., Mr. Tim Nichols, a volunteer firefighter, responded to the fire at Griffin's trailer. The trailer was "all burnt," but he searched through the rubble to make sure the victim was not present since Griffin's sister had voiced concern that he may have been in the trailer [Addendum No. 12, Vol. 11, p. 3567]. An arson investigator was not called because Ms. Branam had told him the wiring in the

13

trailer was faulty and at the time, Mr. Nichols did not suspect arson [Addendum No. 12, Vol. 11, pp. 3564-71].

At 5:59 p.m. on February 24, 1992, two Emergency Medical Technicians ("EMTs") responded to the call when Griffin's body was found. The EMTs testified that when they arrived the body was in rigor mortis and cold and stiff, but they had detected no significant odor of decomposition [Addendum No. 12, Vol. 12, pp. 3781-94].

Defendants also presented the testimony of Martha Blair, who testified that a few days before she learned of Griffin's death on the news, her ex-husband ("Mr. Blair") came in late, threw his clothes in the trash, and told her that he was throwing them away because they were muddy, which was something he had never done before. Then, the next morning, he took the trash bag and put it in his car, again something he had never done before [Addendum No. 12, Vol. 13, pp. 3806-23]. After Ms. Blair heard about the death of the victim on the news, the police came to her residence and searched Mr. Blair's vehicle. Although Mr. Blair always carried a 12-gauge shotgun in the back seat of his car, the last time Ms. Blair saw the shotgun was two or three days before the police came to her residence. *Id.*

Defendants also relied on the testimony of Dr. Larry Elmo Wolfe. Dr. Wolfe was the medical examiner and coroner in Union County. At the time of the trial, he had been in the Union County position for about three years since his appointment in 1989.[9] Dr. Wolfe, a

---

[9]During those three years, Dr. Wolfe was called to examine approximately 45 bodies, and during that time he testified in court as an expert as to cause and time of death even though he was

14

licensed medical doctor, though not board certified in any field of medicine, testified that the time of Griffin's death was 24 to 36 hours before the body was discovered which would have put his time of death between 3:00 a.m. and 3:00 p.m. Sunday, February 23, 1992. On cross-examination, however, he conceded that "[i]t's maybe within the realm of conceivability" that Griffin died on Friday when the shots were heard [Addendum No. 12, Vol. 13, pp. 3853-55; 3914-15; 3923-25; 3941].

### 4. Rebuttal Evidence Presented by State

The State presented Dr. Charles Warren Harlan, a board-certified forensic pathologist, who had performed approximately 15,000 forensic autopsies. Considering the rigor mortis, the tissues on the microscopic slides, and the fact that the victim was seen alive around 11:30 p.m. on Friday, February 21, 1992, Dr. Harlan estimated Griffin's time of death as between 11:30 p.m. on Friday, February 21 and 8:00 a.m. on Saturday, February 22 [Addendum No. 12, Vol. 14, pp. 4018-20].[10]

### 5. Verdict

After hearing all the evidence and considering all the exhibits, the jury returned a verdict finding Sutton guilty of first degree murder as to Tommy Griffin [Addendum No. 18, p. 5530].

---

not professionally qualified to do forensic autopsies [Addendum No. 12, Vol. 13, p. 3855].

[10]Subsequent to Sutton's state post-conviction proceedings, but while his post-conviction case was pending appeal, it came to light that Dr. Harlan's medical license had been revoked. Issues surrounding Dr. Harlan's testimony are discussed *infra* in Section IV.B. of this Memorandum Opinion.

15

## B.    Sentencing Proof

During the penalty phase, the State introduced two prior convictions as aggravating factors against Sutton -- the February 24, 1993, judgment of conviction for the first-degree murder of Ms. Branam in Sevier County Case 5033, and a 1983 aggravated assault conviction from Georgia.

Several family members and friends presented "good character" evidence about Sutton, testifying as to his kindness, generosity, reliability, dependability, and work ethic. In addition, evidence of Sutton's good jail conduct was introduced, *i.e.,* he only had one discipline report for failure to report as scheduled to his job site.

The majority of Sutton's mitigating evidence was presented by Dr. Eric Engum, a clinical psychologist specializing in clinical neuropsychology, who had evaluated Sutton. Dr. Engum spent approximately seventeen hours with Sutton conducting clinical interviews and performing psychological and neuropsychological assessments to determine Sutton's functioning, personality, and intellectual cognitive status.

Dr. Engum administered Sutton two IQ tests. Sutton scored 77 on the first test and 83 on the second test, both of which suggested Sutton was in the borderline range and functioned in the bottom 15 percent in terms of intellectual functioning. In Dr. Engum's opinion,

> What it really indicates is that this is a young man with limited intellectual ability; limited social judgment and knowledge; very limited abstract reasoning; very limited in the way of his vocabulary skills, the way in which he expresses and articulates himself; and very limited in that - - what I call that

just font of general knowledge that people need in order to navigate through life.

[Addendum No. 16, Vol. III, p. 5057]. On cross-examination, however, Dr. Engum acknowledged that Sutton was not within the range of even being mildly retarded and that a person with Sutton's IQ has the capacity to appreciate the wrongfulness of his conduct [Addendum No. 16, Vol. III, p. 5067].

In addition, Dr. Engum presented evidence about Sutton's family history. According to that testimony, Sutton's parents divorced when he was young. His father was a chronic alcoholic, and Sutton followed in his father's footsteps by abusing alcohol beginning at the age of twelve. According to Dr. Engum, Sutton was subjected to "a lot of mind games, a lot of head games" by his parents trying to bribe him to choose with whom to live [Addendum No. 16, Vol. III, pp. 5057-58]. Dr. Engum explained that there was quite a bit of physical and mental abuse and that Sutton was one of the least favored of all the children in the family. Sutton's academic performance was very poor and "by eighth grade he had basically failed and had dropped out" [Addendum No. 16, Vol. III, pp. 5059-61].[11]

Jimmy Ray Sutton, Sutton's older brother, explained the circumstances surrounding his brother's prior Georgia conviction for aggravated assault. Jimmy explained that Sutton was present at the scene when Jimmy attempted to shoot into a car, but instead, the bullet

---

[11]The testimony of Dr. Engum is presented in more detail in Section IV.A.1.c. of this Memorandum Opinion in which the Court addresses the issue raised in Sutton's petition pertaining to Dr. Engum's testimony.

glanced off the car, shot into a mobile home, and struck a female occupant in the leg [Addendum No. 16, Vol. III, pp. 5080-82].

After finding one aggravating circumstance -- that Sulton was previously convicted of two felonies whose statutory elements involved the use of violence by the person -- the jury determined that death was the appropriate punishment for the previously found premeditated murder by Sutton [Addendum No. 18, p. 5512].

### C.    Post-Conviction Proof

Filing a *pro se* petition for post-conviction relief on March 3, 2003, Sutton initiated state court post-conviction proceedings.  Sutton's state post-conviction hearing was held on May 25-26, 2004.  His first witness was one of his two his trial attorneys, Mr. John Goergen. Mr. Goergen was licensed to practice law in 1992 and was appointed to represent Sutton in 1994 or 1995 [Addendum 35, p. 6746].

At the time Mr. Goergen was appointed to represent Sutton, he had never handled a felony case and had only handled one misdemeanor criminal case (telephone harassment) which was disposed of with a plea.  Mr. Goergen attended a capital defense training seminar in Nashville to help him prepare and try Sutton's case.  However, even though Mr. Goergen viewed his job as one of assisting Francis Duncan Gibson, III, lead counsel on the case, he filed a motion to withdraw from representing Sutton after the funds for a jury expert were withdrawn because he did not feel qualified to handle jury selection alone [Addendum No. 35, pp. 6752-58; 6802], but this motion was overruled by the trial court [Addendum No. 9, pp. 1588-89].

18

Mr. Goergen met with Mr. Gibson and Sutton three or four times before the first trial setting.[12]  Although Mr. Goergen did not investigate Sutton's background, the attorneys had almost daily contact for about two years on Sutton's case, and Mr. Goergen recalled some discussion about Sutton's truancy, drinking at an early age, and Sutton's abuse of alcohol. The attorneys were aware that there would be "two trials," and Mr. Goergen's function was to prepare for the guilt/innocence phase while Mr. Gibson took charge of the penalty phase [Addendum No. 35, pp. 6759-60].

Mr. Goergen testified that, although Sutton's and Dellinger's attorneys worked together on a defense, Mr. Gibson told Dellinger's defense attorneys that "once we get into the trial, we'll all be on our own . . . if I have to cut your guy's throat, I'll do it." [Addendum No. 35, p. 6769].[13]  Mr. Goergen acknowledged that the defense teams in this case had an open-file policy with one another and shared an investigator.  Although Mr. Gibson tried to have Sutton's case severed from Dellinger's, the motion was denied and he did not appeal the denial of the severance.  The attorneys were aware that there was no physical evidence

---

[12]Mr. Goergen explained that the trial was initially set for the early part of the year, but it became evident during jury selection that there was an insufficient number of available jurors.  As a result, they were not able to complete the jury selection process, and a new trial date was scheduled [Addendum No. 35, pp. 6779-80].

[13]Dellinger was represented at trial by Mr. Eugene Dixon and Mr. Charles Deas [Addendum No. 12, Vol. 1, p. 1998].

19

against Sutton, and they were unable to locate Bill Cogdill to determine whether he was involved [Addendum No. 35, pp. 6769-75].[14]

Although Dr. Wolfe was not board certified, Mr. Goergen testified that they believed that his experience as medical examiner of one of the counties in Tennessee for several years was sufficient experience for their purposes [Addendum No. 35, pp. 6817-22].

Mr. Gibson, Sutton's lead trial attorney, testified he was licensed to practice law in 1967 and entered private practice in 1975. Although Mr. Gibson had seventeen years of experience at the time he was appointed to represent Sutton and had handled many criminal cases, including several homicide cases, this was his first death penalty case [Addendum No. 35, pp. 6989-90].

According to Mr. Gibson, he discussed sentencing with Sutton and his brother, and Dr. Engum was used as a psychologist and mitigation expert for the sentencing proceeding. Both Mr. Gibson and Dr. Engum spoke with family members and other witnesses several times, and even had group meetings on occasions with the witnesses. Although Dr. Engum was working separately, they remained in contact, and Mr. Gibson received Dr. Engum's input on whether to use certain witnesses from a psychological standpoint. In addition, the investigator utilized by Sutton's defense team interviewed potential mitigation witnesses. Mr. Gibson testified they interviewed "forty or fifty" people in preparation for trial

---

[14]There is a discrepancy between the testimony of Mr. Goergen and Mr. Gibson as to whether Cogdill testified at the trial of Sutton. The record reflects that Cogdill did not testify during Sutton's trial but did testify at Connie Branam's murder trial [Addendum No. 12, Vol. 1, pp. 1999-2011].

[Addendum No. 35, p. 6998]. Mr. Gibson said he was unable to locate Sutton's wife and child, but he tried to have as many family members as possible attend the trial [Addendum No. 35, pp. 6999-7000].

According to Mr. Gibson, the investigation revealed that Sutton was an alcoholic, came from a broken family, depended heavily upon relatives, was socially withdrawn, was a follower, had a low IQ, did not graduate from high school, and had some discipline problems while in school. In addition, the investigation revealed that Sutton was working, was making money, was achieving a minimum level of independence, and was easily persuaded to do things [Addendum No. 35, pp. 6989-7002].

Before Sutton's and Dellinger's defense attorneys began working as a team, they contacted Mr. Lance Bracy of the Board of Professional Responsibility to determine if there would be a conflict if the two teams shared certain information. To Mr. Gibson's knowledge, no ethical conflict ever arose. The relationship between the two sets of attorneys was described by Mr. Gibson as follows:

> Before [they worked as a team], we contacted Mr. Lance Bracy of the Board of Professional Responsibility because there were a lot of issues that affected both people. And we were wanting to have a meeting, kind of like - -I think at that time the "Dream Team" was the thing. The Simpson trial may have been going on. And we wanted to meet together to kind of assign things. Because there were issues that affected both, there were issues that affected one and issues that affected the other. So, we would periodically meet and assign tasks that, you know, research tasks, witness tasks, things of that nature, to get together and meet together and decide how best to use it to benefit both or - - and, you know . . . . But if there was an issue that directly involved Gary that I didn't think the other side should know, I dealt with it outside of those meetings. And there were some of those.

. . . .

[It was necessary to contact Lance Bracy] [b]ecause of two teams, two Defendants meeting together, their teams sharing information. We wanted to make sure there was no conflict as long as we were doing that. And our idea was the joint issues, because we filed for severance and didn't get it. So, we wanted to meet together to kind of reduce the responsibility. Like it was silly for me to be working on the same issue another lawyer was, when we could use that time - - better to work on issues that would benefit both.

. . . .

. . . [I]f we wanted something dealt with that did not - - that we didn't think Mr. Dellinger's team would need to know, we never brought it up at these meetings and Mr. Goergen and I would deal with it outside. And I'm sure they did the same. There were people that we talked to that we didn't divulge to the other side that might have had some effect . . . I know we checked out several lawyers with several theories from the Sevier County team that we never let the other side know about.

[Addendum No. 35, pp. 7002-04].

Prior to trial, Mr. Gibson filed an ex parte motion requesting a ballistics expert, an arson expert, psychological expert, and an investigator. The Sutton and Dellinger defense teams agreed to use one investigator for both defendants, and Mr. Gibson thought they discussed this fact with Mr. Bracy. To his knowledge, no conflict ever arose in relation to the investigator. Mr. Gibson believed that he probably covered the potential conflicts with Sutton and his family. Mr. Gibson spoke alone with the Sevier County attorneys about the Sevier County case; that case was not investigated as a team [Addendum No. 35, pp. 7005-07].[15]

---

[15]The Sevier County case was the first degree murder trial of Griffin's sister, Connie Branam. Although Ms. Branam was murdered after Griffin, the Branam murder case was tried first.

As to the denial of Sutton's motion for a severance, Mr. Gibson testified that he considered filing an interlocutory appeal on the denial, but decided not to do so because:

> My personal opinion of interlocutory appeals is they are rarely successful. And these gentlemen were wanting to get it over with, as I recall. And an interlocutory appeal on a severance is basically a judge's discretion, which is, you know - -and I felt like that it was a good issue for an appeal, that he didn't grant a severance. Because there was some evidence that we went to that [sic] affected Dellinger and didn't affect Sutton - - you know, could have, that we dealt with pretrial. So, I felt it was more appropriate to bring it up on direct appeal, particularly having our own separate jury

[Addendum No. 35, p. 7008]. However, on direct appeal, the trial court's denial of severance and two separate juries was affirmed. *State v. Sutton*, 79 S.W.3d 458, 468 (Tenn. 2002).

When asked to assume that a complaint was made by Sutton that his trial attorneys failed to obtain deposition testimony of unavailable witnesses, Joyce Tipton, Bill Cogdill, and Janice Reed, Mr. Gibson responded:

> Well, Bill Cogdill testified. So, I didn't see any need to get a deposition of him. We knew what he was going to say. And we brought him down to testify. As I recall, [Joyce] Tipton was a lady that - -in the record, noticed that there was some reports that she may have had some mental problems we were attempting to use her. And she had about five minutes worth of testimony from a prior trial about some weird statements that were attributed to Bill Cogdill. And we honestly didn't know why the[y] got into the evidence anyway, because they were clearly hearsay. But in any event, notwithstanding that, it was a trial decision. We decided it wasn't worth putting her on and trying to get that in, when the State could then bring in the psychologist from Lakeshore to say she had been having ongoing mental problems, trying to make it look like she was, you know, not capable of being a good witness, shall I say . . . I don't specifically recall [Janice Reed]. I'm sure we went over it. If it was given to us, we went over that and made a decision whether or not to use them.

[Addendum No. 35, pp. 7017-18].

According to Mr. Gibson, he selected Dr. Wolfe because he was a friend and Mr. Gibson had used Dr. Wolfe in the past when Mr. Gibson needed a medical opinion. When asked if he had any concerns that Dr. Wolfe was not board certified, Mr. Gibson explained:

> Well, he was appointed as the coroner of Union County, Tennessee, and I didn't have any concerns about it. Because he was a good witness, he was a conscientious man. I think he was - - at that time, he was, I thought would come across - - he was a country doctor who gave up a very lucrative practice to go into a clinic in the poor folks area, and he was translating the Dead Sea Scrolls, and I felt like this would - - you know, his personality would overcome that. I knew he wasn't Board certified, but he's a doctor and he was certified as a coroner - - or listed as a coroner in Union County for several years.

[Addendum No. 35, pp. 7010-11].

Sutton's lawyers also used Dr. Ellington, the State's witness, to obtain information the lawyers thought valuable to their case theories, and, as Mr. Gibson further explained, contacted other experts to assist them:

> Well, as I recall, I used the Tennessee Criminal Defense Lawyer's e-mail list, so any questions that come up on that, I may have gotten some ideas from other fellow attorneys, as most of us do in a case like this. I know we consulted with several leading lawyers - - Herb Moncier, Tom Dillard, Bob Ritchie. Jerry Cunningham actually testified for us in the preliminary hearing for getting us a jury selection expert. So, we kind of picked the brains of those persons. We also talked to Dr. Ellington, who was not on our list; Dr. Blake, who we chose not to use - - and effectively prevented him from being used by the State. Because one of our objections was he had already been interviewed by us, and Judge Thomas wouldn't let him testify for the State. I also - - perhaps, maybe the investigator may have talked to some of them. But, now . . . I pretty much knew who I wanted to use because of past experience, like most lawyers. I was comfortable with the team I had . . . . We were investigating the shotgun shells - - I mean, the blast that was heard by the witness up in the area where they found the body. They had heard shots the night before, and I think we attempted, through the University, to talk to people to see how far sound would carry and what weather conditions would

have been, just for some information. I think we also made inquiry, written inquiry, of - - well, what I call a bug expert. When a body is located and it's been there for a certain period of time, what type of insects and all should be around the body, just for our cross-examination purposes and assistance in developing a lead - - or a theory that we were going to have concerning the rigor mortis theory . . . I've forgotten his name. He was out of LSU, I think it was. And we called him down there at LSU - - the expert, we talked to at LSU. And the sound laboratory was over at the University of Tennessee. And also we talked to a music studio, you know, where they record records.

[Addendum No. 35, pp. 7020-21].

Mr. Gibson's strategy during sentencing was to portray Sutton in the most positive light he could by letting the jury know how much good he had done for other people and how he had behaved in jail, all in an effort to convince the jury that Sutton's life should be spared. Although Dr. Engum touched on some of Sutton's harsh upbringing, Mr. Gibson did not want to use that aspect as an excuse for the crime. According to Mr. Gibson, the defense also said they tried to portray that only one person shot the victim. Specifically, they attempted to show Sutton was friends with the victim and would not have shot him, thus insinuating it was Dellinger who actually shot Griffin and that Sutton was just following Dellinger [Addendum No. 35, pp. 7043-47].

Dr. Pamela Mary Auble, a psychologist with a specialty in neuropsychology and forensic psychology, testified that Sutton's defense team did not present a comprehensive social history during the sentencing phase of the trial, which she believed to be absolutely necessary when presenting mitigating evidence in a death penalty case. According to Dr. Auble, although Dr. Engum mentioned there was abuse in Sutton's background, there was no explanation or detail concerning Sutton's background provided to the jury. Moreover,

25

according to Dr. Auble, there is little in Dr. Engum's testimony or notes that reflects any social history gathered from Sutton though the notes do reflect a small amount of information gathered from a short interview with the family as a group [Addendum No. 35, pp. 6831-32].

Dr. Auble believed that Sutton's alcoholism and the fact that Dellinger provided Sutton with alcohol at a young age were relevant mitigation issues that should have been explored [Addendum No. 35, pp. 6823-34]. Dr. Auble explained that this evidence was relevant mitigating evidence because:

> Mr. Dellinger was much older than Mr. Sutton, like fifteen years older than he was. And Mr. Sutton grew up in a family where his parents were not there for him, basically. He didn't live with his mother. His mother was afraid of intervening too much in the father's family, for fear she would not see her son anymore. His father was alcoholic and was a very hard worker and was not really there much.

> The person that Mr. Sutton had the most contact with during his childhood was his stepmother, who was very emotionally unstable and physically abusive. And there's just numerous accounts of her lashing out and striking Mr. Sutton, even biting Mr. Sutton, for little or no provocation. So that Mr. Sutton was growing up in a family where he really didn't have a parent, except for his stepmother who was abusive. He would have been flattered by the attentions of Mr. Dellinger, who was older, kind of a parental figure.

> He would have also seen Mr. Dellinger as a potential protector from his stepmother. Apparently, he stayed with Mr. Dellinger pretty frequently while he was a child - - or when he was a young adolescent. So, this would also have influenced him in starting to drink so young. And being provided with alcohol by Mr. Dellinger, he would be prone to take it and to use it.

> . . . I think that he was under the domination of Mr. Dellinger since he was a child; both, as I said, as sort of an escape or as a parental figure. And then later, I think he grew to fear Mr. Dellinger.

[Addendum No. 35, pp. 6835-36].

Dr. Auble interviewed Sutton; conducted psychological and neuropsychological testing on Sutton; reviewed records from Middle Tennessee Mental Health Institute, Dr. Engum, and schools Sutton attended; and examined psychiatric history records from Sutton's stepmother. In addition, Dr. Auble reviewed the testimony offered at the sentencing hearing and reviewed summaries of interviews with various family members. Based on her investigation and testing, Dr. Auble concluded there was relevant mitigation evidence not presented on behalf of Sutton [Addendum No. 35, pp. 6831-32].

Dr. Auble explained that two defense teams working so closely together would have created a problem because, for example, the juvenile charges from Georgia involved Sutton, Sutton's older brother, and Dellinger. That incident, according to Dr. Auble, could have been used to illustrate Dellinger's propensity toward violence and aggression and could have explained why Sutton was afraid of Dellinger.[16] Dr. Auble found Sutton to be of limited intelligence. She noted that he has consistently been in the borderline range of functioning on the Wexler tests, as demonstrated by evaluations performed by the Tennessee Mental Health Institute, Dr. Engum, and herself. Sutton's IQ has been in the 70's, which is the lower end of intellectual ability. Dr. Auble testified that Sutton's weaknesses are mainly in the area of verbal knowledge and reasoning, with the lowest score being in verbal comprehension [Addendum No. 35, pp. 6844-45].

---

[16]The juvenile conviction from Georgia which was introduced at trial was based on Sutton's brother shooting a gun [Addendum No. 16, Vol. III, pp. 5080-82]. A review of the record does not reveal how these charges would have illustrated Dellinger's propensity for violence and aggression.

Dr. Auble discussed studies that indicate presenting positive information about a defendant as mitigating evidence, which is what Sutton's defense introduced during his sentencing hearing, is fairly ineffective mitigating evidence and carries very little weight in jury decision-making in capital cases. Therefore, she concluded within a reasonable degree of psychological certainty that a defense strategy focused only on positive-type information "is unlikely to carry significant weight with the jury in their decision-making process" in a sentencing hearing [Addendum No. 35, p. 6846]. However, she acknowledged that innocence and mental retardation, two factors that are not applicable to Sutton, carry the most weight during sentencing. She also testified that brain injury carries weight and negative childhood carries some weight, though not a great deal, but does have some impact on juries depending on how it is developed. To carry some weight, however, Dr. Auble insisted the defense must present an expert to testify about the negative childhood experiences, along with lay witnesses who testify about the same subject. Dr. Auble concluded that Sutton's defense team failed to prepare a thorough and proper investigation of his social background [Addendum No. 35, pp. 6846-48].

On cross-examination, Dr. Auble explained that her opinion concerning a lack of social background investigation was based on the information provided to her, which did not include defense attorneys' files nor a conversation with defense counsel. She admitted that she lacked any knowledge as to the kind of investigation or social history the defense attorneys had performed or constructed. Dr. Auble also admitted that the evidence reflects that Dr. Engum interviewed Anna Morris, Sutton's mother, who told him that both Sutton's

28

father and Dellinger had exposed Sutton to alcohol. Dr. Engum's notes reflect that Sutton's father had locked him out of his house and that Sutton had stayed in the dog house on at least one occasion; however, Dr. Auble noted that Dr. Engum obtained that information after he prepared his report and did not present that information to the jury [Addendum No. 35, pp. 6849-54].

Sutton's family members testified at the post-conviction proceeding about Sutton's life and his upbringing. Jimmy Sutton, Sutton's older brother, testified that Sutton came to live with him and their father when Sutton was six or seven. Their father married Shirley Gregory, and Sutton lived with them for a year or two. Jimmy said there was a lot of hollering, screaming, and arguing in the household. Jimmy said that Shirley would beat Sutton and her children, and that Shirley would beat Sutton with clothes hangers, sticks, and belts when she got angry [Addendum No. 35, pp. 6867-68; 6871-73].

When Sutton was a pre-teenager, Dellinger started picking up Jimmy and Sutton almost every weekend, and they would drive around and drink. One night, Sutton's father called law enforcement three times. Each time officers took Sutton out of Dellinger's car and brought him home, but Dellinger would return to the house and get Sutton [Addendum No. 35, pp. 6874; 6880-81]. Jimmy was afraid of Dellinger because he often saw him fight. One time while they were in Georgia, Dellinger threw a knife at Jimmy and hit him in the arm. When Sutton was about 16 years old he moved to Georgia with Dellinger who left Tennessee because he had numerous outstanding warrants in Sevier County for rape, stealing, and other offenses [Addendum No. 35, pp. 6866-6900].

Diane Sutton, Sutton's sister-in-law, also testified that she observed Sutton's stepmother abusing Sutton. According to Diane, Shirley was unstable and would attack Sutton with her hands and fists. According to Diane, she treated her own children the same way and that is why she did not have custody of them. When Sutton's father would go to work, he would make Sutton go to Diane and Jimmy's house or to his grandmother's house so that he would not be left alone with his stepmother, Shirley. Diane further testified that Dellinger had a rough reputation. She related that Dellinger shot the windshield out of Sutton's car on one occasion, shot at his car another time, and also pulled a gun on Sutton in Georgia during the same incident in which Dellinger stabbed Jimmy [Addendum No. 35, pp. 6901-25].

Anna Morris divorced Sutton's father when Sutton was three. She remarried and lived in North Carolina and Kentucky before moving back to Tennessee. When Sutton was six, he moved in with his father and grandmother because the grandmother said she would help with Sutton and take him back and forth to school. According to Ms. Morris, she was not concerned when her ex-husband married Shirley until Sutton started telling her what Shirley was doing to him. According to Ms. Morris, Sutton basically had to raise himself and was living in Georgia working to support himself at 15 years of age [Addendum No. 35, pp. 6925-42].

Pat Sutton is the wife of Sutton's uncle, Jim Sutton. She lived within 500 feet of Sutton's father's home during Sutton's childhood. Pat testified that Sutton's mother had very little contact with Sutton and that Shirley was always cussing, yelling, and beating him.

When Sutton was nine or ten, he lived in a camper on his father's property because Shirley did not want him in the house. Pat also testified that she would observe bite marks on Sutton's arms and scratches on his arms, face, and neck. Often, these observations were preceded by sessions of Shirley cussing and yelling at Sutton. This behavior occurred for three to five years. On one occasion, a Department of Human Services caseworker went to Sutton's house, saw where Shirley had pulled out Sutton's hair, and observed scratch marks on Sutton. However, the caseworker never returned, and no one ever followed up on the complaint [Addendum No. 35, pp. 6958-59].

Pat also observed Sutton being locked out of the house when his father and Shirley went to work. Sutton would have to drink water from the outside spigot and would have to eat at someone's house unless he had food in the camper. She observed Sutton crying with an earache and fluid running out of his ears, but neither his father nor Shirley ever took him to the doctor. Pat and his grandmother were the only ones who took him to see the doctor. Pat described the inside of Sutton's home as "nasty" with dishes on the bar and in the sink, clothes everywhere, and beds unmade [Addendum No. 35, p. 6960].

Although Sutton was put on the school bus or taken to school, Pat further testified, Dellinger would go around the back of the school and pick him up. As a result, Sutton rarely attended school. Pat testified that this pattern started when Sutton was eight or nine years old and when Dellinger was in his twenties. According to Pat, Sutton liked the attention because Dellinger showed him the attention his mother and father never showed him. Pat

believes that if Sutton had been loved and taken care of he would not be where he is today [Addendum No. 35, pp. 6954-63].

The State called Sutton as a witness at the post-conviction proceeding with the understanding that it would not be permitted to question him about the crime for which he was convicted. Sutton admitted to drinking and being an alcoholic. While in Georgia, Sutton met his future wife when both were 15 years old. After dating for almost two years they moved to Tennessee and lived together in Sutton's old camper. They finally married when they were both approximately 21 years of age. Sutton's daughter was born in 1990. When Sutton returned to Tennessee, he worked for his grandfather on his farm and for his uncles in their excavating businesses doing bulldozer work. Later, he went to work at A.J. King's Lumber Company with his father and then worked for Goodin Homes [Addendum No. 35, pp. 6970-84].

Dellinger remained in Georgia for approximately four years after Sutton moved back to Tennessee. Sutton testified he did not have any contact with Dellinger during that period of time except for two or three occasions when Dellinger tried to kill him. Sutton, however did not provide any details about Dellinger's alleged attempts to kill him, and Sutton appeared to contradict himself when he testified:

> Actually, I guess the first time actually that I had actually talked to him, probably, was when I was seventeen, when they had locked me up over the incident we had had in Georgia, they had actually put him in the jail cell with me. And the guys actually was - - I had been there for like seven or eight months, something like that. And they had - - the guys there that I was telling, you know, that he had had me arrested, we had been setting and talking about it, you know. And there was some guys there - - actually about six guys there

that was charged with murder. And, you know, they was sitting there talking about it and they wanted to jump on him when he come in. You know, they had got knives and stuff and was talking about killing him there in the jail cell. And, you know, I told them, you know, I didn't want them to do it and stuff. I said, it's my brother's brother and stuff, you know, and I said you know, I really ain't got nothing for him. But I kind of talked them out of doing anything to him, you know. And that was basically the first time we had talked in - - it was probably - - I guess probably seven or eight months after that, he showed up at my dad's one day, you know, after that, after we had got out. And that was the first time I'd actually got back around him.

. . . .

. . . Sometimes, we'd get together on the weekends and drink. And sometimes it might - - you know, through the week, it just - - it depended. Sometimes we'd get out and sometimes we'd stay out a week or something, drinking. But . . . we'd go, like, on the weekends out maybe to bars and stuff like that, you know. And usually it was riding around, like, in the mountains, drinking and stuff like that, you know occasionally . . . . [That went on] [p]robably five or six years, I guess, me and him and Tommy Griffin. Basically, we was together about most every day. You know, after I'd get off from work - - they was usually done together, you know, and I'd get off from work and we'd all three be out drinking, you know.

[Addendum No. 35, pp. 6985-88].

According to Sutton, he was not afraid of Dellinger when he was a child or as an adult, although he did worry over the incident in Georgia where Dellinger threw a knife at Sutton's brother and threatened to shoot Sutton. Sutton claimed, without elaborating, that there were other occasions when he and Dellinger had problems [Addendum No. 35, p. 6988].

33

## III.    STANDARDS OF REVIEW

### A.    Habeas Claims Cognizable Under 28 U.S.C. § 2254

A federal district court has jurisdiction to grant a writ of habeas corpus pursuant to § 2254 of Title 28 to the United States Code.  Section 2254(a) limits the court's jurisdiction to those cases in which a petitioner "in custody pursuant to the judgment of a state court" alleges "he is in custody in violation of the Constitution or laws or treaties of the United States."  The initial question in a habeas petition is, therefore, whether the petitioner raises claims cognizable under § 2254(a).

### B.    Review of Habeas Claims on the Merits

Section 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), limits a federal district court's jurisdiction to review habeas claims on the merits.  In particular, a court considering a habeas claim must defer to any decision by a state court concerning that claim unless the state court's judgment (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d)(1)-(2).  The Supreme Court has interpreted the language of § 2254.  *See Williams v. Taylor*, 529 U.S. 362, 402 (2000) (O'Connor, J., delivering the opinion of the Court as to Part II and concurring as to Parts I and III-V); *see also Harris v. Stovall*, 212 F.3d 940 (6th Cir. 2000), *cert. denied*, 532 U.S. 947 (2001) (construing *Williams*).

According to the *Williams* Court, the phrase "clearly established Federal law, as determined by the Supreme Court of the United States" refers to "holdings, as opposed to dicta, of [the Supreme Court's] decisions as of the time of the relevant State-court decision." *Williams*, 529 U.S. at 412. Hence, a federal district court hearing a habeas corpus petition may not look to lower federal court decisions to determine whether the state court's decision "was contrary to, or involved an unreasonable application of, clearly established law." *See id.*; *Harris*, 212 F.3d at 943-44.

The phrase "contrary to . . . clearly established precedent" means "substantially different from the relevant precedent of [the Supreme Court]." *Williams*, 529 U.S. at 405. A state court decision is "contrary to . . . clearly established precedent" if the state court applied a rule contradicting the governing law set forth in Supreme Court cases or the state court confronted a set of facts materially indistinguishable from a Supreme Court decision and arrived at a different result. *Id.* at 405-08. But a state court decision applying valid Supreme Court precedent does not fall within the "contrary to" language and cannot be reviewed by a federal court under § 2254(d)(1), even if the federal court would have reached a different result in applying the rule.

The phrase "an unreasonable application of . . . clearly established precedent" means an "application of clearly established law [that] was objectively unreasonable." *Id.* at 409. It does not mean "an incorrect application of federal law." *Id.* at 410 (emphasis original). Hence, if a federal court concludes in its independent judgment that the state court decision

applied clearly established federal law erroneously or incorrectly, it can grant habeas relief under § 2254(d)(1) only if the application was also unreasonable. *Id*. at 410-13.

## C. Factual Bases for Habeas Claims

In reviewing a state court's adjudication of a habeas claim, the federal district court must presume the state court's factual determinations were correct. 28 U.S.C. 2254(e)(1). The petitioner may rebut this presumption of correctness by clear and convincing evidence. *Id*. If the petitioner has failed to develop the factual basis for his habeas claim in the state court proceedings, however, he generally is not entitled to an evidentiary hearing unless (1) the legal or factual basis of the habeas claim did not exist at the time of the state court proceedings, and (2) "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense." *Id*. at § 2254(e)(2).

A petitioner "fail[s] to develop the factual basis" for his habeas claim in the state court proceedings through a lack of diligence or some greater fault attributable to him or his counsel. *Williams*, 529 U.S. at 431-35. Congress intended that "prisoners who are at fault for the deficiency in the state court record must satisfy a heightened standard to obtain an evidentiary hearing." *Id*. Hence, whether a petitioner must satisfy the heightened standard imposed by § 2254(e)(2) depends on whether the petitioner was diligent in his efforts to develop a factual basis for his claim, not on whether the facts could have been discovered or whether those efforts would have been successful. *Id*. at 433-37.

36

Lack of diligence will not bar an evidentiary hearing if efforts to discover the facts would have been in vain because there is no relationship between the petitioner's fault and the impossibility of discovery. 28 U.S.C. § 2254(e)(2)(A)(I). Similarly, a petitioner's lack of diligence or fault will not bar a hearing if there is clear and convincing evidence a reasonable trier of fact would not have found the petitioner guilty of the underlying offense but for constitutional error, *id*. at § 2254 (e)(2)(B), or if a new rule of constitutional law not available at the time of the earlier proceedings is made retroactive to cases on collateral review by the Supreme Court. *Id*. at § 2254(e)(2)(A)(I). Thus, a petitioner who failed to develop the factual basis of a claim in state court proceedings through lack of diligence or fault has an opportunity to obtain an evidentiary hearing if the legal or factual basis of the claim did not exist at the time of state court proceedings. *Williams*, 529 U.S. at 435-37.

In summary, a prisoner must be diligent in developing the record and, if possible, in presenting all claims of constitutional error so the state court will have its rightful opportunity to adjudicate federal rights. If the prisoner contributes to the absence of a full and fair adjudication in state court and fails to diligently develop the record, then an evidentiary hearing is prohibited in federal court pursuant to § 2254(e)(2) unless the statute's other stringent requirements are met. *Williams v. Taylor*, 529 U.S. 420, 437 (2000). If a prisoner made insufficient effort to pursue a claim in state court, then he will be prohibited from pursuing the claim in federal court. However, if a prisoner failed to develop the factual basis of a claim because he was unable to develop his claim in state court despite diligent

effort, then an evidentiary hearing will not be barred by § 2254(e)(2). *See Williams*, 529 U.S. at 437.

### D.     Procedural Default

Section 2254(b) limits a federal court's jurisdiction to hear a habeas claim to those cases in which a petitioner has exhausted all available state court remedies:

> (1)     An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted unless it appears that—
>
> (A)     the applicant has exhausted the remedies available in the courts of the State; or
>
> (B)     (i)     there is an absence of available State corrective processes; or
>          (ii)    circumstances exist that render such process ineffective to protect the rights of the applicant.
>
> (2)     An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

28 U.S.C. § 2254(b); *see also Granberry v. Greer*, 481 U.S. 129, 133-34 (1987); *Rose v. Lundy*, 455 U.S. 509, 519 (1982); Rules Governing § 2254 Cases in the U.S. District Courts R. 4.

A petitioner has failed to exhaust his available state court remedies if he still has the opportunity to raise his claim by any available state court procedure. *Gray v. Netherland*, 518 U.S. 152, 161 (1996), *Preiser v. Rodriguez*, 411 U.S. 475, 477, 489-90 (1973); *Gall v. Parker*, 231 F.3d 265, 283-84 (6th Cir. 2000), *cert. denied*, 533 U.S. 941 (2001). To exhaust these state remedies, the petitioner must have presented to the state courts both the legal basis

of the claim for which he seeks habeas relief and the factual basis of the claim. *Gray*, 518 U.S. at 162-63 (stating that the exhaustion requirement is not satisfied "by presenting the state courts only with the facts necessary to state a claim for relief"); *Picard v. Connor*, 404 U.S. 270, 275-76 (1971); *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994). The factual allegations made in federal court must be the same factual allegations made in state court, and the substance of a federal habeas claim presented to the federal court must first be presented to the state court. *Picard*, 404 U.S. at 276.

When a petitioner raises different factual issues under the same legal theory, he is required to present each factual claim to the highest state court in order to exhaust his state remedies. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999). A petitioner has not exhausted his state remedies if he has merely presented a particular legal theory to the courts without presenting each factual claim. *Pillette v. Foltz*, 824 F.2d 494, 497-98 (6th Cir. 1987). Moreover, each factual claim must be presented to the state courts as a matter of specific federal law. *Gray*, 518 U.S. at 163 ("It is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the 'substance' of such a claim to a state court"); *Duncan v. Henry*, 513 U.S. 364, 366 (1995) ("If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court"); *see also Anderson v. Harless*, 459 U.S. 4, 6 (1982) ("It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar State-law claim was made").

39

Conversely, if a petitioner presented the substance of his habeas claim to the state courts, an elaboration of the facts or legal theories will not result in a new claim. *Jones v. Washington*, 15 F.3d 671, 674-75 (7th Cir.), *cert. denied*, 512 U.S. 1241 (1994). The standard for determining whether the petitioner has exhausted the factual basis of his claim is whether the additional facts "fundamentally alter the legal claim already considered by the state courts." *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986). The supplementation and clarification of the state court factual record does not necessarily change a claim so dramatically as to require that the state courts be given a new opportunity to hear the issues. *Id.* at 258-60. The "failure to make every factual argument to support [a] claim does not constitute a failure to exhaust." *Patterson v. Cuyler*, 729 F.2d 925, 929 (3rd Cir. 1984); *see also Picard*, 404 U.S. 270 (discussing how a claim may be fairly presented to the state court without citing chapter and verse of the Constitution).

At bottom, a claim sought to be vindicated in a federal habeas proceeding must have been raised in the state courts so that the state courts have the first opportunity to hear the claim. The state court to which the petitioner presented the issue of federal law must address the merits of those claims. *Coleman v. Thompson*, 501 U.S. 722, 734-35 (1991). If the state court decides those claims on an adequate and independent state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, the petitioner is barred by this procedural default from seeking federal habeas review, unless he can show cause and prejudice for that default. *Edwards v. Carpenter*, 529 U.S. 446 (2000); *Teague v. Lane*, 489 U.S. 288, 297-99 (1989); *Wainwright v. Sykes*, 433 U.S. 72, 87-88

40

(1977). Cause for a procedural default depends on some "objective factor external to the defense" that interfered with the petitioner's efforts to comply with the procedural rule. *Coleman*, 501 U.S. at 752-53; *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

### E. Miscarriage of Justice: Actual Innocence

A petitioner may avoid the procedural bar and the necessity of showing cause and prejudice by demonstrating "that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. The petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent of the crime." *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (quoting *Carrier*, 477 U.S. at 496). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.*; *see also Sawyer v. Whitley*, 505 U.S. 333, 339 n.5 (1992) (holding that a petitioner must "show a fair probability that, in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial, the trier of the facts would have entertained a reasonable doubt") (citations omitted).

When raising a gateway claim of actual innocence, a habeas petitioner must demonstrate "an independent constitutional violation occurring in the underlying State criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993). Thus, as a gateway claim, "a claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim

41

considered on the merits." *Id*. at 404. The Supreme Court has explicitly tied the fundamental miscarriage of justice exception to the petitioner's innocence to ensure the exception would remain rare and only be applied in the extraordinary case, while also ensuring relief would be extended to those who are truly deserving. *See Schlup*, 513 U.S. at 299.

A "freestanding claim" of actual innocence is a petitioner's attempt to prove his innocence outright. *See House v. Bell*, 547 U.S. 518, 554-55 (2006). Although the United States Supreme Court has never explicitly recognized a freestanding claim of actual innocence, it recognized the possibility of such a claim and the "extraordinarily high" burden a petitioner would have to meet in *Herrera v. Collins*, 506 U.S. 390 (1993):

> We may assume, for the sake of argument in deciding this case, that in a capital case a truly persuasive demonstration of "actual innocence" made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim. But because of the very disruptive effect that entertaining claims of actual innocence would have on the need for finality in capital cases, and the enormous burden that having to retry cases based on often stale evidence would place on the States, the threshold showing for such an assumed right would necessarily be extraordinarily high. The showing made by petitioner in this case falls far short of any such threshold.

*Id.* at 417.

Although the issue of a freestanding innocence claim was before the Supreme Court in *House v. Bell,* 547 U.S. 518 (2006), and the Court observed that "House urges the Court to answer the question left open in *Herrera* and hold not only that freestanding innocence claims are possible but also that he has established one[,]" the Court declined to resolve the issue. *House*, 547 U.S. at 554-55. Instead, the Court concluded :

42

We conclude here, much as in *Herrera*, that whatever burden a hypothetical freestanding innocence claim would require, this petitioner has not satisfied it. To be sure, House has cast considerable doubt on his guilt-doubt sufficient to satisfy *Schlup's* gateway standard for obtaining federal review despite a state procedural default. In *Herrera*, however, the Court described the threshold for any hypothetical freestanding innocence claim as "extraordinarily high." 506 U.S., at 417, 113 S.Ct. 853. The sequence of the Court's decisions in *Herrera* and *Schlup*-first leaving unresolved the status of freestanding claims and then establishing the gateway standard-implies at the least that *Herrera* requires more convincing proof of innocence than *Schlup*. It follows, given the closeness of the *Schlup* question here, that House's showing falls short of the threshold implied in *Herrera*.

*Id.* at 555.

In summary, whether raising a gateway innocence claim or a freestanding innocence claim, it appears that a petitioner is required to present new reliable evidence that was not presented at trial. Once armed with the new evidence, a petitioner asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt, *Schlup,* 513 U.S. at 328, and a petitioner asserting a freestanding innocence claim must meet an "extraordinarily high" standard which the Supreme Court has not yet defined. *House*, 547 U.S. at 555.

Finally, the miscarriage of justice exception is concerned with actual—not legal—innocence. *See Smith v. Murray*, 477 U.S. 527, 537 (1986). Hence, to show "actual innocence" of the death penalty imposed, a petitioner must show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found petitioner eligible for the death penalty. *See Sawyer*, 505 U.S. at 336. Actual innocence "does not

translate easily into the context of an alleged error at the sentencing phase of a trial on a capital offense." *Smith*, 477 U.S. at 537, *quoted in Sawyer*, 505 U.S. at 339-40. "Actual innocence" of the death penalty is a very narrow exception and must be determined by relatively objective standards. The "actual innocence" requirement must focus on those elements that render a defendant eligible for the death penalty and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error. *Sawyer*, 505 U.S. at 347.

## F.     Summary Judgment

Under Rule 56(c) of the Federal Rules of Civil Procedure, the Court will render summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The burden is on the moving party to conclusively show no genuine issue of material fact exists. *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994), *cert. denied*, 516 U.S. 806 (1995); *Kentucky Div., Horsemen's Benevolent & Protective Assoc., Inc. v. Turfway Park Racing Assoc., Inc*., 20 F.3d 1406, 1411 (6th Cir. 1994). The Court must view the facts and all inferences drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *In re Julien Co.*, 44 F.3d 426, 429 (6th Cir. 1995); *City Mgmt. Corp. v. U.S. Chemical Co., Inc*., 43 F.3d 244, 250 (6th Cir. 1994).

Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to an evidentiary hearing merely on the basis of allegations. The nonmoving party may not rest on its pleadings, but must come forward with

44

some significant probative evidence to support its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Lansing Dairy*, 39 F.3d at 1347; *Horsemen's Benevolent*, 20 F.3d at 1411; *see also Guarino v. Brookfield Twp Trs*, 980 F.2d 399, 404-06 (6th Cir. 1992) (holding that courts do not have the responsibility to search *sua sponte* the record for genuine issues of material fact). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

The Court determines whether sufficient evidence has been presented to make the issue of fact a proper question for the trier of fact, but does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435-36 (6th Cir. 1987). The standard for summary judgment mirrors the standard for directed verdict. The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a [fact finder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. There must be some probative evidence from which the fact finder could reasonably find for the nonmoving party. If the Court concludes a fair-minded fact finder could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment. *Id.*; *Lansing Dairy*, 39 F.3d at 1347; *Horsemen's Benevolent*, 20 F.3d at 1411.

## IV.    ANALYSIS

The Court will address Petitioner's numerous claims in his amended petition for writ of habeas corpus in the order in which he raised them in his amended petition [Doc. 24]. However, the Court will parenthetically number the claims as numbered in the amended petition.

### A.    Failure to Investigate and Present Evidence and State Court's Denial of Relief on This Claim was Objectively Unreasonable (Claim I)

Sutton maintains that the jury would have imposed a sentence of less than death if it had been informed of his alleged brain damage, Dellinger's control over him, and his family history of abuse and virtual abandonment by his parents.  Sutton therefore argues that his trial counsel was ineffective for failing to present the details of his home-life to the jury.  The Court will address these sub-issues separately after first analyzing the law applicable to ineffective assistance of counsel claims.

### 1.    Ineffective Assistance of Counsel

The criteria for analyzing a claim of ineffective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  *Strickland* requires a defendant to demonstrate two essential elements: (1) counsel's performance was deficient (*i.e.*, counsel was not functioning as counsel guaranteed the defendant by the Sixth Amendment), and (2) counsel's deficient performance prejudiced the defense (*i.e.*, deprived the defendant of a fair trial rendering the outcome of the trial unreliable).  *Id.* at 687-88; *see also McQueen v. Scroggy*, 99 F.3d 1302, 1310-11 (6th Cir. 1996), *cert. denied*, 520 U.S. 1257 (1997); *Sims*

46

*v. Livesay*, 970 F.2d 1575, 1579-81 (6th Cir. 1992); *Flippins v. United States*, 808 F.2d 16, 17-18 (6th Cir.), *cert. denied*, 481 U.S. 1056 (1987).

In order to demonstrate deficient performance, it must be shown that counsel's representation fell "below an objective standard of reasonableness" in light of the "prevailing professional norms." *Id.* at 686-88. The Supreme Court has recently reiterated that an objective standard of reasonableness is a general standard:

> No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Restatements of professional standards, we have recognized, can be useful as "guides" to what reasonableness entails, but only to the extent they describe the professional norms prevailing when the representation took place.

*Bobby v. Van Hook*, ___ U.S. ___, 130 S.Ct.13, 16 (2009) (quoting *Stickland v. Washington*, 466 U.S. at 688-89) (citations omitted).[17]

_____

[17]The ABA Standards for Criminal Justice 4-4.1, Duty to Investigate, and commentary 4.55 (2d ed.1980), which were in effect at the time of Sutton's trial provides as follows:

Standard 4-4.1. Duty to investigate

It is the duty of the lawyer to . . . explore all avenues leading to facts relevant to . . . the penalty in the event of conviction. . . .

The commentary to the above standard includes the following:

The lawyer also has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing. . . . Information concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant, as will mitigating circumstances surrounding the commission of the offense itself. Investigation is essential to fulfillment of these functions.

When applying these standards, the Court is cognizant of the fact that there is a strong presumption counsel's conduct was within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689. "Reviewing courts focus on whether counsel's errors have undermined the reliability of and confidence that the trial was fair and just." *Austin v. Bell*, 126 F.3d 843, 847 (6th Cir. 1997) (citing *Strickland*, 466 U.S. at 687; *United States v. Cronic*, 466 U.S. 648, 658, (1984), *cert. denied*, 523 U.S. 1088 (1998); *McQueen*, 99 F.3d at 1310-11). A reviewing court cannot indulge in hindsight but must instead evaluate the reasonableness of counsel's performance within the context of the circumstances at the time of the alleged errors. *Strickland*, 466 U.S. at 690; *McQueen*, 99 F.3d at 1311. Trial counsel's tactical decisions are particularly difficult to attack. *McQueen*, 99 F.3d at 1311; *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). A defendant's challenge to such decisions must overcome a presumption that the challenged actions might be considered sound trial strategy. *McQueen*, 99 F.3d at 1311; *O'Hara*, 24 F.3d at 828. "[R]eviewing court[s] must remember that 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Wong v. Money*, 142 F.3d 313, 319 (6th Cir. 1998) (quoting *Strickland*, 466 U.S. at 690). A court must make an independent judicial evaluation of counsel's performance and determine whether counsel acted reasonably under all the circumstances. *McQueen*, 99 F.3d at 1311; *O'Hara*, 24 F.3d at 828; *Ward v. United States*, 995 F.2d 1317, 1321-22 (6th Cir. 1993); *Sims*, 970 F.2d at 1580-81.

48

To establish the prejudice prong, a petitioner must show that absent his attorney's errors, the result of his trial would have been different. *Lynott v. Story*, 929 F.2d 228, 232 (6th Cir. 1991). "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the [ultimate] judgment." *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (quoting *Strickland*, 466 U.S. at 691 (further citation omitted)).

The Supreme Court has reiterated the standard of prejudice in *Wiggins v. Smith*, 539 U.S. 510 (2003):

> [T]o establish prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." . . . In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence.

*Id.* at 534 (quoting *Strickland v. Washington*, 466 U.S. at 694).

The question to be answered when a petitioner claims that counsel failed to present mitigating evidence "is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695.

In applying these standards to such a claim, the Supreme Court has found ineffective assistance of counsel when defense attorneys "failed to act while potentially powerful mitigating evidence stared them in the face, . . . or would have been apparent from documents any reasonable attorney would have obtained[.]" *Bobby v. Van Hook*, ___ U.S. at ___, 130

49

S.Ct. at 19 (citing *Wiggins*, 539 U.S. at 525, and *Rompilla v. Beard*, 545 U.S. 374, 389-393 (2005)). In addition, the Supreme Court has found ineffective assistance of counsel when an attorney failed to conduct a thorough investigation of the defendant's background, and, thereby, left undiscovered and unpresented a voluminous amount of mitigating evidence. *Williams v. Taylor*, 529 U.S. 362, 396 (2000). In each of these cases, the Supreme Court concluded counsel performed deficiently because the jury had no hint that the mitigating evidence even existed because trial counsel presented a picture of their client which was substantially different from that which would have been painted by the unpresented mitigating evidence.

When evaluating Sutton's ineffective assistance of counsel claim, not only must the Court follow the guidelines for evaluating claims of ineffective assistance of counsel as identified in the cases cited above, but its review of the state court's decision that Sutton failed to establish ineffective assistance of counsel is circumscribed by § 2254(d)'s deferential review standards. Therefore, Sutton will meet his burden of establishing ineffective assistance of counsel only if he demonstrates the state court's finding of no ineffective assistance is contrary to, or an unreasonable application of Supreme Court precedent. *See* 28 U.S.C. § 2254(d).

### a. Brain Damage

Sutton contends his trial counsel "failed to investigate the mental disorder most associated with [his] long standing and well known history of alcohol and drug abuse—profound brain damage" [Doc. 24 at 16]. Instead, Sutton contends the jury knew

50

only that he could be described as "slow" [Doc. 24 at 16]. In his state post-conviction proceedings, Sutton claimed counsel was deficient for failing to investigate and use evidence of his "intellectual impairments and organic brain damage" *Sutton v. State*, 2006 WL 1472542, at *12 (Tenn. Crim. App. May 30, 2006).

The Court will first address Sutton's inclusion of the affidavit of Dr. Barry M. Crown, Ph.D., which has been submitted in this habeas case.[18] Respondent contends the affidavit is not properly before the Court because it was not presented to the state court during post-conviction proceedings. Respondent contends the affidavit should be stricken from the record and that, pursuant to *Holland v. Jackson*, 542 U.S. 649, 652 (2004), this Court's assessment of the reasonableness of the post-conviction trial court's decision must be made in light of the record that court had before it.

---

[18]Dr. Crown, a psychologist licensed to practice in the State of Florida, testifies in his affidavit that Sutton has:

 "a significant neuropsychological impairment (brain damage) that impacts reasoning, judgment, language-based critical thinking, and memory functions. . . .

He is easily led and directed and could be subject to substantial domination by another person. He was operating under these impairments throughout his adult life, including in 1992.

Mr. Sutton's capacity to appreciate the consequences of his conduct and choices is substantially impaired as a result of his brain damage.

The brain damage substantially affects his judgment.

[T]hese impairments are likely to have their origins in the perinatal-neonatal period and were further aggravated by alcohol consumption beginning in childhood."

[Doc. 24-5 at 3 (Attachment E)].

Sutton offers no response to Respondent's arguments and did not address them in response to the motion for summary judgment, nor does he contend the state court denied him the opportunity to submit expert evidence or suggest that he was prevented from presenting such evidence in state court [Doc. 86 at 20]. Therefore, the Crown affidavit will not be considered. What will be considered in determining whether the state court's decision involved an unreasonable application of the law to the facts are the facts actually presented to the state court and contained in its records. 28 U.S.C. § 2254(d)(2). Considering new facts presented for the first time in this habeas proceeding would skew the determination to be made under AEDPA's standards of review because, logically, the state court could not have applied the law to facts that were not before it. 28 U.S.C. § 2254(d)(2); *Nichols v. Bell*, 440 F. Supp. 2d 730, 799 n.26 (E.D. Tenn. 2006).[19]

Sutton claims he was vulnerable to Dellinger's influence because years of consumption of alcohol, beginning in pre-adolescence (alcohol which, in the greatest part, came directly from Dellinger), damaged his brain irreparably. This brain damage, Sutton contends, compounded the damage done during the perinatal-neonatal period because of poor

---

[19]Respondent requests that the Crown affidavit be stricken from the record [Doc. 30 at 28]. However, the Court will not strike the affidavit given the possibility of appeal, but it will not be a factor in deciding whether Sutton is entitled to relief under AEDPA standards. Nonetheless, the Court notes that there is no evidence that a neurologist or other specialist has ever diagnosed Sutton with brain damage. Indeed, Dr. Crown recommends further investigation by a qualified neurologist. Dr. Crown's conclusions are neither supported with any identification of the specific facts he relied upon nor a detailed explanation of what led him to reach his conclusions. Moreover, there is no credible factual evidence that this alleged brain damage caused Sutton to participate in this murder, prevented him from understanding the wrongfulness of this crime, prevented him from conforming his conduct to the requirements of the law, or that he was under the influence of extreme mental or emotional disturbance at the time of the murder.

health care and nutrition. Additionally, Sutton contends the years of abuse caused persistent

biological changes in his brain which also impaired his decision-making abilities. Sutton

claims the "early and persistent consumption of alcohol, the neo-natal trauma, and his abuse-

filled childhood had a devastating affect [sic] on his decision-making abilities and rendered

him easily led." [Doc. 24 at 15]. As such, he contends he has significant neuropsychological

impairment that impacts reasoning, judgment, language-based critical thinking, and memory

functions.

The state appellate court summarized the post-conviction court's findings of fact and

conclusions of law:

> [Petitioner] claimed that counsel failed to develop reasonable trial or
> mitigation strategies and failed to investigate and use evidence of the
> petitioner's "intellectual impairments and organic brain damage." In addition,
> the trial court found that counsel were assisted by Dr. Eric Engum, a
> psychologist obtained by counsel to evaluate the petitioner and present
> information on the petitioner's psychological and intellectual capabilities as
> well as his social history. Lastly the trial court noted testimony by the
> petitioner's expert psychologist indicating that evidence of mental illness,
> mental defect, or organic brain injury was persuasive with jurors with respect
> to their sentencing decision. The court found, however, that the "petitioner did
> not suffer from any brain disfunction [sic]."

*Sutton v. Tennessee*, 2006 WL 1472542, at *12.

The state appellate court affirmed the trial court's denial of relief, finding that trial

counsel presented proof of Sutton's mental deficiencies through Dr. Engum:

> At sentencing, the defense presented the majority of its evidence through the
> testimony of Dr. Engum. Dr. Engum testified that he evaluated and conducted
> tests of the petitioner over the course of three days. He said the petitioner had
> a low IQ, was "borderline mentally retarded," and had "limited intellectual
> functioning," scoring in the bottom 15% of that category. He said the

petitioner was also limited in the areas of social judgment and knowledge, abstract reasoning, and vocabulary and had undiagnosed learning disabilities. Dr. Engum concluded that the petitioner was very limited in the "general knowledge that people need in order to navigate through life."

*Id.* at *24. The appellate court concluded that, although counsel might have chosen to place greater emphasis on his client's limited intelligence, the record supported the trial court's finding that much of the evidence presented at the post-conviction hearing was cumulative and merely "expanded" the evidence presented at trial. *Id.*

During trial, Dr. Engum testified he conducted psychological and neuropsychological assessments on Sutton to determine his functioning, personality, and intellectual cognitive status. Dr. Engum testified that Sutton's test results reflected he was in the borderline range of intellectual functioning, suggesting he is in the bottom 10 to 15 percent in terms of intellectual functioning. Dr. Engum testified Sutton was very limited in his ability to function in society and that there was strong evidence of a learning deficit, specifically major deficits in verbal processing, problem-solving, attention, and concentration [Addendum No. 16, pp. 5056-57; 5062-63].

During Sutton's state post-conviction hearing, Dr. Pamela Mary Auble testified in support of Sutton's post-conviction claims. Dr. Auble is a psychologist, with a speciality in neuropsychology, which involves evaluating the mental functioning of people as it relates to deficits or problems in their intelligence, memory, or personality [Addendum No. 35, p. 6823]. Although Dr. Auble testified that brain injury would carry weight with a jury during sentencing, she did not state that Sutton suffered from a brain injury [Addendum No. 35, p.

6847]. There was no evidence presented during Sutton's state post-conviction proceeding demonstrating that Sutton suffered from severe brain damage. Dr. Auble's report reflects that her test data for mental abilities was consistent with that obtained in Dr. Engum's evaluation from 1994-1995, and, although both doctors concluded Sutton's mental abilities were low, neither testified he suffered from brain damage [Addendum No. 16, Vol. 3 pp. 5053-68, Addendum No. 35, pp. 83-123]

Accordingly, after reviewing the record without considering Dr. Crown's affidavit, the Court concludes there is no evidence that Sutton suffers from "profound brain damage," and the jury was advised of his mental limitations by Dr. Engum. This claim will be **DISMISSED** since Sutton has failed to demonstrate that the state court decision was based on a unreasonable determination of the facts or that it was contrary to or an unreasonable application of Supreme Court precedent.

### b.      Dellinger's Corrupting Influence and Control

Sutton contends that had his trial counsel conducted a proper investigation, counsel could have discovered that the one constant authority figure in Sutton's life was his uncle and co-defendant, Dellinger. A proper investigation, according to Sutton, would have revealed Dellinger lured Sutton away from school and provided him with a steady supply of alcohol. Dellinger's corrupting influence on Sutton began during his formative years and "explains any role Sutton might have had in the Griffin murder, even if that role was, as new evidence now shows, merely an attempt to conceal Dellinger's guilt" [Doc. 24 at 11]. Sutton asserts this explanation would have caused the jury to impose a sentence of less than death.

55

Dellinger's role in Sutton's upbringing will be discussed in connection with Sutton's family history. Addressed here will be Sutton's claim that Dellinger forced him to participate in this crime and conceal Dellinger's guilt. Although substantial evidence exists to demonstrate Dellinger showed Sutton attention and was a major influence in his life, the evidence does not support that Dellinger was the only significant influence in Sutton's life or that he forced Sutton to participate in the crime.[20] To the contrary, the evidence introduced at trial was that Sutton was very close to his older brother, Jimmy Sutton, who was like a parent to Sutton [Addendum No. 16, p. 4862]. When Sutton was approximately 13 years old, his brother and wife moved to Kansas, and Sutton called every day for two weeks, crying for his brother, which prompted their father to fly Sutton to Kansas to stay with his brother [Addendum No. 16, p. 4862]. Sutton lived with his brother and sister-in-law when he was 14 or 15 years old [Addendum No. 16, p. 4876].

Sutton's next argument is that the ballistics evidence implicates only Dellinger and the proof shows that Dellinger did all of the talking and bought all of the beer evidencing that he was in control of the situation both nights. This proof, according to Sutton, demonstrates that Dellinger forced him to participate in the murder. However, this evidence in and of itself does not demonstrate that Dellinger forced Sutton to do anything, much less to participate in or to conceal the crime. Moreover, the two bar employees testified the three men played

_____

[20]Moreover, there is no direct evidence in the record of Sutton's role in the actual crime, as Sutton's defense from the onset has been that he did not commit the crime, further precluding the Court from drawing a conclusion of coerced participation in the murder of Griffin.

pool, appeared to get along, exhibited no ill feelings, and had no confrontation [Addendum No. 12, Vol. 1, pp. 2053-77]. Consequently, although Dellinger ordered and bought the beer on Friday evening, the evidence does not establish that Dellinger was in control of Sutton on that night and forced his participation in Griffin's murder. The record further shows that it was Sutton who was attempting to persuade Ms. Newman to leave the establishment with him, Dellinger, and Ms. Branam to find Griffin. Finally, according to the proof, it was Sutton who told Ms. Newman, "well, your husband is going to be surprised whenever you're missing one morning, when he wakes up and you're missing." [Addendum No. 12, Vol. 4, pp. 2514-22].

Petitioner's argument that, during the commission of this murder, he was an accomplice, a minor participant, or dominated by Dellinger is therefore simply unsupported by the record. Sutton did not submit an affidavit or adduce any other evidence supporting his allegation that Dellinger dominated, manipulated, or forced him to participate in the instant murder. As to the actual commission of the crime, the information contained in Dr. Auble's report is that Sutton did not want to discuss what occurred except to say it was a "sad situation where two innocent people got killed." [Addendum No. 36, Exhibit 5, p. 7105]. Moreover, the only reference to Dellinger exercising a dominating influence on Sutton is contained in Dr. Auble's report and her testimony at Sutton's state post-conviction proceeding. Nothing offered by Sutton points to differing levels of culpability between the two men during Griffin's murder or suggests that, during the crime, Sutton's actions were the result of Dellinger's domination, force, or control. There is simply no evidence from

57

which to conclude the claimed omissions of Sutton's trial counsel were objectively unreasonable and amounted to a deficiency of performance.

As such, the state court's findings that Sutton failed to demonstrate any deficiency of performance or that, but for counsel's claimed shortcomings, the jury would have reached a different decision is not an unreasonable application of or contrary to *Strickland*. Accordingly, Sutton is not entitled to habeas relief on this claim and it will be **DISMISSED**.

### c. Sutton's Family History

Sutton claims that his trial counsel failed to properly investigate his family history and adequately prepare for the penalty phase of his trial. More specifically, Sutton claims his trial attorney failed to properly develop and present mitigating evidence, and that his decision to present him in a positive light, rather than obtaining and presenting his adverse background, was unreasonable. Sutton insists that his trial attorney's shortcomings at the penalty stage deprived him of compelling mitigating evidence to present to the jury and that this alleged deficient performance on trial counsel's part resulted in prejudice to him.

The state appellate court reviewed Sutton's claim and concluded the record did not support Sutton's assertion that counsel failed to investigate his background, and that as a result of this failing did not offer sufficient mitigating proof of his social and family history. According to the state court, Mr. Gibson, the sentencing phase attorney, made his decision as to what penalty phase evidence to present based on Dr. Engum's input, as well as information counsel gleaned through personal interviews of dozens of witnesses. Recognizing that greater emphasis might have been given to certain negative aspects of

58

Sutton's background, the appellate court concluded that, nonetheless, the jury was made aware of his abuse and neglect, alcoholism, drug abuse, lack of education, limited intelligence, and tendency to be influenced by others:

> Counsel's efforts to convince the jury not to return a sentence of death by emphasizing the petitioner's more positive attributes and by arguing that the petitioner's life had some value and should be spared despite his convictions were not unreasonable or uninformed. The fact the strategy was not successful does not, alone, establish that counsel were ineffective in preparing or presenting his case in mitigation. "The petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings."

*Sutton v. State*, 2006 WL 1472542, at 24 (Tenn.Crim.App. May 30, 2006) (quoting *Adkins v. State*, 911 S.W. 2d 334, 347 (Tenn.Crim.App. 1994)).

Next, the appellate court addressed prejudice observing that the Tennessee Supreme Court "has stated that the prior violent felony aggravating circumstance is 'more qualitatively persuasive and objectively reliable than others.'" *Id.* at *24. The court found that, in Sutton's case, the prior violent felony "was all the more persuasive and difficult to overcome . . . considering the fact that one of the petitioner's prior violent felony convictions was for the murder of the victim's sister." *Id.* The appellate court was "unpersuaded that being presented with more details or specific instances of the petitioner's abuse and neglect or his relationship with Dellinger would have led the jury to reach a different sentencing decision." *Id.* (citation omitted).

It is the state court's finding that counsel was not ineffective which must be reviewed for reasonableness under the *Strickland* test. Sutton has the burden of overcoming "the

presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689. In fact, trial counsel identified his sentencing strategy as a portrayal of Sutton in the most positive light possible, conveying to the jury his good deeds and exemplary behavior in jail, in an effort to convince the jury that his client's life should be spared [Addendum No. 35, pp. 7043-44]. Sutton attempts to attack that strategic decision by relying on the details of his family history presented during his post-conviction hearing. Sutton argues the omission of those details amount to deficient performance and resulted in prejudice to the extent that there is a reasonable probability that the outcome of the proceeding would have been different.

(1)     Deficient Performance

According to Sutton's post-conviction expert, Dr. Auble, there were three main areas of attorney deficiency—failure to develop and present the facts indicating the adversity in Sutton's life (i.e., inadequate parenting and long-term physical and emotional abuse by his stepmother);[21] failure to develop and present evidence of Dellinger's influence on Sutton as

---

[21]Sutton's parents divorced when he was three years old and he lived with his mother until the age of six or seven, when he moved in with his father. Although the testimony of Sutton's childhood is vague and at times conflicting, as the Court reads that testimony, Sutton's father remarried a couple of years after Sutton moved in with him; the physical and verbal abuse by the stepmother lasted approximately two years; at age eleven Sutton moved into the camper on his father's property; at age thirteen he lived with his brother in Kansas; and at fourteen he moved to Georgia with Dellinger [Addendum No. 35, pp. 6867-6870].

a youth;[22] and failure to offer as witnesses, family members who had observed the neglect and abuse.[23]

(a)       Adversity in Sutton's Life

The record contradicts most of Dr. Auble's claims, though she is correct that there was no specific testimony about incidents of abuse by the stepmother,[24] no testimony about

---

[22]When Sutton was eleven or twelve, he, his brother, and Dellinger began getting together almost every weekend to drive around and drink, according to Sutton's brother's testimony [Addendum No. 35, pp. 6881-82].

[23]The observations purported include: (1) Sutton's father locked Sutton out of the house "of the morning"and Sutton was found in the dog house on one or two occasions [Addendum No. 35, p. 6918]; (2) there was a lot of yelling, screaming, and arguing [Addendum No. 35, p. 6871]; (3) during a two-year period, Sutton's stepmother "beat on him" with "clothes hangers, . . . hickory . . . [and] belts" and once bit him when they were fighting over the last piece of bologna; and (4) he lived in the camper in his father's yard during his preteen years [Addendum No. 35, pp. 6872-73, 6890, 6900, 6956].

[24]Dr. Engum explained Sutton's family history and background as being:

[e]ssentially, a fairly deplorable family background. I guess the most significant aspect of his family background is a father who was basically a chronic alcoholic. This kind of set the stage for Gary himself to become an alcohol abuser by age twelve. Mother and father were divorced fairly early. There were indications, from interviewing both Mr. Sutton as well as other family members, that there was a lot of - - I don't want to use the word competition, but a lot of attempts to bribe Gary by one parent or the other to try to cause Gary to live with either the father or the mother. Gary was subjected to a lot of mind games, a lot of head games. There's also indications in the record of quite a bit of physical and mental abuse, and a certain sense that - - it was at least felt by some family members that Gary was one of the least favored of all the children.

[Addendum 16, Vol. 3, pp. 5057-58]

Dellinger's influence on Sutton during his youth,[25] and no lay-witness testimony about Sutton's childhood.[26]  Nevertheless, the jury was informed of the adversity in Sutton's life, and the impact of such adversity on Sutton's development, choices, and reliability on others.

Specifically, Dr. Engum disclosed at the sentencing phase that Sutton was subjected to physical and mental abuse and that Sutton's deplorable family background and alcoholic father set the stage for him to become a chronic alcoholic by the age of twelve.  Dr. Engum further revealed that Sutton developed a sense of distrust of people which significantly impaired his ability to bond.  Dr. Engum also explained that these early negative influences made him vulnerable to being manipulated by others and pointed to Sutton's history of

---

[25]Describing Sutton's personality profile, Dr. Engum explained:

> I think the most fundamental thing that one needs to understand about Gary Sutton is from a very early age, he developed a sense of distrust of other people. And that's not unexpected coming from the type of family life that he came from. The result is his ability to bond with and get close to people is significantly impaired. And so he's somebody who attempts to keep distances, almost a self-protective mechanism.  That obviously creates feelings of social isolation, feelings of aloneness, and strong feelings of depression.  And from a very early age, Mr. Sutton sought to, what I say, self-anesthetize himself.  And he did that by consuming large amounts of alcohol that essentially - - it essentially made the pain go away.  And so, he could just kind of lose himself in an alcoholic haze.  And he started that at a very early age, eleven, twelve.  He was drinking heavily by that time.
>
> It also made him easily manipulated.  Even though you learn not to trust people, you still want to approach - - you still want to bond with people and so you do things that - - you become kind of a follower.  And his history is replete with following people who are older and more experienced.  And he kind of followed along in alcohol abuse with them and ran the roads and did that kind of thing.

[Addendum 16, Vol. 3, pp. 5059-60].

[26]Trial counsel did call lay-witnesses and family members to testify about Sutton's positive qualities.

following older and more experienced people as illustrative of his vulnerability. In addition, Dr. Engum emphasized that the adversity in Sutton's life left him feeling socially isolated, alone, and depressed, and to make the emotional pain go away, he anesthetized himself by consuming large amounts of alcohol [Addendum No. 16, Vol. 3, pp. 5057-60]. Thus, while Dr. Engum did not specify that Sutton's stepmother abused him and while testimony by witnesses who observed the abuse was lacking, the penalty-phase expert did tie the adversity in Sutton's life to his development as a person, lack of educational success, and his alcoholism.

Dr. Auble also admonished Dr. Engum for failing to explain the effects of Sutton's youthful drinking on his development history. Although Dr. Auble presented a more detailed and coherent mitigation case in this regard, trial counsel's presentation of the same information, albeit in a different manner, did not amount to deficient performance [*see* Addendum No. 35, pp. 6823-65]. While the Court can envision a case in which inadequate presentation of mitigation evidence may amount to deficient performance, such is not the case herein, where post-trial testimony merely adds more specific details to the mitigation evidence actually offered at trial.

In this regard, the Supreme Court's recent decision in *Van Hook, supra,* dealt with facts similar to those present in the instant case. *See Bobby v. Van Hook*, ___ U.S. ___, 130 S.Ct. 13 (Nov. 9, 2009). In *Van Hook*, petitioner claimed trial counsel failed to investigate and present all mitigating evidence which could have helped counsel "narrate the true story of [his] childhood experiences." *Id.* at *19. Counsel had investigated his client's childhood,

family history, military history, and he had also hired an expert who testified that the client suffered from a borderline personality disorder. Counsel did not interview Van Hook's stepsister, two uncles, and two aunts—who variously could have testified Van Hook's mother was temporarily committed to a psychiatric hospital and that Van Hook's father hit him and tried to kill his mother—or a psychiatrist who once treated his mother. Counsel's decision not to seek more mitigating evidence than they had, according to the Court, fell "well within the range of professionally reasonable judgments." *Id*. (internal quotation marks and citation omitted).

(b)    Dellinger's Influence

Dr. Auble believed that parental abuse and emotional abandonment would have made him particularly vulnerable to the influence of adults who took an interest in him and who could protect him. According to Dr. Auble, Dellinger fulfilled that role, in addition to encouraging Sutton's addictive behaviors and criminal actions. Most importantly, it was Dr. Auble's opinion that Sutton was afraid of Dellinger and unable to end their relationship or withdraw from Dellinger's control.[27] Dr. Engum, however, testified at the sentencing phase about Sutton's family background of alcoholism, physical and emotional abuse, and that, because of his family life, he was easily manipulated and had a history of following older, more experienced people. In addition, Dr. Engum explained that these role models led him

---

[27]Interestingly, the evidence supports the adverse effect his family history had on him and why he and Dellinger were so close, but Sutton's own testimony does not support Dr. Auble's conclusion that he feared Dellinger, could not terminate their relationship, or could not free himself from Dellinger's control [Addendum No. 35, p. 6988].

to abuse alcohol [Addendum No. 16, Vol. 3, pp. 5059-60]. Thus, while Dr. Engum did not identify Dellinger as the one who fulfilled that role, he did present essentially the same testimony offered by Dr. Auble.[28] Also to be considered is the fact that Sutton did not advance the defense that Dellinger forced him to participate in the crime. Nor did Sutton so testify during his collateral proceeding. Therefore, the failure to present the evidence in question does not amount to deficient performance.

(c)     Lay-Witnesses

Sutton argues his trial counsel performed deficiently by failing to present his family history through the testimony of lay-witnesses who observed the neglect and abuse. The state appellate court observed that although counsel could have chosen to place greater emphasis on certain negative aspects of Sutton's background, evidence of his abuse and neglect, alcoholism, drug abuse, lack of education, limited intelligence, and tendency to be influenced by others was presented to the jury and much of the evidence presented by Sutton's family members during the state post-conviction proceedings "was cumulative and only expanded the evidence presented at trial." *Sutton v. State*, 2006 WL 1472542 at *24.

As the *Strickland* Court observed, "[t]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a

---

[28]Sutton's trial counsel was aware of Dellinger's influence on Sutton as a youth. The record reflects Mr. Gibson conducted an investigation into the role Dellinger played in Sutton's formative years and was aware that Dellinger had guided Sutton in his younger years and was the dominate personality between the two [Addendum No. 36, p. 7046]. Dr. Engum's notes reflected Sutton had been exposed to alcohol as a child by Dellinger and other family members [Addendum No. 35, p. 6833].

particular client in the same way." *Strickland,* 466 U.S. at 689. Thus, trial counsel's decision to humanize Sutton by emphasizing his positive qualities rather than by focusing on his abusive childhood does not render counsel's performance deficient. Again instructive in this regard is the Supreme Court's decision in *Van Hook, supra,* where counsel investigated, interviewed witnesses, and presented evidence, but stopped short of interviewing *all* witnesses who Van Hook believed "could have helped his counsel narrate the true story of [his] childhood experience." *Van Hook*, 130 S.Ct., at *19. The Supreme Court found no deficient performance. *Id. Cf. Porter v. McCollum*, 130 S.Ct. 447, 2009 WL 4110975, *5 (Nov. 30, 2009) (deficient performance found because counsel completely failed to present mitigating evidence relating to Porter's lack of education, his mental health, his family background, and his battlefield service in the Korean War which "left him a traumatized, changed man").

This Court concludes that counsel's failure to present lay-witnesses to testify about Sutton's childhood abuse, as opposed to the expert testimony which he did use, is not a deficiency of performance. *See Webb v. Mitchell*, 586 F.3d 383 (6th Cir. Nov. 5, 2009) (counsel's performance was not deficient even though habeas counsel raised some legitimate critiques of trial counsel's performance and the habeas expert presented a more "nuanced and troubling picture" of defendant's mental health than trial expert did, the habeas expert "merely develop[ed] a different psychological profile based on the same facts" trial expert used). This is so because the information about which they would have testified was presented to the jury, albeit in a different and less detailed manner.

66

As stated earlier, this Court may only grant relief if the state court's rejection of the ineffective-assistance claim was contrary to, or an unreasonable application of *Strickland*. Applying the AEDPA standard and the relevant Supreme Court law, there is nothing in the record to indicate Sutton's trial counsel failed to make a reasonable investigation for purposes of uncovering relevant mitigating evidence that could have been useful in persuading the sentencing jury that Sutton's moral culpability was not sufficient to warrant the death penalty.[29]  The record reflects trial counsel was aware of the facts that Sutton faults him for failing to present.  Thus, this case raises the issue of whether counsel's failure to present *detailed* mitigating evidence, of which he was aware, during the sentencing phase of his client's capital trial amounted to deficient performance.  Based on the foregoing discussion, the Court concludes it does not.  Accordingly, after a thorough review of the state court decision, the underlying reasoning, as well as Sutton's allegations challenging that decision, this Court finds that Sutton has not demonstrated the state court decision concluding counsel's performance was contrary to, or an unreasonable application of Supreme Court precedent.

(2)     Prejudice

Even if Sutton has proven deficient performance related to the presentation of family history as mitigation evidence, he has not shown resulting prejudice.  The Sixth Circuit has

---

[29]Although it is troubling that trial counsel's time records showed only four hours preparing for the penalty stage of the trial, the Court's concerns are allayed in part by counsel's testimony that the investigation of the sentencing hearing and the investigation of the guilt/innocent phase of the trial overlapped one another [Addendum No. 35, pp. 6995-7002; 7035-7049].

instructed that, to show prejudice, a petitioner must demonstrate that the new post-conviction evidence differs in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing. *Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir.), *cert. denied*, 546 U.S. 1039 (2005). Here, the evidence that was presented at Sutton's post-conviction proceeding was similar to the evidence presented at sentencing. Granted, the post-conviction evidence was more factually developed and stronger, but it does not differ in a sufficiently substantial way in subject matter.

In assessing prejudice, the Court reweighs the evidence in aggravation against the totality of available mitigating evidence. *Wiggins*, 539 U.S. at 535. Prejudice may be found when counsel fails to conduct an adequate investigation or no investigation at all into his client's background or when counsel fails to present any evidence of a defendant's personal background or psychological history. *See, eg., Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (failure to review a file of a prior conviction, from which the prosecution intended to quote damaging evidence and which contained a wealth of mitigation evidence about petitioner's family and mental history that no other source had revealed); *Wiggins*, 539 U.S. at 535-36 (failure to investigate and discover evidence of repeated physical and sexual abuse); *Williams v. Taylor*, 529 U.S. 362 (2000) (failure to conduct an investigation into extensive records "graphically describing Williams' nightmarish childhood," along with other compelling mitigating evidence); *see also Coleman v. Mitchell*, 268 F.3d 417, 450-53 (6th Cir. 2001) (deficient performance for failing to investigate and present evidence of defendant's personal

background, psychological history, or potential organic brain dysfunction), *cert. denied*, 535 U.S. 1031 (2002).

Upon reviewing the aggravating and mitigating evidence presented at the penalty phase of Sutton's trial, along with the mitigating evidence presented during his post-conviction hearing, the Court concludes Sutton has failed to demonstrate that he was prejudiced by counsel's failure to present the available facts of his family history as mitigation evidence. As the state court reasonably found, the mitigating evidence adduced at the collateral proceeding was simply a more detailed version of that which was adduced during the sentencing trial. *See Sutton v. State*, 2006 WL 1472542, at * 24 (finding that much of the post-conviction evidence was cumulative and only 'expanded' the evidence presented at trial). The prior violent felony aggravator is of the most substantial and compelling nature, and the additional facts about Sutton's difficult childhood simply do not outweigh the facts of the subsequent murder of the victim's sister. Thus, given the powerful aggravating factor of the murder conviction, there is no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstance outweighed the mitigating circumstances. *See Wong v. Belmontes*, 558 U.S. ___, 130 S.Ct. 383 (2009) ("It is hard to imagine expert testimony and *additional* facts about Belmontes' difficult childhood outweighing the facts of McConnell's murder. It becomes even harder to envision such a result when the evidence that Belmontes had committed another murder—"the most powerful imaginable aggravating evidence," as Judge Levi put it[.]").

69

Accordingly, Sutton is not entitled to any relief on this ineffective assistance of counsel claim, and it will be **DISMISSED.**

## B. Dr. Harlan Claim (Claim II)

Dr. Harlan, a forensic pathologist, testified at the initial trial in rebuttal as to the victim's time of death. Sutton claims the jury did not know that virtually all of Dr. Harlan's testimony, "beginning with his description of his current occupation and ending with his scientifically indefensible testimony about the time of Mr. Griffin's death, was deliberately and intentionally false." [Doc. 24 at 21]. Sutton contends that the State failed to disclose this information and that his trial counsel was ineffective for failing to thoroughly examine Dr. Harlan's opinions and qualifications as well as rebut his testimony when he testified at Sutton's trial. Specifically, Sutton claims the State, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), failed to provide evidence that Dr. Harlan had been terminated from his position as Chief Medical Examiner prior to Sutton's trial, instead presented him as an expert witness, and permitted misleading and untruthful testimony to go uncorrected in violation of *Napue v. Illinois*, 360 U.S. 264, 269 (1959). Sutton contends the State either failed to reveal evidence to his trial counsel, which would have impeached Dr. Harlan's credibility, or presented Dr. Harlan's testimony knowing it was false. Intertwined with these claims and, at least partially based upon the evidence he has obtained about Dr. Harlan, Sutton claims counsel was ineffective for failing to utilize an appropriate expert to determine the time of death and for failing to present competent expert testimony to rebut Dr. Harlan's testimony.

70

As a preliminary matter, this claim consists of numerous intertwined subparts which must be resolved at the same time. Sutton did not raise the Dr. Harlan claim on direct review or in the state trial court during his post-conviction proceedings. However, he did generally raise at least some of the Dr. Harlan claim while his post-conviction appeal was pending by filing a motion to remand his post-conviction case to Blount County Criminal Court to reopen the proof [Addendum No. 41]. Counsel notified the appellate court that issues had arisen concerning Dr. Harlan when the Final Order was entered on May 4, 2005, by the State Board of Medical Examiners of Tennessee (hereinafter "Board"), permanently revoking Dr. Harlan's license to practice medicine based upon a "'pattern of continued or repeated negligence and incompetence.'" [Addendum No. 41, p. 2, quoting *In the Matter of Charles Harlan, M.D.*, Board of Medical Examiners, Docket No. 17.18022307A]. After the State filed a response, the appellate court denied Sutton's motion to remand.

Nevertheless, Respondent now agrees that "[s]ummary disposition of this fact-intensive issue is inappropriate, particularly in light of the discovery depositions of the two prosecutors in this case (District Attorney General Mike Flynn and former Assistant District Attorney General Edward Bailey) . . . , and the Court should require that petitioner demonstrate his allegations in an evidentiary proceeding." [Doc. 90].

Accordingly, because there are genuine issues of fact pertaining to the Dr. Harlan claim, an evidentiary hearing is warranted. The record reflects that Sutton was not permitted to develop the factual basis for this claim once he became aware of it. Accordingly, the

Court will **RESERVE RULING** on Petitioner's Dr. Harlan claim in its entirety (Claim II) pending an evidentiary hearing on the claim. 28 U.S.C.§ 2254(e)(2).[30]

## C.    Trial Counsel's Irreconcilable Conflict of Interest (Claim III)

In this claim, Sutton complains that his trial counsel undertook a joint-defense[31] approach with his co-defendant's counsel which "blinded his counsel to the obvious: that he was distinctly less culpable than Dellinger." [Doc. 24 at 42]. Sutton also contends there was no strategic reason for aligning his defense with Dellinger's at either the guilt or sentencing phase. Sutton argues that the physical evidence pointed solely to Dellinger, that all the evidence demonstrated Dellinger was the leader, and that his counsel's failure to emphasize the weakness of the State's case against him was prejudicial. Sutton argues this conflict contributed to his counsel's lack of investigation into his relationship with Dellinger because, had Sutton presented evidence of Dellinger's violence, it would have hurt Dellinger's case for a life sentence. Sutton contends "[t]he state court essentially held that because the State's evidence shows they were together counsel had no duty to show they were not together . .

---

[30]Petitioner's Claim II consists of several subsections, all of which are intertwined with the Harlan issue. As the Court explained to the parties at the pre-evidentiary hearing conducted in this case on April 28, 2009, out of an abundance of caution the Court will hear evidence relative to the Dr. Harlan claims (Claim II *in its entirety*), including the allegations of ineffective assistance of counsel in Claim II. Although the Court is permitting testimony on all of these claims, as the parties were advised at the hearing, once the Court hears the evidence and discerns the actual facts surrounding these issues, it still could determine that some or all of the evidence should not be considered in resolving this segment of Petitioner's habeas petition.

[31]The Court will use the terms "innocence defense" and "joint defense" interchangeably because the defense the two defendants undertook jointly was the innocence defense.

. . If counsel had represented only Mr. Sutton's interests, the evidence would have been otherwise . . . ." [Doc. 24 at 43].

Respondent counters that Sutton and Dellinger were represented by separate counsel who chose, for strategic reasons, to share responsibility for work on issues common to both defendants. Respondent also argues the state court's rejection of this claim was not contrary to or an unreasonable application of Supreme Court precedent.

In his state post-conviction proceeding, Sutton claimed trial counsel was ineffective for undertaking a "joint defense approach," for choosing a defense theory that sought to prove both defendants innocent, and for having an "open file approach" of sharing information with Dellinger's counsel. *Sutton v. State*, 2006 WL 1472542, at *16. At that proceeding, one of Sutton's trial attorneys, Mr. Gibson, testified he envisioned a "Dream Team" approach and that he worked with Dellinger's counsel on joint issues after being denied a severance. However, issues which only involved Sutton were not discussed or shared with the other side [Addendum No. 35, Vol. 2, p. 7003]. Mr. Gibson preliminarily contacted Mr. Lance Bracy of the Board of Professional Responsibility to make sure there was no conflict of interest by working with Dellinger's counsel on joint, non-conflicting issues. In addition to the joint-defense approach, they also shared an investigator who did not alert counsel to any conflicts [Addendum No. 36, p. 7006].

The appellate court summarized the State's theory as follows:

At trial, the State's theory was that the defendants shared a common purpose and actively participated in the events leading to the victim's murder beginning

with their altercation with him on Alcoa Highway and ending when both defendants were present while one of them shot him to death . . . .

*Id.* at 17.  The state appellate court also referred to its own opinion on direct review and summarized the evidence linking both defendants with the victim shortly before the time that the victim was last seen alive:

> The State's theory of the case, which was supported by extensive proof, was that Dellinger and Sutton acted in unison with a common purpose and design to kill Griffin.  Indeed, the State's theory was that both Appellants fought with Griffin, attempted to bail Griffin out of jail, set fire to Griffin's trailer, transferred the murder weapon from a truck to a car, successfully bailed Griffin out of jail, and they were both present while one of them fired the fatal shot.  The defense theory for both Appellants was that neither one of them committed the murder.  Indeed, much of the defense proof went to establishing that they were friends with Griffin and had no reason to kill him, that Griffin died long after he was last seen with Appellants, and that there were several other possible culprits in this case.  Thus, the evidence in the record created an "all or nothing" situation in which Sutton and Dellinger both actively participated and promoted the murder of Griffin or neither one of them did.

*Id*. at 17.

> The state appellate court concluded

> "[g]iven the amount of evidence connecting the petitioner and Dellinger with each other and with the victim a short time before the victim's murder, we cannot agree it was unreasonable for counsel to try to establish that neither defendant was responsible for his murder rather than trying to persuade the jury that Dellinger alone was guilty and the petitioner neither shot the victim nor played any role in his death."

*Id*. at 18.  Thus, the court concluded Sutton failed to establish any deficiency on the part of trial counsel.  *Id.*

Under *Strickland*, counsel's decision to present an innocence defense is accorded a high degree of deference.  *Strickland*, 466 U.S. at 689.  In *Strickland*, the Supreme Court

cautioned that "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* at 689. Thus, it is imperative when assessing counsel's performance that "every effort be made to eliminate the distorting effects of hindsight" and that the circumstances of counsel's challenged conduct be reconstructed to evaluate the conduct from counsel's perspective at the time. *Id.* "Because of the difficulties inherent in making the evaluation, a court must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (citation omitted).

Sutton's claim that counsel had a conflict of interest is actually a claim attacking trial counsel's choice of defense theory that sought to prove Sutton innocent. Based on the State's case, it does not appear that Sutton would have fared any better at trial using such evidence to demonstrate his lesser culpability. As Sutton correctly alleges, the record demonstrates that Dellinger acted alone in hiding the alleged murder weapon. However, the record further shows that prior to going to bail the victim from jail, Sutton waited in Ms. Dellinger's vehicle when Dellinger removed the weapon from his truck and placed it in his wife's car [Addendum No. 12, p. 2285-86]. And even though the evidence shows that Dellinger did most of the talking at the bar and that he purchased most of the beer for the group, there is also proof that it was Sutton who tried to persuade the evening-shift employee to go with

75

Dellinger, Ms. Branam, and him to search for Griffin. It was also Sutton who threatened and frightened Ms. Newman by telling her "well, your husband is going to be surprised whenever you're missing one morning, when he wakes up and you're missing." [Addendum No. 12, Vol. 4, pp. 2521-22; 2532-33].

Sutton is apparently contending he should have admitted his guilt but counsel should have demonstrated he was less culpable by emphasizing the evidence of Dellinger's alleged "leadership" role while they were together during the time frame of this crime. Sutton, however, has not provided any evidence demonstrating that he was less culpable or that Dellinger was the leader in the commission of this murder. Furthermore, Sutton has not provided any proof that trial counsel's defense theory was not a legitimate strategic choice or how emphasizing evidence which was before the jury would have changed the outcome of his case. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Strickland*, 466 U.S. at 693 (internal citations omitted).

Accordingly, Sutton has not demonstrated the state appellate court's decision was based on an unreasonable application of *Strickland* or presented any clear and convincing evidence to overcome the presumption of correctness to be given the state court's factual findings. 28 U.S.C. § 2254(e)(1). The claim will therefore be **DISMISSED**.

### D. Lack of Prior Notice of Dr. Harlan's Testimony (Claim IV)

Sutton complains that he was deprived of due process by the State's presentation of a surprise rebuttal witness and the trial court's decision to allow the witness to testify. Because he was not given pretrial notice that Dr. Harlan would testify before the State presented him as a rebuttal witness, Sutton contends the admission of his testimony denied him due process. Sutton claims, without providing any explanation or analysis, that the state court's conclusion that the trial court did not abuse its discretion in permitting Dr. Harlan's testimony is contrary to or an unreasonable application of *In re Oliver*, 333 U.S. 257, 273 (1948).

As a preliminary matter, Sutton's reliance on *In re Oliver* is misplaced as that case does not address the use of rebuttal witnesses. Moreover, Sutton was provided all of the due process protections identified in that case.[32]

Sutton argues that his rights to due process and counsel were violated when the State called Dr. Harlan to testify about the time of death in rebuttal with no notice to Sutton. During trial, Sutton's counsel objected to Dr. Harlan's testimony arguing it was impermissible to call an expert to rebut an opinion. Sutton's counsel argued that introducing

---

[32]*In re Oliver* involved a witness called to testify at a one-judge grand jury proceeding who was found in contempt and sentenced to prison immediately after his testimony because it did not "jell" with other testimony given before the judge. 333 U.S. 259. In finding this "secret" procedure violated the Due Process Clause of the Fourteenth Amendment of the United States Constitution, the Supreme Court concluded that '[e]xcept for a narrowly limited category of contempts, due process of law . . . requires that one charged with contempt of court be advised of the charges against him, have a reasonable opportunity to meet them by way of defense or explanation, have the right to be represented by counsel, and have a chance to testify and call other witnesses in his behalf, either by way of defense or explanation." *Id.* at 275.

such evidence in rebuttal amounted to introducing new proof since the State relied upon Jason McDonald,[33] his mother,[34] and Dr. Ellington, who admitted he was not qualified to determine time of death, rather than presenting a time-of-death expert during the State's case in chief. According to Sutton's counsel, the State chose only to offer lay testimony as to time of death in its case in chief rather than expert testimony, and it should not have been allowed to rebut Dr. Wolfe's expert testimony offered by defendants as to time of death with Dr. Harlan's countervailing opinion.

Respondent argues the prosecution had an expert witness prepared to testify in its case in chief, who was not presented because of a defense objection and not through any fault of the State, so Dr. Harlan was properly permitted to testify in rebuttal to Dr. Wolfe's opinion. Although the record is not complete, it appears the State sought to introduce the expert testimony of Dr. Cleland Blake during its case-in-chief regarding time of death. An out-of-jury hearing was conducted, which was not transcribed, per the request of Dellinger's defense attorney, Mr. Dixon [Addendum No. 12, Vol. 7, p. 3047]. The trial court determined Dr. Blake would not be able to testify [Addendum No. 12, Vol. 7, p. 3047]. Prior to the introduction of Dr. Harlan's testimony, the prosecutor explained that the State sought to present Dr. Blake, but due to the defense's objection the testimony was not allowed. The prosecutor explained:

---

[33]McDonald was the witness who made a note in his journal when he heard a gunshot.

[34]McDonald's mother also heard a shot and discussed it with her son.

And I think the record is clear that was through no fault of the State, that the witness himself didn't know about the basis of their objection or the fact that he had received any information from them at the time, on the opinion he was prepared to render.

[Addendum No. 12, Vol. 14, p. 4010].

"[E]rrors in the application of state law, especially rulings regarding the admission or exclusion of evidence, are usually not to be questioned in a federal habeas corpus proceeding." *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988). Sutton's claim that he was deprived of due process by the presentation of an undisclosed rebuttal witness does not amount to a constitutional error because state-court evidentiary rulings do not rise to a level of due process violations unless they "offend . . . some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996) (citations omitted).

Under Tennessee law, the determination of the admissibility of rebuttal evidence lies in the discretion of the trial court, and the state appellate court will not interfere with the exercise of that discretion unless there has been a clear abuse of discretion appearing on the face of the record. *State v. Kendricks*, 947 S.W.2d 875, 884 (Tenn. Crim. App. 1996). Rebuttal evidence is not necessarily rendered inadmissible by the fact that the rebutting party could have offered the evidence in its case-in-chief. *State ex. rel. Com'r of Dept. of Transportation v. Williams*, 828 S.W.2d 397, 401 (Tenn. Ct. App. 1991); *Coates v. Thompson*, 666 S.W.2d 69, 76 (Tenn. Ct. App. 1983).

In addition, as the state appellate court observed, "it is clear that the State did not disclose Dr. Harlan's identity before trial because it intended to call Dr. Blake as its expert. In addition, it is well established that the State's duty to disclose the names of its witnesses is merely directory, not mandatory." *State v. Sutton*, 2001 WL 220186, at *25 (citing *State v. Harris*, 839 S.W.2d 54, 69 (Tenn. 1992)). Although a defendant is entitled to relief for nondisclosure of a rebuttal witness if he can show prejudice, bad faith, or undue advantage, Sutton's counsel expressed no intention to offer surrebuttal nor did he ask for a continuance in order to call other witnesses when asked whether the defendants had surrebuttal. The state appellate court concluded Sutton waived any claim that he was prevented from calling further witnesses to offer surrebuttal, and thus the issue had no merit. *Id.*

"There is no general constitutional right to discovery in a criminal case." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977). "Rather, all the Constitution requires, per the due process clause, is that the defendant not be deprived of a fundamentally fair trial." *Lorraine v. Coyle*, 291 F.3d 416, 441 (6th Cir. 2002), *cert. denied*, 538 U.S. 947 (2003). Thus, neither the Constitution nor the Tennessee Rules of Criminal Procedure compel pretrial disclosure of any rebuttal witnesses related to the defendant's case, and therefore, "there is no constitutional violation cognizable on habeas here." *Id.*

In sum, Sutton presented expert testimony that the time of death was later than that shown through testimony presented by the State's lay witnesses who heard a gun shot. The State attempted to present expert testimony as to the time of death, but it was prevented from doing so when defense counsel objected because counsel had provided the State's expert

with evidence, unbeknownst to the State. In addition, as pointed out by the state court, Sutton's attorneys neither presented surrebuttal nor requested a continuance to prepare to respond to the new testimony. *State v. Sutton*, 79 S.W.3d 458, 488 (Tenn. 2002). Therefore, in light of the wide latitude afforded to states with regard to evidentiary matters, and relevant Supreme Court precedent, the Court concludes Sutton's due process rights were not violated by the State's introduction of Dr. Harlan's testimony. *See Gray v. Netherland*, 518 U.S. 152, 166-70 (1996) (rejecting a habeas petitioner's due process challenge to the State's failure to give him sufficient notice of its intent to present testimony from a police officer and medical examiner at his sentencing and concluding that only the adoption of a new constitutional rule could establish that due process required more than a day's notice and that a continuance, whether or not requested, was required).

Sutton has therefore failed to overcome the presumption of correctness afforded the state court's factual findings that Sutton was not denied due process with regard to this claim and has not demonstrated that the state court's conclusion is contrary to or an unreasonable application of Supreme Court precedent. Accordingly, Sutton's due process claim based on the non-disclosure of Dr. Harlan as a rebuttal witness will be **DISMISSED**.

### E. Counsel Failed to Present Evidence to Challenge the Branam Homicide (Claim V)

The trial court allowed the State to prove Ms. Branam's death as part of its case in chief in the Griffin trial to prove the identity of Griffin's murderers [Addendum No. 8, Vol. 1, p. 1561]. The State also used Ms. Branam's murder as an aggravating circumstance during

81

the sentencing phase. Sutton contends that, under these circumstances, trial counsel should have investigated and presented available evidence challenging the Branam death.

Specifically, Sutton claims his counsel was deficient for failing to implicate Bill Cogdill and for failing to call Joyce Tipton or otherwise have her declared unavailable for his murder trial. Although Sutton did not call either witness to testify at his post-conviction hearing, Sutton's lead trial counsel made a tactical decision not to call Ms. Tipton and counsel was mistaken when he testified Bill Cogdill had testified at trial. Nevertheless, Sutton has not demonstrated he was prejudiced by the fact Mr. Cogdill did not testify at trial [Addendum No. 35, p. 7017].

The state appellate court affirmed the denial of relief on this claim and explained:

> We believe the record reflects that counsel's decision not to pursue Cogdill was not uninformed. At the evidentiary hearing, Mr. Gibson testified that he attended the Branam murder trial in Sevier County and reviewed the transcript to determine which witnesses to call at trial. He stated that he personally interviewed Cogdill, whom he characterized as a "mountain man" type, and that he found Cogdill hard to understand and to be someone who would "just about agree with anything you tell him." Mr. Gibson concluded Cogdill would not be a favorable witness for the defense, but he hoped he could cross-examine him as a state's witness instead. He testified that he was aware that Joyce Tipton had testified in the Sevier County trial and attributed "some weird statements" to Cogdill, to the effect that Branam's body would be found "burned up somewhere," which may have been made before Branam's body was found. He said that the defense initially sought to have Tipton testify at the Blount County trial, but he recalled that he did not pursue her after she made efforts to avoid testifying because of her mental problems.

> The record also reflects that when trial counsel did make some attempt to establish Cogdill as a possible suspect in Branam's murder, he was unsuccessful. On questioning regarding Branam's murder, Jack Sutton testified that Cogdill told him that "Connie would either be found in water or burned in a car." However, Sutton could not recall whether Cogdill made this

82

statement before or after Sutton had learned that Branam's body had been found. On cross-examination, Sutton testified that he did not believe Cogdill's statement because he knew Cogdill to be a bragger [sic] or a liar and not one to be believed. In our view, such testimony supported counsel's decision not to call Cogdill as a defense witness.

The petitioner strenuously asserts that potential witnesses such as Cogdill, Tipton, and Reed could have established that someone other than the petitioner may have killed Branam and thereby lessened the impact of this prior conviction at the petitioner's sentencing for the victim's murder. However, the record does not include any evidence suggesting Cogdill or anyone else as a viable, alternate suspect in Branam's murder, and the petitioner did not present any witnesses having potentially exculpatory testimony at the post-conviction hearing. A petitioner should have such witnesses testify at the evidentiary hearing. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). "Typically, that is the only method of establishing prejudice" because absent testimony from a witness at the evidentiary hearing, "this court could only speculate as to what prejudice may have resulted by trial counsel's failure to subpoena . . . a witness" at trial. *James Leath v. State*, No. E2004-02708-CCA-R3-PC, Knox County, slip op. at 7, (Tenn. Crim. App. Dec. 28, 2005).

*Sutton v. State*, 2006 WL 1472542, at *18-19.

The Court has reviewed the record which supports the state appellate court's assessment of this claim. In addition, as the state court notes, Sutton did not present any of these witnesses at his state post-conviction hearing to testify about what evidence they would have offered had they been called to testify in Sutton's trial. *Id.* at 19. Thus, even if the Court were to assume trial counsel was deficient for failing to present these witnesses, Sutton has failed to demonstrate he suffered any prejudice as a result of counsel's alleged deficient performance.

Sutton relies on Cogdill's testimony during Ms. Branam's trial to support this claim. However, a review of Cogdill's testimony does not demonstrate that Sutton was prejudiced

by counsel's failure to present evidence from Cogdill as his testimony does not exonerate Sutton of Ms. Branam's murder. Cogdill testified that a woman asked him what kind of shape they would find Ms. Branam in, to which he replied, "Well, her might be in the water, her might be buried, her might be charred or might be burned one," and he denied saying that Ms. Branam "was shot like Tommy, with a .12 gauge shotgun" to either Joyce Tipton or Jack Sutton [Doc. 24-10 at 4-5, 8-9 (Attachment J)].

Although Joyce Tipton testified at Ms. Branam's trial that, prior to the discovery of Ms. Branam's body, Cogdill made statements to her and Jack Sutton that Ms. Branam would be found shot and burned, Sutton's counsel made the strategic decision, after she failed to comply with a trial subpoena, not to present her as a witness. Counsel decided not to present her testimony because her statements were hearsay and because the State could then call a psychologist who would testify that Tipton had ongoing mental problems to suggest that she was not a credible witness [Addendum No. 36, p. 7017]. Additionally, this evidence was presented to the jury in Ms. Branam's murder trial and, apparently, the jury in that trial concluded the evidence deserved little or no weight.

Sutton's counsel did present at trial Jack Sutton, who testified he could not remember whether Cogdill made the statement that Ms. Branam would either be found in water or burned in a car, before or after her body was actually found [Addendum No. 12, Vol. 13, pp. 3845-49]. This testimony and that offered at Ms. Branam's murder trial presents no more than a convoluted conversation which neither exonerates Sutton nor renders his trial unfair or the result unreliable.

Sutton has not presented any clear and convincing evidence to overcome the presumption of correctness to be given the state court's findings, nor has he demonstrated that the decision made by the state appellate court was contrary to or an unreasonable application of Supreme Court precedent. Accordingly, this claim will be **DISMISSED**.

### F.    Denial of Severance Motion (Claim VI)

Sutton challenges the trial court's decision requiring him to be jointly tried with Dellinger. The basis for his challenge is that key pieces of evidence were admitted at the joint trial which allegedly were only relevant to Dellinger. It is his position that the denial of his motion to sever was constitutional error in that it deprived him of a fair trial.

The evidence to which Sutton refers were the shells found near Griffin's body, which matched shells found on Dellinger's property and in or near his trash can, ballistic evidence allegedly linking Dellinger's rifle seized from his trailer to evidence found near Ms. Branam's body, and testimonial evidence that a white truck (implying it was Dellinger's) was seen in the general area where Ms. Branam's remains were eventually found.[35] Sutton claims there was no evidence linking the ballistics or the white truck to him.

Sutton raised the ballistic issue on direct review. The appellate court, summarizing the lower court proceedings, observed that, although Sutton and Dellinger filed a pretrial motion requesting a severance or, in the alternative, separate juries, at the motion hearing,

---

[35]The trial court ruled Sutton did not have standing to challenge the admissibility of the evidence found at Dellinger's residence [Addendum No. 1, Vol. 4, p. 578]. It does not appear that Sutton raised this claim in relation to the white truck; thus, it is procedurally defaulted and will not be addressed [Addendum No. 23, pp. 6038-43].

the defendants abandoned their motion to sever, and, instead, asked the court for separate juries. *State v. Sutton*, 79 S.W.3d at 467. The trial court overruled the motion, ordering that any evidence that might be inadmissible against one of the defendants would not be allowed into evidence [Addendum No. 3, pp. 1051-53].[36]

The appellate court concluded that Sutton was not denied a fair trial, that he had failed to cite any authority that would require separate juries in a case such as his, and that he had failed to identify a single instance in which he was prejudiced by the introduction of evidence admissible solely against Dellinger. *State v. Sutton*, 2001 WL 220186, at *11. When the issue was raised in the Tennessee Supreme Court, that court specifically found that the evidence of the rifle and shells discovered at Dellinger's trailer were properly admitted against Sutton, and that severance was not required, since the evidence admitted at trial would have been admissible against each defendant at a separate trial. *State v. Sutton*, 79 S.W.3d 458, 468 (Tenn. 2002).

The decision to grant or deny a severance is governed by Rule 14 of the Tennessee Rules of Criminal Procedure, and the decision is within the sound discretion of the trial court. *State v. Carruthers*, 35 S.W.3d 516, 552-53 (Tenn. 2000). In denying Sutton's motion for severance (or separate juries), the Tennessee courts applied state law. The Court must accept as binding the state court's interpretation of the state rules and law on severance of criminal

---

[36]Sutton incorrectly states "[i]n post-conviction, the appellate court concluded the ballistics was relevant only to Dellinger's guilt. *Sutton*, at *21." [Doc. 24 at 40]. The Court was unable to find the claimed appellate court finding. To the contrary, on direct review, the Tennessee Supreme Court found that "[a] thorough review of the record reveals no admitted evidence that was improper as to one of the defendants." *State v. Sutton*, 79 S.W.3d 458, 468 (Tenn. 2002).

86

trials.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (re-emphasizing "that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions").

Nevertheless, the failure to grant a severance, if it rises to the level of a Fourteenth Amendment due process violation, is a constitutional error which warrants habeas relief. *Davis v. Coyle,* 475 F.3d 761, 777 (6th Cir. 2007).  To obtain habeas relief on a claim involving state law, the burden is on Sutton to demonstrate the state court's denial of his motion to sever resulted in prejudice so great that he was denied his right to a fair trial.  *Id.* In other words, a state trial court's alleged abuse of discretion, without more, is not a constitutional violation and does not entitle Sutton to habeas relief.  *Stanford v. Parker*, 266 F.3d 442, 459 (6th Cir. 2001).  Disparity in the amount of evidence presented against a co-defendant does not justify severance in the absence of a showing of prejudice.  *United States v. Hogan*, 763 F.2d 697, 705 (5th Cir. 1985).  Joint trials of co-defendants are generally favored.  *Id*.  "A petitioner seeking habeas relief on the basis of a trial court's failure to sever his trial from his co-defendant's bears a very heavy burden." *Id*

Contrary to Sutton's allegations, the pieces of evidence he claims were only relevant to Dellinger were actually relevant to the commission of the crime of which they were both accused and ultimately convicted.  The contested evidence established, or at least strongly implied, that the murders were committed by means of weapons which had been shot and arguably possessed by Dellinger or by someone who was practice-shooting in his yard [Addendum No. 12, Vol. 7, pp. 2915-56; 2973-98, 3020, 3031-39; Addendum No. 12, Vol.

87

9, pp. 3261; Addendum No. 12, Vol. 11, p. 3417-3418]. Since the evidence revealed Dellinger and Sutton were together during the pertinent times and since the ballistic evidence was connected to the murders, the evidence was properly admitted against those persons standing trial for those murders. The evidence was introduced to establish the murders against both defendants, and severance was not warranted merely because the defendants may have played different roles in the murders. Thus, Sutton has failed to show he suffered the requisite quantum of prejudice since the challenged evidence was intertwined with the murder and since it was admissible against both Sutton and Dellinger in trying to establish their guilt. Sutton, therefore, was not deprived of any constitutional right by the denial of a severance.

This determination is not affected by Sutton's argument that the ballistic evidence would not have been introduced at his trial if he had been granted a severance. This is not a case where ballistic evidence from a crime Sutton was not accused of committing was admitted. It is also not a case where Dellinger and Sutton presented antagonistic defenses, naming each other as the shooter. Rather, circumstantial evidence connected Dellinger and Sutton to the crime, and the ballistic evidence was a piece of the circumstantial evidence. There was also proof which established that Dellinger and Sutton were the last individuals with each victim when that victim was last seen alive. Thus, even if Sutton had received a severance, the ballistic evidence is relevant evidence that could have been introduced at his trial.

Consequently, under the circumstances, the Court does not find that Sutton carried his burden of establishing, by clear and convincing evidence, that the state court was erroneous in this connection or that "no . . . evidence that was improper as to one of the defendants" was admitted. *State v. Sutton*, 79 S.W.3d at 468 (Tenn. 2002). Thus, he has not demonstrated that the denial of his motion for severance (or separate juries) resulted in prejudice so great as to deny him his constitutional right to a fair trial. *United States v. Lane*, 474 U.S. 438, 446, n.8 (1986) (finding improper joinder of defendants does not, in itself, violate the Constitution because the demonstration of prejudice must be so great as to deny the Fifth Amendment right to fair trial in order to rise to level of constitutional violation).

Accordingly, since Sutton has failed to demonstrate that the state court's resolution of this claim was contrary to or an unreasonable application of Supreme Court precedent, no habeas relief is warranted, and this claim will be **DISMISSED**.

### G.     Admission of Evidence of Ms. Branam's Murder, Fight on Alcoa Highway, and Trailer Arson in Sevier County (Claim VII)

Although the critical question the jury was to resolve was whether he was guilty of the first degree murder of Griffin, Sutton contends that the trial court admitted volumes of proof about the death of Ms. Branam, a fight on Alcoa Highway, and a trailer arson in Sevier County. Citing to *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974), Sutton argues that admission of extensive evidence of these other alleged bad acts denied him his right to a fair trial and due process, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

89

Respondent maintains this claim is procedurally defaulted because, when arguing that Ms. Branam's murder evidence was inadmissible before the state trial court, Sutton relied upon the Tennessee Rules of Evidence and Tennessee state cases and made no constitutional argument [Addendum No. 8, pp. 1525-61]. Respondent contends that, although Sutton attempted on direct appeal to recast this claim as a constitutional violation, the state appellate court properly determined that such a change of argument is prohibited under Tennessee law. *See State v. Adkisson*, 899 S.W.2d 626, 634-635 (Tenn. Crim. App. 1994) (holding that an objecting defendant is bound by the ground raised in an objection and cannot abandon it to raise a new ground in a motion for new trial or on appeal).

In his state appellate brief, Sutton claims he was denied a fair trial and due process, citing Amendments Five, Six, Eight, and Fourteen of the United States Constitution [Addendum No. 18, pp. 5378-81]. The state appellate courts did not address the claim on constitutional grounds. Nevertheless, even assuming, for the sake of discussion, that the constitutional claim is properly before the Court, Sutton is not entitled to any relief on his claim. Specifically, because Sutton cannot demonstrate that introduction of the challenged evidence denied him his right to a fair trial or due process, habeas relief is not warranted.

As to the altercation on Alcoa Highway and the burning of Griffin's trailer, the trial court ruled the evidence was relevant to establishing the sequence of events on the night of Griffin's murder. Additionally, the trial court concluded the probative value of this evidence was not outweighed by the danger of any prejudicial value [Addendum No. 8, pp. 1453-55]. The appellate court agreed, concluding, "[t]he evidence that showed that [Sutton and

90

Dellinger] were involved in an altercation with Griffin and that they set fire to Griffin's trailer on the night that he was killed was relevant to establishing [their] intent and motive for killing Griffin." *State v. Sutton*, 2001 WL 220186, at *21. The appellate court found this evidence was properly admitted because it was relevant to show Sutton's and Dellinger's hostility toward Griffin, as well as "malice, intent, and a settled purpose to harm the victim." *Id.* Further, the appellate court found "the evidence that tied [Sutton and Dellinger] to the other crimes against Griffin that were committed just hours before Griffin was killed was also relevant to establishing the identity of Griffin's killer, . . . and that the probative value of this evidence was not outweighed by danger of unfair prejudice." *Id.*

As to Ms. Branam's murder, the trial court admitted this evidence because it was relevant to establish the identity of Griffin's killer [Addendum No. 8, pp. 1560-72]. On direct appeal, the appellate court addressed this claim as follows:

> We conclude that the trial court did not abuse its discretion when it ruled that this evidence was admissible. The evidence regarding the Branam murder showed that when [Sutton and Dellinger] went to Howie's Hideaway with Branam the day after Griffin was killed, they acted suspiciously by repeatedly questioning the barmaids about whether they remembered seeing them with Griffin on the previous day and by attempting to fabricate a story about drinking at the bar with Griffin after he had been released from jail. In addition, the evidence showed that when Newman told [Sutton and Dellinger] that she remembered them from the day before, Sutton attempted to convince Newman to come with them. When Newman refused, Sutton threatened her. This evidence suggests that [Sutton and Dellinger] had the intent to silence any witness who could connect them with Griffin's murder. Thus, the evidence of Branam's murder was highly relevant to establishing the identity of Griffin's killers because it tended to show that [Sutton and Dellinger] had killed Branam in order to conceal the fact that they had murdered Griffin. In addition, we conclude that the highly probative value of this evidence was not outweighed by the danger of unfair prejudice. Under these circumstances, we cannot say

91

that the trial court abused its discretion when it admitted this evidence. This issue has no merit.

*State v. Sutton*, 2001 WL 220186, at *22.

The state appellate court determined that the trial court's rulings did not violate Tennessee's evidentiary rules, citing specifically to Rule 404(b) of the Tennessee Rules of Evidence, which permits the admission of "evidence of other crimes, wrongs, or acts" for reasons other than to demonstrate "the character of a person in order to show action in conformity with the character trait." *Id.*

"[F]ederal habeas corpus relief does not lie for errors of state law," *Estelle v. McGuire*, 502 U.S. 62, 67 (1991), such as evidentiary rulings, unless the rulings "rendered the trial so fundamentally unfair" that a denial of constitutional rights results. *Webster v. Rees*, 729 F.2d 1078, 1079-80 (6th Cir. 1984) (citing *Logan v. Marshall*, 680 F.2d 1121, 1123 (6th Cir. 1982)). The admission of evidence violates due process "[o]nly if there are no permissible inferences the jury may draw from the evidence[.]" *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir.1991). When an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process, and thus warrant habeas relief. *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001) ("A state court evidentiary ruling will be reviewed by a federal habeas court only if it were so fundamentally unfair as to violate petitioner's due process rights."); *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000). Nonetheless, "courts 'have defined the category of infractions that violate 'fundamental fairness' very narrowly.'" *Wright v. Dallman*, 999 F.2d 174, 178 (6th Cir.

1993) (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)). "Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour*, 224 F.3d at 552 (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)). Thus, unless Sutton can demonstrate that the introduction of this evidence denied him his right to a fair trial or due process, as he claims, habeas relief is not warranted.

The evidence of the fight on Alcoa Highway, the trailer arson, and Ms. Branam's murder was introduced to prove the sequence of events that occurred prior to Griffin's murder and the identity of his murderers. The evidence of the altercation and arson preceding Griffin's death was properly admitted as circumstantial proof which bore on the issue of intent and the identity of the perpetrators of Griffin's murder. The evidence of Ms. Branam's murder was relevant to prove the perpetrators of Griffin's murder based upon the circumstances and events that occurred over the course of the weekend. Thus, any prejudicial effect of the proof of all three crimes or acts was outweighed by the probative value of that evidence and was necessary to support the State's burden of proof.

Sutton also attacks the amount of evidence of the "prior bad acts" and the number of witnesses the State used to introduce that evidence, in addition to claiming the court did not consider the probative value versus the prejudice which ensued. A review of the record reflects that both the trial and appellate courts specifically determined the probative value of this evidence outweighed any prejudice. *State v. Sutton*, 79 S.W.3d at 483-85. A review of the record also reflects that this case was based purely on circumstantial evidence and that

93

numerous witnesses possessed different pieces of the evidence. Consequently, the amount of evidence and the number of witnesses used were necessary to introduce all of the relevant evidence and to enable the State to carry its burden of proof.

Also, the Court disagrees with Sutton's claim that numerous pieces of evidence, including Ms. Branam's age, status as a mother, and condition of her dead body were introduced solely for inflammatory purposes. First, the Court concludes any reference to Ms. Branam's age was inconsequential. Next, the evidence that Ms. Branam was a mother was required to explain the relationship of her daughters to Griffin, Ms. Branam's brother, and the victim in this case. Both of Ms. Branam's daughters were important witnesses for the State. Specifically, one of the daughters testified that Ms. Branam left home the next day looking for Griffin. Finally, the State's theory was that an accelerant was used to burn Griffin's trailer and Ms. Branam and her car. The evidence of the condition of her body therefore was probative of the State's position that an accelerant was used to burn Branam.

Sutton does not cite to, nor does research reveal, any Supreme Court cases directly addressing the constitutionality of a trial court admitting evidence of a defendant's other crimes or bad acts. While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, see *Old Chief v. United States*, 519 U.S. 172, 117 S.Ct. 644, 651 n.7 (1997) (limiting the holding to cases involving proof of felon status); *Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly addressed the

issue in constitutional terms.[37] Moreover, Sutton presents no evidence that the admission of the challenged evidence rendered his trial fundamentally unfair. Indeed, the evidence did not mislead the jury or misrepresent facts, and thus the trial was not rendered unfair by its introduction. Thus, the admission of prior bad acts evidence was not contrary to clearly established Supreme Court precedent as there is no clearly established Supreme Court precedent which holds that a state violates due process by permitting evidence in the form of other bad acts evidence to establish the intent or identity of the killers in a murder case.

Accordingly, Sutton is not entitled to habeas relief on his evidentiary claim involving the fight, the trailer arson, and Ms. Branam's murder, and this claim will be **DISMISSED**.

## H. Confrontation Rights (Claim VIII)

Sutton contends he was denied his Sixth Amendment right to confront witnesses against him by the admission of Griffin's statement to Officer Roberts concerning the incidents on Alcoa Highway and two missing persons reports filed by Griffin's mother. In those reports, Griffin's mother stated that she had not seen or heard from Griffin or Ms. Branam since February 21, 1992. Respondent maintains these claims are procedurally

---

[37]Tennessee Rule of Evidence 404(b) is very similar to its counterpart in the Federal Rules. Just as federal courts have concluded Rule 404(b) permits evidence of other acts to prove that a defendant was in fact the perpetrator of the conduct at issue, such evidence is likewise admissible under the Tennessee rule to establish the identity of the perpetrator. *See United States v. Mills*, 895 F.2d 897, 907 (2nd Cir. 1990) ("In order to show that it was in fact Mills who had made the counterfeit bills, the government was entitled to show that the process used to make the bills at issue here was a unique one, that it had been encountered only once before in the experience of the Secret Service, and that on that prior occasion the perpetrator was Mills."), *cert. denied*, 495 U.S. 951 (1990).

defaulted because Sutton never raised them in state court as a violation of his Sixth Amendment right to confront.

As to his challenge to the missing persons reports, the state appellate court concluded that, since Sutton raised this issue during trial on the grounds that the reports were not proper rebuttal evidence, but on appeal argued the reports were inadmissible hearsay, the issue was waived. *State v. Sutton*, 2001 WL 220186, at *24. A claim that is waived in state court will not be reviewed by a habeas court unless a petitioner shows cause and prejudice for the default or actual innocence. Moreover, Sutton has claimed for the first time in his habeas petition that his confrontation rights were violated. The substance of a federal habeas corpus claim must first be presented to the state courts and Sutton's failure to do so renders this claim procedurally defaulted. Likewise, the appellate court's finding that the claim challenging the missing persons reports on grounds of hearsay was waived prevents the Court from considering that claim because a state procedural rule which is regularly enforced prohibits the state court from extending further consideration to the claim, as it is deemed procedurally barred. *See Coleman*, 501 U.S. at 752-53.

Sutton also claims statements that Griffin made to Officer Roberts concerning the incident on Alcoa Highway violate his confrontation rights. Again, Sutton failed to raise this constitutional claim in state court [Addendum No. 18, p. 5443-44]. In state court, Sutton argued the trial court erred when it allowed the State to introduce Griffin's statements to the officer because those statements were inadmissible hearsay. Nowhere in his state appellate brief addressing this issue does he mention the Constitution or the confrontation clause.

96

Tellingly, Sutton does not address his procedural default in response to Respondent's summary judgment motion, but instead continues to claim the "hearsay and Confrontation Clause issues were resolved with reference to *Ohio v. Roberts*, 448 U.S. 56 (1980), and *White v. Illinois*, 502 U.S. 346 (1992)." [Doc. 86 at 80-81]. He fails to direct the Court's attention to the claimed constitutional argument.

Consequently, Sutton's alleged constitutional violation was raised at the state level only as a state evidentiary ruling violation, and he has committed a procedural default for which no cause and prejudice has been shown. Accordingly, this claim will be **DISMISSED** as procedurally defaulted.

## I. Sutton's Tape-Recorded Statement (Claim IX)

Even though Sutton's statement to law enforcement officers was tape-recorded, the sound quality was too poor for the jury to understand, and the trial court instead admitted a transcription of the statement, which allegedly included 272 blanks indicating unintelligible portions. Sutton complains that admission of the incomplete statement prevented him from presenting evidence favorable to his case, in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. Sutton, however, fails to explain what favorable evidence he was prevented from presenting.

The state appellate court concluded the trial court did not abuse its discretion when it admitted this evidence because Detective Widener, who had interviewed Sutton at the Sevier County Sheriff's Department on February 25, 1992, and who had electronically recorded the statement, testified he had previously listened to the tape and verified that the

97

transcript of the tape was accurate by comparing the tape several times to the transcript when the tape was in better shape. The appellate court, relying upon Widener's testimony, concluded the transcript was not inaccurate simply because parts of the tape were unintelligible, resulting in blanks in the transcript, and denied relief. *State v. Sutton*, 2001 WL 220186, at *24.

Sutton has failed to identify any Supreme Court precedent which prevents the admission of the transcript. Sixth Circuit case law provides that "the admission of tape recordings at trial rests within the sound discretion of the trial court[;] [t]hat discretion presumes, as a prerequisite to admission, that the tapes be authentic, accurate and trustworthy [; and although] they must be audible and sufficiently comprehensible for the jury to consider the contents[,] recordings will be deemed inadmissible if the 'unintelligible portions are so substantial as to render the recording as a whole untrustworthy.'" *United States v. Robinson*, 707 F.2d 872, 876 (6th Cir. 1983) (citations omitted). In addition, it is within the court's discretion to determine whether unintelligible portions of the tape render the whole recording untrustworthy. *United States v. King* 272 F.3d 366, 374 (6th Cir. 2001), *cert. denied*, 535 U.S. 1119 (2002).

Absent evidence that the transcript was inaccurate or untrustworthy and lacking any showing that the state court decision was contrary to or an unreasonable application of Supreme Court precedent, Sutton has not demonstrated he is entitled to habeas relief, and this claim will be **DISMISSED**.

98

### J.       Biased Jury (Claim X)

Sutton contends the trial court's denial of a change of venue violated the Fifth, Sixth, Eighth, and Fourteenth Amendments.   In January of 1996, the trial court halted the proceeding because, according to Sutton, an impartial jury could not be impaneled.  Counsel filed a motion to change venue, arguing that extensive publicity made a fair trial in Blount County impossible.  The trial court denied the motion, and the state appellate court upheld the decision. *State v. Sutton*, 2001 WL 220186, at *13-14.

Sutton contends the state court's opinion was an unreasonable application of or was contrary to Supreme Court precedent.  Sutton contends the trial court should have granted his motion for a change of venue because the motion was filed after a previous unsuccessful attempt to select a jury, and his jury was selected only after the court took over questioning and eliminated questioning about the appropriate sentence.  Thus, Sutton argues that he was denied his right to an impartial jury.

Respondent contends that Sutton did not adequately present this constitutional claim to the state court, thus procedurally barring it from habeas review.  Alternatively, Respondent claims Sutton's conclusory allegations fail to show the barrage of publicity necessary to demonstrate an instance of presumed prejudice, citing *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976).

Respondent's arguments are well-taken.  Sutton raised this claim in state court as a state law claim, and he has failed to support his conclusion that his jury was biased with any factual support.   In his state appellate brief, Sutton claimed the trial court abused its

discretion in denying his change of venue motion. On direct appeal, Sutton argued there was "a lot of pre-trial publicity which many jurors indicated they had knowledge of" [Addendum No. 18, p. 5387]. Additionally, he claimed that "[d]ue to the small community of Maryville being adjacent to Sevier County with extensive newspaper coverage of every aspect and every hearing, . . . the Court abused discretion in failing to change venue or obtain a jury from another county for trial" [Addendum No. 18, pp. 5387-88].

The state appellate court observed that a defendant must demonstrate that the jurors who actually sat were biased and/or prejudiced before an accused is entitled to a reversal of his conviction on the ground that a trial judge erroneously denied his motion for change of venue. *State v. Sutton*, 2001 WL 220186, at *13. The state appellate court concluded Sutton was not entitled to relief, reasoning:

> On January 6, 1996, [Sutton and Dellinger] filed a motion for change of venue in which they referred to an article in that day's edition of the Daily Times. [This article is not in the record.] Although the trial court's order of January 31, 1996, which denied the motion states that the court heard testimony from witnesses and argument from counsel, the record does not contain a transcript of this hearing. However, the record does contain two volumes of excerpts from the voir dire that was conducted in this case. A review of these excerpts indicates that the trial court carefully and meticulously orchestrated the jury selection process to ensure the selection of an impartial jury. The trial court conducted individual voir dire of the potential jurors in order to determine whether they had heard anything about the facts of this case and the Connie Branam case that would interfere with their impartiality. The trial court then gave counsel for the State and the defense the opportunity to ask further questions. The trial court then excused any potential jurors who indicated that they would have difficulty being impartial.

> In this case, [Sutton and Dellinger] have failed to specifically identify any pretrial publicity that would suggest that there was any "undue excitement against [them]" in Blount County or any other reason why a fair trial could not

100

be had in Blount County. Moreover, [Sutton and Dellinger] have failed to identify a single juror who was allegedly biased. Quite simply, [Sutton and Dellinger] have failed to meet their burden of showing that any of the jurors who sat during trial were actually biased or prejudiced against them. This issue has no merit.

*Id.* at *13-14 (footnote added to body).

Sutton filed a motion for mistrial or change of venue on January 26, 1996, claiming that, on that date, the Blount County newspaper contained an extensive review of the case [Addendum No. 1, Vol 5, p. 612]. The court denied the motion on January 30, 1996, after hearing testimony from witnesses and argument from counsel [Addendum No. 1, Vol. 1-3, p. 196]. The record reflects that on January 31, 1996, the trial court had to reset the trial of this matter because there was "an insufficient number of jurors" [Addendum No. 1, Vol. 5, p. 624]. There was an attempt to seat a jury in February of 1996, with the help of a jury selection expert. The process lasted a week before the jury pool was depleted [Addendum No. 1, Vol. 5, p. 807]. The trial date was reset to August of 1996, and a jury was eventually selected.

Sutton has not directed the Court's attention to the location of any evidence supporting his claim that his jury was biased, and the Court's review of this voluminous record has revealed none. The record does contain a transcript of a portion of the voir dire conducted in this case [Addendum No. 10]. The transcript supports the state supreme court's conclusion that this claim lacked merit. *State v. Sutton,* 79 S.W.3d 458, 481 (Tenn. 2002).

"[A] biased juror is one who cannot 'conscientiously apply the law and find the facts.'" *Franklin v. Anderson*, 434 F.3d 412, 422 (6th Cir. 2006) (quoting *Wainwright v. Witt*,

469 U.S. 412, 423 (1985). A juror's "exposure to information about a state defendant's prior convictions or news accounts of the crime with which he is charged [does not] alone presumptively deprive the defendant of due process." *Murphy v. Florida*, 421 U.S. 794, 799 (1975). Thus, "[i]t is not required . . . that the jurors be totally ignorant of the facts and issues involved." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id*. at 723 (citations omitted). A jury should be composed of jurors who "will consider and decide the facts impartially and conscientiously apply the law as charged by the court." *Adams v. Texas*, 448 U.S. 38, 45 (1980).

The portion of the jury selection included in the record does not reveal that Sutton was tried by a biased jury [Addendum No. 10]. For example, one potential juror stated that she had formed an opinion that Sutton and Dellinger were guilty based on what she had read and heard. Although this juror thought she could set aside her preconceived opinion, she was not certain, so the trial judge excused her for cause [Addendum No. 10, pp.1653-58]. Moreover, the transcript reflects other jurors were also excused for cause when there was a demonstration of bias. After conducting jury selection for five and a half days, the trial judge took over *voir dire* on the death penalty questions. However, if a juror's response was equivocal, or there was a problem or question, the trial judge permitted the State and defense to question the juror on the death penalty. The record does not include the complete jury selection process and Sutton does not identify any selected juror who claimed bias, nor has Sutton provided any evidence of undue excitement or any other evidence demonstrating that

102

pretrial publicity resulted in any prejudice. Consequently, Sutton's allegation that he was sentenced to death by a biased jury is factually unsupported and fails to state a constitutional claim upon which habeas relief can be granted.

Accordingly, Sutton has not demonstrated that the state court unreasonably determined the facts or issued a decision that is contrary to or an unreasonable application of clearly established federal law. Therefore, Sutton is not entitled to any habeas relief on his change of venue claim, and this claim will be **DISMISSED**.

### K.    Revocation of Funding for Jury Consultant (Claim XI)

Sutton contends the trial court erred when it revoked authorization for funds to pay for a jury selection expert. Initially, Sutton's motion requesting funds to pay a jury selection expert was granted. In January of 1996, jury selection began with the help of the expert, but a mistrial was declared almost two weeks into jury selection because, according to Sutton, an impartial jury could not be impaneled.

On direct appeal, the state appellate court found no error in the trial court's subsequent revocation of the jury selection expert:

> The record indicates that on March 7, 1994, the trial court granted [Sutton's and Dellinger's] request for funds to pay for a jury selection expert. [Sutton and Dellinger] then had the assistance of jury selection expert Margie Fargo during the initial jury selection that began on January 22, 1996. Although it is not clear from the record, the trial court apparently did not empanel this jury because the jury pool was too small.

> Subsequently, during an *ex parte* hearing on June 18, 1996, the trial court revoked its authorization of funds to pay for a jury selection expert. The trial court reasoned that because defense counsel had spent approximately one and one-half weeks working with Fargo during the first jury selection process,

103

defense counsel had acquired the knowledge that was necessary to effectively select a jury. Thus, the trial court ruled that continued employment of a jury selection expert was not necessary to ensure that [Sutton and Dellinger] received a fair trial.

During an *ex parte* hearing on July 29, 1996, [Sutton and Dellinger] asked the trial court to reconsider its denial of funds for a jury selection expert. [Sutton and Dellinger] argued that a jury selection expert was necessary in every capital case and in addition, a jury selection expert was needed in this case because defense counsel had never selected a "death qualified" jury before. The trial court ruled that [Sutton and Dellinger's] right to a fair trial would not be violated by discontinuing the jury selection expert services. The trial court stated that because defense counsel had already been instructed by Fargo about how to select a jury and because three of the defense attorneys had over twenty years of almost exclusive trial experience, defense counsel would be able to competently select a jury. In addition, the trial court noted that [Sutton and Dellinger] had a right to have a jury that would apply the law fairly and impartially, but [Sutton and Dellinger] did not have the right to have a jury that would never impose a death sentence.

Tennessee Code Annotated section 40-14-207 provides, in relevant part, that when a capital defendant has been found to be indigent, the trial court "may in its discretion determine that investigative or expert services or other similar services are necessary to ensure that the constitutional rights of the defendant are properly protected." Tenn. Code Ann. § 40-14-207(b) (1990). "Absent an abuse of discretion, the trial court's ruling on the necessity for an expert will be upheld." *Ruff v. State*, 978 S.W.2d 95, 101 (Tenn. 1998). In addition, the Tennessee Supreme Court has expressly stated that a trial court may deny a defendant the assistance of a jury selection expert when the defendant has failed to demonstrate a particularized need for the expert services.

 . . . .

In this case, [Sutton and Dellinger] have failed to establish that they had a "particularized need" for the continued use of the jury selection expert. Essentially, [Sutton and Dellinger] argue that because none of the defense attorneys had ever selected a "death qualified" jury before, they were incapable of effectively selecting a jury in this case without continued employment of the jury selection expert. The mere fact that defense counsel had never selected a jury in a capital case before, standing alone, is insufficient

to establish a "particularized need" for the continued services of a jury selection expert in this case. Indeed, as noted by the trial court, two of the defense attorneys had worked closely with Fargo for one and one half weeks during the previous jury selection process. Further, defense counsel stated at the hearing that Fargo had already collected information from [Sutton and Dellinger] and defense counsel and had prepared two pages of questions for defense counsel to ask the potential jurors. Under these circumstances, we conclude that the trial court did not abuse its discretion when it revoked the funds for continued employment of Fargo. This issue is without merit.

*State v. Sutton,* 2001 WL 220186, at *14-15.

Without providing analysis or explanation, Sutton bases his revocation of jury selection claim on *Ake v. Oklahoma*, 470 U.S. 68 (1985), which held that states must provide indigent defendants "access to a competent psychiatrist" in cases in which "a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial." *Id* at 83. Sutton also cites, without discussing its relevance, *Powell v. Alabama*, 287 U.S. 45 (1932), wherein the Supreme Court concluded the defendants were not afforded a fair opportunity to secure counsel of their own choice and that "designation of counsel . . . was so indefinite or so close upon the trial as to amount to a denial of effective and substantial aid in that regard." *Id.* at 53. Sutton has not cited any Supreme Court authority extending the principles of *Ake* to an indigent defendant's request for a jury selection expert. Sutton claims that the prior murder conviction coupled with the extensive publicity made jury selection a formidable task. In addition, he claims that not all counsel worked with the jury consultant because not all counsel participated in the initial unsuccessful *voir dire*.

105

Although there is not a substantial amount of case law on this topic, the Fifth Circuit has discussed an indigent defendant's right to a jury selection expert using the framework set forth in *Ake*, and explained that after *Ake*, defendants are provided access to court-appointed psychiatric professionals because those professionals:

> [G]ather facts, through professional examination, interviews, and elsewhere, that they will share with the judge or jury; . . . analyze the information gathered and from it draw plausible conclusions about the defendant's mental condition, and about the effects of any disorder on behavior; and . . . offer opinions about how the defendant's mental condition might have affected his behavior at the time in question. They know the probative questions to ask of the opposing party's psychiatrists and how to interpret their answers. Unlike lay witnesses, who can merely describe symptoms they believe might be relevant to the defendant's mental state, psychiatrists can identify the "elusive and often deceptive" symptoms of insanity, *Solesbee v. Balkcom*, 339 U.S. 9, 12 (1950), and tell the jury why their observations are relevant. Further, where permitted by evidentiary rules, psychiatrists can translate a medical diagnosis into language that will assist the trier of fact and therefore offer evidence in a form that has meaning for the task at hand. Through this process of investigation, interpretation, and testimony, psychiatrists ideally assist lay jurors, who generally have no training in psychiatric matters, to make a sensible and educated determination about the mental condition of the defendant at the time of the offense.

*Moore v. Johnson*, 225 F.3d 495, 503 (5th Cir. 2000) (quoting *Ake,* 470 U.S. at 80). Unlike the need to have a count-appointed psychiatrist to educate the jurors to make a sensible and educated determination about the mental condition of a defendant, the Fifth Circuit observed that jury selection experts are not required to enable an attorney to select a fair and impartial jury. As the Fifth Circuit observed, the *Ake* Court explained that "a defendant cannot expect the state to provide him a most-sophisticated defense; rather he is entitled to 'access to the

106

raw materials integral to the building of an effective defense.'" *Id.* (quoting *Ake*, 470 U.S. at 77). The Fifth Circuit persuasively reasoned:

> Most of those raw materials come to the defendant in the form of his court-appointed lawyer-in his expert knowledge about how to negotiate the rules of court, how to mount an effective defense, and so forth. Other materials come from lay witnesses, such as evidence necessary to the defendant to establish his defense . . . .
>
> [J]ury selection is not a mysterious process to be undertaken by those learned in the law only with the assistance of outside professionals. All competent lawyers are endowed with the "raw materials" required to pick a jury fairly disposed toward doing substantive justice. While the wealthiest of defendants might elect to spend their defense funds on jury consultants, indigent defendants are not privileged to force the state to expend its funds on this exercise in bolstering an attorney's fundamental skills. Meanwhile, of course, a defendant does not lack "an adequate opportunity to present [his] claims fairly" because he has been denied a jury consultant. Communicating with the jury is a quintessential responsibility of counsel.

*Moore*, 225 F.3d at 503.

The Court does not question that jury selection was a formidable task, as it no doubt is in every death penalty case. Although a jury selection expert's assistance may be helpful, the Court has not found, nor has Sutton directed the Court's attention to, any federal case requiring states to provide indigent criminal defendants with funds to hire a jury selection expert in a death penalty case. Consequently, Sutton has failed to demonstrate that the trial court's revocation of funds for a jury expert was unconstitutional. Sutton has not shown that a jury selection expert would have materially assisted him in his defense or that absence of the requested assistance deprived him of a fair trial.

107

Although the Supreme Court stated it was time to consider the question of whether and when non-psychiatric expert assistance is such a basic tool in *Johnson v. Oklahoma*, 484 U.S. 878 (1987), it didn't directly address the issue nor provide specific guidelines for courts to follow. Instead, the Supreme Court specifically concluded denial of petitioner's request for appointment of an expert chemist resulted in a fundamentally unfair trial because the denial of an expert chemist prevented petitioner from raising doubts about the strength of the State's evidence against him and prevented him from gaining potentially conclusive exculpatory evidence in support of his affirmative alibi defense, thus depriving petitioner of a meaningful opportunity to present a defense. *Id.* at 880. Applying *Johnson* to the instant case, the denial of a jury selection expert did not result in a fundamentally unfair trial because the denial of a jury selection expert did not prevent Sutton from raising doubts about the strength of the State's evidence against him, did not prevent him from gaining potentially conclusive exculpatory evidence in support of his defense, and did not deny him a fair and impartial jury.

Accordingly, the Court is not persuaded that the Tennessee courts applied *Ake* in an objectively unreasonable manner, as Sutton has not demonstrated he was denied expert services that were necessary to present an adequate defense and that denial of the services deprived him of a fundamentally fair trial. Thus, Sutton is not entitled to habeas relief on this claim, and it will be **DISMISSED**.

**L.      Limiting *Voir Dire* (Claim XII)**

      **1.      Restrictions on Death Penalty Questions**

Sutton first claims that the trial court unconstitutionally denied him his right to a fair trial by an impartial jury by barring questions about the death penalty during *voir dire*. The record reflects that the trial court did not bar questions about the death penalty but, instead, took over such questioning because it concluded trial counsel's questions were unclear and confusing the jurors.

Specifically, the trial court took over questioning when it concluded,

> "[T]he jurors are really getting bogged down and confused in these hypothetical situations. They're being asked to compare the effect of a very concrete aggravating factor, another murder conviction, with totally imaginable, not-even-named mitigating factors and they can't do it. And it's just creating a real mental swamp here that we've been stuck in, and we we're going to change directions"

[Addendum No. 10, p. 1751]. However, the trial court still permitted limited questioning by counsel [Addendum No. 10, p. 1751-1935].

On direct appeal, Sutton claimed "[counsel] could not get a feel of the true feeling of the jurors concerning the death penalty." *Tennessee v. Sutton*, 2001 WL 220186, at *13. The state appellate court concluded:

> Indeed, [Sutton and Dellinger] have failed to indicate anything they could or would have done differently if the trial court had conducted *voir dire* differently. In addition, [they] have failed to identify a single instance in which they were prevented from asking questions of a potential juror. Further, [Sutton and Dellinger] have not even argued that any of the jurors who were actually selected through this method of *voir dire* were biased or prejudiced. Indeed, the partial excerpts that are contained in the record indicate that the trial court excused jurors who indicated that they would be unable to be

impartial. Under these circumstances, we conclude that the trial court did not abuse its discretion when it conducted *voir dire* in the manner that it did. This issue has no merit.

*Id.* at *14.

Sutton incorrectly claims the state appellate court denied relief and held that he had no right to learn the "true feelings of the jurors concerning the death penalty" [Doc. 24 at 51]. The portion of the decision Sutton quotes is an argument made by counsel; it is not a holding made by the state appellate court. *State v. Sutton*, 2001 WL 220186, at *14. As the above citation indicates, the state court concluded Sutton had failed to indicate anything he could or would have done differently if the trial court had conducted *voir dire* differently, failed to identify a single instance in which he was prevented from asking questions of a potential juror, and failed to argue any of the actual jurors selected through this method of *voir dire* were biased or prejudiced. *Id.* Likewise, Sutton has failed to make any of those showing before this habeas Court.

## 2. Mitigating Evidence

Sutton, relying on *Morgan v. Illinois*, 504 U.S. 719, 726-27 (1992), next argues that he was denied an opportunity to question the jury's ability to consider mitigating evidence, even though due consideration of dmitigating evidence was particularly important in his case given his prior murder conviction for the murder of Griffin's sister. As a result, Sutton claims he was denied a fair and impartial jury.

In *Morgan*, the trial court would not permit the defendant to inquire whether the jurors would automatically impose the death penalty if they found the defendant guilty. The

Supreme Court reversed, holding that due process requires that a capital defendant be permitted to question prospective jurors as to whether they would impose the death penalty automatically, without regard to mitigating circumstances, and that general fairness and "follow the law" questions are not enough to uncover jurors who harbor that view. *Id.* at 735-36.

As previously explained, a defendant has a due process right to an impartial jury. *Irvin v. Dowd*, 366 U.S. 717, 721-22 (1961). The Supreme Court has consistently held that an impartial jury consists of "jurors who will conscientiously apply the law and find the facts[,]" *Wainwright v. Witt*, 469 U.S. 412, 423 (1985), and "[d]ue process means a jury capable and willing to decide the case solely on the evidence before it." *Smith v. Phillips*, 455 U.S. 209, 217 (1982).

In light of the record as it exists, there is no proof that the *voir dire* deprived Sutton of his constitutional right to a fair and impartial jury. The portion of the *voir dire* that is in the record reflects that each juror retained by the trial court had responded that he or she would listen to the instructions and consider the evidence presented during the sentencing hearing before deciding punishment. Any juror who expressed an inclination to sentence the defendants to death if they were found guilty was dismissed by the trial court. The jurors who were not excused were those who stated they could set aside their views and perform their duties in accordance with their instructions and their oaths [Addenda Nos. 9-10].

Although only a portion of *voir dire* is part of the record, Sutton has not identified any juror from the trial who indicated that he or she would automatically vote to impose the death

111

penalty regardless of the facts. Indeed, Sutton has provided no specific facts to support this claim, relying instead on insufficient generalities. Moreover, the record reflects that the trial court generally asked the jurors if they could consider both life imprisonment and the death penalty as possible punishments [Addenda Nos. 9-11].

Based on the foregoing, the Court cannot conclude that the jury which sentenced him to death was not constitutionally empaneled. *See Mu'Min v. Virginia*, 500 U.S. 415, 424 (1991) ("[T]he trial court retains great latitude in deciding what questions should be asked on *voir dire*"). Accordingly, Sutton has not demonstrated that the Tennessee state courts unreasonably applied clearly established federal law; thus, this claim will be **DISMISSED**.

## M.  Alleged Error For Failing to Excuse Juror Who Had Been Bribed (Claim XIII)

Sutton contends the trial court erred when it failed to remove a juror who "reported to the Court that while sequestered, he received a phone call from his ex-wife attempting to bribe him to find Sutton innocent" [Doc. 24 at 58]. The juror reported the call to a court officer who told the juror not to mention it to anyone else and that he (the court officer) would report it to the court. The state supreme court analyzed the claim as follows:

> After the juror explained what had happened, the trial court commended him for the way that he handled the situation. The trial court then asked the juror how the phone call would affect his feelings about serving on the jury and about following the court's instructions. The juror responded, "I already told her, it's not going to change. I'm not going to change what I already decided on. They can take the money and do whatever they want with it. It just made me mad . . . ." After this somewhat ambiguous statement, the trial court asked the juror whether he would be able to vote according to the dictates of his conscience based on the proof and the instructions from the court. The juror responded that he would. After a brief bench conference, the

112

trial court asked the juror whether he had told any other jurors about the phone call and the juror responded that he had not. The trial court then asked the juror again whether the phone call would inhibit his ability to reach a verdict based on the facts and the law. The juror responded that it would not.

[Sutton and Dellinger's] argument as to why this juror should have been removed is far from clear. However, it appears that their contention is that the juror's statement that the phone call would not "change what I already decided on" demonstrates that the juror was biased against them and that he had a preconceived judgment about the case. This statement could have any number of meanings in the context in which it was given, including an assertion that the phone call would not affect his ability to be impartial. In any case, the trial court clarified the meaning of the statement by asking the juror about whether the phone call would affect his ability to impartially reach a verdict based on the proof and the court's instructions about the law. On two occasions, the juror responded that he would follow the law and apply it to the proof that had been presented. Under these circumstances, we conclude that the trial court did not abuse its discretion when it failed to remove this juror. This issue has no merit.

*State v. Sutton*, 79 S.W.3d at 493-94.

Sutton is correct that the Sixth Amendment guarantee of a trial by jury requires the jury verdict to be based on the evidence produced at trial. *Turner v. Louisiana*, 379 U.S. 466, 472 (1965). Sutton, however, does not claim that the jury verdict in his case was not based on the evidence produced at trial. Sutton instead argues that the jury pool was tainted and that jury tampering is "deemed presumptively prejudicial," citing *Remmer v. United States*, 347 U.S. 227, 229 (1954). In addition, Sutton contends the burden to overcome this presumption rests on the State and that the burden was not overcome by the State in this case.

The *Remmer* Court did state:

In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in

113

pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties.

*Id.* However, it also instructed that "[t]he presumption was not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant." *Id.*

Sutton does not contend nor submit any evidence demonstrating that contact with this juror was not harmless to him. The trial court in Sutton's case "determine[d] the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial in a hearing with all interested parties permitted to participate[,]" as instructed in *Remmer*. *Id.* at 229-230. Specifically, the trial court asked the juror whether he was certain he could vote what his conscience dictated, based on the proof that he heard and the law about which he would be instructed, without any influence or any second thoughts about the bribe. [Addendum No. 15, pp. 4660-69]. The juror replied that he could perform his duty without permitting the bribery to influence his decision [Addendum No. 15, pp. 4664-64]. The trial court then inquired a second time, asking the juror whether the bribery would have any influence with his following the law, taking the facts that he heard during trial, and applying them to the law that the court would provide. The juror responded that the bribe would have no influence [Addendum No. 15, p. 4668].

Therefore, the state trial court followed the mandate of the Supreme Court to conduct a hearing with all interested parties to determine whether the incident complained of was harmful to Sutton, and after the hearing, the court found that it was not. Finding that the

114

bribery attempt had no effect upon the integrity or the state of mind of the juror, who stated unequivocally on two different occasions that the incident in question would not impact his ability to apply the law to the facts that he had heard at trial, the court concluded the incident was not harmful to Sutton. *State v. Sutton*, 79 S.W.3d 458, 493-94 (Tenn. 2002).

There is no evidence before the Court reflecting that this juror's impartiality was compromised. As the Supreme Court has recognized:

> [D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable . . . . [I]t is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.

*Smith v. Phillips,* 455 U.S. 209, 217 (1982). The state court's actions and ultimate determination regarding this juror are fully in accord with *Remmer* and provide no basis for habeas relief. Accordingly, this claim will be **DISMISSED**.

## N.      Revelation of Sevier County Trial (Claim XIV)

Sutton contends the jury was tainted because the State revealed to the jury that Sutton had already been tried in Sevier County (for the death of Connie Branam). Sutton contends that Larry Muncy's testimony that he had turned certain evidence over to a court reporter "during the course of the trial" denied him of his right to an impartial jury. [Doc. 24 at 58-59] In addition, Sutton contends a juror wrote the judge indicating he had seen an evidence bag with words that stated "not admitted in Sevier County trial." [Addendum No. 12, Vol. 10, p. 3453].

The trial court inquired into the matter with the juror. Although the juror assured the court the extrinsic evidence would not affect deliberations, Sutton contends that relief is warranted because juror knowledge of prior criminal behavior is inherently prejudicial. Sutton further contends the juror told another juror and also wrote a letter to the judge about it, which indicates the juror's claim that he could set aside the information cannot be accredited [Doc. 26 at 58-59]. Without providing any analysis or explaining its relevance, Sutton cites *Turner v. Louisiana*, 379 U.S. 466 (1965), to support this claim. In *Turner*, the Supreme Court concluded the defendant had been denied his right to a fair trial by an impartial jury because the two court officers assigned to guard the jury were also trial witnesses and had fraternized with the jury outside the courtroom during performance of their duties. *Id.* at 473.

Respondent counters that Sutton failed to raise this claim as a constitutional claim in state court and, alternatively, that his failure to demonstrate that the state court decision was contrary to or an unreasonable application of federal law entitles him to no habeas relief [Doc. 30 at 56]. In response, Sutton acknowledges that he did not specifically identify a constitutional provision nor cite to federal law, but he claims that he did cite to *State v. Fleece*, 925 S.W.2d 558 (Tenn. Crim. App. 1995), a case based on federal law. The *Fleece* court held "that the trial court improperly permitted the jury to hear evidence of appellant's restricted license" and, thus, reversed the conviction and remanded for a new trial. *Id.* at 559. The *Fleece* court concluded that Tennessee Rules of Evidence 404(b) established the proper procedure for determining whether the evidence of his other crime was admissible. The only

116

mention by the court of the United States Constitution was when it cited to *State v. Luellen*, 867 S.W.2d 736 (Tenn. Crim. App. 1992), and noted parenthetically that the *Luellen* case cited the United States Constitution and the Tennessee Constitution. Thus, this constitutional claim is procedurally barred.

Even if Sutton's procedural default did not foreclose federal habeas review, he is not entitled to relief on this claim because he has not demonstrated that the state court's decision was contrary to or an unreasonable application of Supreme Court precedent. The state supreme court summarized the facts supporting this claim as follows:

> The record indicates that while Larry Muncy was testifying about the chain of custody of various pieces of evidence, he stated that certain evidence had been turned over to Jenny Noe "during the course of the trial." Defense counsel then objected and moved for a mistrial on the ground that the jurors could assume based on Muncy's use of the word "trial" that [Sutton and Dellinger] had previously been charged and tried for the murder of Branam. The court overruled the motion.

> The record also indicates that the trial court subsequently received a note from an alternate juror in which the juror indicated that he had seen a bag with the words "not admitted in Sevier County trial" sitting on a table. When the trial court questioned the juror about this incident, the juror stated that because he had seen the bag and because Muncy had previously used the word "trial," he assumed that there had already been a trial in Sevier County. The juror then stated that he had mentioned the bag to one other juror, but she had given no response. The trial court then asked the juror whether seeing the bag or hearing the word "trial" would have any influence on his ability to base his verdict on the proof presented in this case and the juror responded, "None whatsoever." Defense counsel renewed the motion for a mistrial and the court overruled it.

*State v. Sutton,* 79 S.W.3d at 494-495.

117

Although a litigant has no right to a perfect trial, "for there are no perfect trials," *Brown v. United States*, 411 U.S. 223, 23-32 (1973), due process does require "a jury capable and willing to decide the case solely on the evidence before it." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). When a party challenges the results of a trial on the basis of a juror's alleged untruthfulness in *voir dire,* the Supreme Court requires the party first to demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further to show that a correct response would have provided a valid basis for a challenge for cause. *See McDonough Power Equip. Inc. v. Greenwood*, 464 U.S. 548, 556 (1984). The Supreme Court stated that "[t]he motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." *Id.* Although the Court realizes the challenged questioning was not done during the initial *voir dire*, there is no evidence before the Court that the juror failed to honestly answer the trial court's questions.

Evidence at trial tied both the murder of Griffin and the murder of Ms. Branam to Sutton and Dellinger. Thus, any prejudicial impact from the information the jury had indicating there was a previous trial in Sevier County is minimized by the fact that the State offered direct evidence implicating Sutton in Ms. Branam's murder. The trial court conducted a hearing with counsel and the juror, though it is unclear from the record whether this juror, who was an alternate, was one of the jurors who rendered the verdict. Nonetheless, the juror told the trial court he had not heard whether there was a trial, though that was the innuendo from the mention of trial and from seeing the evidence bag. If there

was a trial, the juror did not know who was involved in it, who was charged, or the outcome of the trial. Finally, the juror assured the trial court that the intimation that there had been a trial would not affect his verdict [Addendum No. 12, Vol. 10, pp. 3457-62]. The state court concluded the inadvertent disclosure in this case of the word "trial" by the witness and the writing on the evidence bag ("not admitted in Sevier County trial") "did not create any inference whatsoever about the verdict in the Sevier County trial." *State v. Sutton*, 79 S.W.3d at 495.

Sutton has not provided any evidence that this juror decided his fate or, assuming this alternate juror did ultimately deliberate, that he did not decide the case solely on the evidence before the jury. Sutton has failed to provide any juror affidavits or other evidence suggesting that this juror or any of the other jurors were prejudiced by the disclosure that there was a trial in Sevier County. There simply is no evidence before the Court that any juror's impartiality was compromised. Nothing submitted herein shows that the juror exposure was prejudicial or that the state court's finding that the trial court did not abuse its discretion was contrary to or an unreasonable application of the governing legal rule in Supreme Court decisions. Accordingly, this claim does not warrant habeas relief and will be **DISMISSED**.

### O. Conviction-Prone Jury (Claim XV)

Sutton claims the jury that sentenced him to death was the same jury that adjudicated his guilt, and since the jurors were death penalty qualified, they were prone to convict him. Sutton contends that he should have been provided a separate sentencing jury and that the failure to provide him with one denied him due process and a fair and impartial jury.

119

There is no Supreme Court precedent for Sutton's contention that he should have been provided a separate sentencing jury. Although the Supreme Court has not addressed this specific claim, it has consistently approved the use of the same jury to determine both guilt and punishment. *See generally Lockhart v. McCree*, 476 U.S. 162, 175-76 (1986) ("'Death qualification,' unlike the wholesale exclusion of blacks, women, or Mexican-Americans from jury service, is carefully designed to serve the State's concededly legitimate interest in obtaining a single jury that can properly and impartially apply the law to the facts of the case at both the guilt and sentencing phases of a capital trial"); *see also Buchanan v. Kentucky*, 483 U.S. 402, 417 (1987) ("The Court further explained in *McCree* that the State's interest in having a single jury decide all the issues in a capital trial was proper."). Since Sutton has not shown that the procedure utilized at his trial rendered his conviction or sentencing outcome fundamentally unfair and since there is no clearly established federal law requiring a separate sentencing jury, the state court's determination that relief should be denied cannot be contrary to or an unreasonable application of Supreme Court precedent. Habeas relief is not warranted on this claim, and it will be **DISMISSED**.

### P.    Refusal to Instruct on Lesser Offense (Claim XVI)

Sutton claims that, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments, the state trial court denied him a reliable death sentence, a fair trial, and due process by refusing to instruct on the lesser included offense of facilitation. Sutton makes several supporting arguments that he was less culpable for Griffin's premeditated murder than his co-defendant, Dellinger. First, he asserts that there was one shot and two defendants

120

and that he was not responsible for the one shot. Second, he maintains that he did not put the alleged weapon in the car as he was already in the car when Dellinger placed the weapon in the trunk. Finally, Sutton submits that he was not present when Dellinger removed the weapon from the car and stored it underneath his trailer [Doc. 24 at 60].

Respondent contends this claim is procedurally defaulted because Sutton failed to raise this claim as a constitutional error in the state courts. Sutton does not contest that he has defaulted this claim. On direct appeal he cited to the Tennessee Constitution and state cases, but he also cited to *Jackson v. Virginia*, 443 U.S. 307 (1979), to support his argument that there was no evidence to suggest that he was an accomplice [Addendum No. 18, pp. 5450-53]. Therefore, Sutton contends that he was not criminally responsible for Dellinger's conduct. Sutton does not, however, argue that failing to give the lesser-offense instruction was a constitutional violation. This claim is procedurally defaulted.

Notwithstanding the default, Sutton would still not qualify for habeas relief. This claim of error is based on *Beck v. Alabama*, 447 U.S. 625, 627 (1980), wherein the Supreme Court held that it is unconstitutional to impose the death penalty when a "jury [is] not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict." *Id*. at 627. Contrary to Sutton's argument, as explained below, the evidence would not have supported a verdict of the lesser included offense of facilitation of a felony.

121

Tennessee Code Annotated § 39-11-403 provides in pertinent part:

> A person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony.

Tenn. Code Ann. § 39-11-403(a) (1991). The intent required for criminal responsibility under § 39-11-402(2) is "intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense." Tenn. Code Ann. § 39-11-402(2) (1991).

In assessing Sutton's claim, the state supreme court reviewed the elements for determining whether an offense is a lesser-included offense of another and observed that facilitation is a lesser-included offense when a defendant is charged with criminal responsibility for the conduct of another. However, the court further observed that the instruction must not be given simply because an offense is a lesser-included offense of another. Rather, the court must determine whether any evidence exists that reasonable minds could accept as to the lesser included offense and whether the evidence viewed in this light is legally sufficient to support a conviction for the lesser-included offense. *State v. Sutton*, 79 S.W.3d at 486. The court analyzed the evidence as follows:

> In this case, there is absolutely no evidence in the record from which a rational jury could conclude that Dellinger forced Sutton to participate in the murder against his will. Further, we hold that a rational jury could not conclude from the evidence in the record that Sutton was merely a bystander during the murder of Griffin. The State's theory of the case, which was supported by extensive proof, was that Dellinger and Sutton acted in unison with a common purpose and design to kill Griffin. Indeed, the State's theory was that both [Sutton and Dellinger] fought with Griffin, attempted to bail Griffin out of jail, set fire to Griffin's trailer, transferred the murder weapon from a truck to a car, successfully bailed Griffin out of jail, and then were present while one of them

122

fired the fatal shot. The defense theory for both [Sutton and Dellinger] was that neither one of them committed the murder. Indeed, much of the defense proof went to establishing that they were friends with Griffin and had no reason to kill him, that Griffin died long after he was last seen with [Sutton and Dellinger], and that there were several other possible culprits in this case. Thus, the evidence in the record created an "all or nothing" situation in which Sutton and Dellinger both actively participated and promoted the murder of Griffin or neither one of them did. There is simply no evidence in the record from which a rational jury could conclude that Sutton provided substantial assistance to Dellinger without having the intent to promote or assist the commission of the offense. Therefore, the trial court did not err when it failed to instruct the jury on the lesser included offense of facilitation of a felony. This issue has no merit.

*Id.* at 496-497.

Sutton's argument that the state appellate court manufactured the element of forced participation as an element of facilitation is unsound. In his appellate brief, Sutton suggested that the proof circumstantially could have shown that he could have left the jail with Dellinger and Griffin without knowing of any plan to kill his friend and "was either forced to go along with or was present when it happened and then gave a statement assisting Dellinger in attempting to present an alibi." [Addendum No. 18, p. 5451]. Thus, the court did not manufacture an element, but rather addressed Sutton's argument—that he could have been forced to participate—ultimately concluding that a lesser-included offense instruction on facilitation was not warranted because there was not evidence to support it.

The state court's determination of the facts in light of the evidence presented in the state court will be presumed correct because there is no clear and convincing evidence to rebut it. *See* 28 U.S.C. § 2254(e)(1). The state court's decision was based on reasonable

factual determinations and was not contrary to or an unreasonable application of clearly established Supreme Court precedent.  This claim will therefore be **DISMISSED**.

Q. **Failure to Instruct Jury [Rebuttal Evidence & Last Person Seen] (Claim XVII)**

1. **Refusal of Rebuttal Instruction**

Sutton claims the trial court refused to instruct the jury on the meaning of and how to consider rebuttal evidence.  Sutton argues this instruction was particularly warranted because the State offered its sole "scientific" evidence on time of death in rebuttal [Doc. 24 at 62].  Sutton claims the trial court's failure to give this instruction denied him due process and a fundamentally fair trial.  Although this claim was raised on direct review, the state supreme court concluded the issue was waived because Sutton failed to provide a specific explanation for why this instruction should have been given, failed to cite any authority for his proposition that this instruction should have been given, and failed to provide a proper citation to the record.  *State v. Sutton*, 79 S.W.3d at 497.  Sutton does not address his default, but he does claim "[t]he refusal to instruct about the relevance of time of death was upheld on appeal."  [Doc. 24 at 62].

A claim is deemed procedurally defaulted where, as here, the claim was presented to the state court, but rather than reaching the merits of the claim, the state court decided the claim in reliance on an independent and adequate state ground, such as a state procedural rule barring review of the claim.  *See Coleman v. Thompson*, 501 U.S. 722, 734-35(1991).  In *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986), the Sixth Circuit instructed that a four-

124

part analysis should be used when determining whether a claim is procedurally barred on procedural grounds, such as waiver. A court must ascertain whether there is an applicable state procedural rule, whether the state courts actually enforce the rule, and determine whether the state procedural rule relied upon is an adequate state ground on which the state relies to foreclose review of a federal constitutional claim. *Id.* If the first three parts of the *Maupin* test are satisfied, then the petitioner must satisfy the fourth part, *i.e.*, there was cause not to follow the rule and that he was actually prejudiced, or that a substantial miscarriage of justice will occur if the claim is not reviewed. *Id.*

The waiver rule in effect in 1997 when Sutton filed his notice of appeal provided that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. R. of Crim. App. P. 10(b). Thus, because there was an applicable state waiver rule in effect when Sutton filed his direct appeal, the first element of the *Maupin* test is satisfied. Further, review of Tennessee case law shows that when an issue raised on appeal is unsupported by citation to the record, authority, or argument, Tennessee courts have consistently held that the issue is waived. *Fults v. State,* 2009 WL 311461 (Tenn. Crim. App. 2009); *State v. Schiefelbein*, 230

S.W.3d 88, 129 (Tenn. Crim. App. 2007).[38]  Thus, Rule 10(b) of the Tennessee Rules of Criminal Appellate Procedure is regularly enforced and firmly established.

Next, the state procedural rule is an adequate state ground on which the State relies to foreclose review of a federal constitutional claim because the State has a legitimate interest in requiring a defendant to provide factual support to his claims, cite any authority for his claims, and provide a proper citation to the record.  Sutton does not argue that the rule is not an adequate state rule to foreclose review and, applying this rule, the state courts were prevented from reviewing Sutton's claim due to his failure to properly support the claim with fact and authority.  *See Hodges v. Bell*, 548 F. Supp. 2d 485, 563 (M.D. Tenn. 2008) (concluding Tennessee's waiver rule in Tennessee Rule of Criminal Appellate Procedure 10(b) is an independent and adequate state rule that promotes the timely presentation of claims).

The Court is satisfied that Sutton's failure to instruct jury claim has been procedurally defaulted.  No cause and prejudice has been alleged, much less shown, since Sutton did not address his procedural default in responding to Respondent's summary judgment motion.

---

[38]*See also State v. Reynolds,* 2005 WL 468318, at *11 (Tenn. Crim. App. 2005); *State v. Dowell,* 2003 WL 402815, at *3 (Tenn. Crim. App. 2003); *Mathews v. State,* 2002 WL 1482780, at *2 (Tenn. Crim. App. 2002); *Wilcoxson v. State,* 22 S.W.3d 289, 317 (Tenn. Crim. App. 1999); *State v. Sowder*, 826 S.W.2d 924, 929 (Tenn. Crim. App. 1991), *per. app. denied* (Tenn. 1992); *Smithson v.* State, 1989 WL 28311, at *2 (Tenn. Crim. App. 1989); *State v. Killebrew*, 760 S.W.2d 228, 231-32 (Tenn. Crim. App.), *per. app. denied* (Tenn. 1988); *State v. Davis,* 751 S.W.2d 167, 170 (Tenn. Crim. App.), *per. app. denied* (Tenn. 1988); *State v. Bloodsaw*, 746 S.W.2d 722, 726 (Tenn. Crim. App. 1987), *per. app. denied* (Tenn. 1988); *State v. Wallace*, 664 S.W.2d 301, 302 (Tenn. Crim. App.), *per. app. denied* (Tenn. 1983); *State v. Kennedy*, 649 S.W.2d 275, 279 (Tenn. Crim. App. 1982), *per. app. denied* (Tenn. 1983); *State v. Roberson*, 644 S.W.2d 696, 699 (Tenn. Crim. App. 1982), *per. app. denied* (Tenn. 1983).

Even if there were no procedural default, refusal to instruct the jury on rebuttal evidence instructions was not constitutional error and furnishes no basis for habeas relief. Sutton requested, without citation to any case or law, that the court instruct the jury as follows:

> [T]hat any evidence offered by the prosecution during its rebuttal case cannot be considered as substantive evidence and that the only purpose for which the jury may consider such evidence is for the purpose of impeaching the testimony of witnesses offered by the Defendant during his evidence.

[Addendum No. 1, Vol. 4-6, p. 512]. As Sutton has offered no authority for his contention that the rebuttal testimony could not be considered as substantive evidence,[39] he has failed to demonstrate cause and prejudice to excuse his procedural default. Sutton has not identified any state or federal law that provides substantive proof is not permitted to be introduced during rebuttal nor has he demonstrated that failure to give the jury his requested instruction denied him a fair trial. It therefore appears that the requested jury instruction is not a correct statement of the law, and the state court's adjudication of this denial of

---

[39]Although the Court's research did not reveal a Supreme Court case on point, courts which have addressed the issue have reached the opposite conclusion; rebuttal evidence can serve as substantive evidence. *See United States v. Day*, 89 F. App'x 986, 993-94 (6th Cir. 2004), *available at* 2004 WL 326374, at *6 ("Even though the Government called Adams as a rebuttal witness, that does not prevent her testimony from serving as substantive evidence." *See United States v. Herron*, 567 F.2d 510, 515 (D.C. Cir.1977) ("[T]he testimony given by [the witness] was primarily substantive evidence, properly admissible in rebuttal as such, even though it did have some probative quality as impeachment. The evidence in question was not offered solely for its effect, as impeachment and is not required to be so limited."); *see also United States v. Gray*, 24 F. App'x 358, 361 (6th Cir. 2001) ("Although the testimony of the rebuttal witnesses did contradict claims made by Gray during his testimony, that evidence was not relevant only to establish that Gray was not a credible witness. Rather, the rebuttal testimony also served to contradict the defendant's claims of innocence and to establish more sinister motives . . . .")).

127

instruction claim did not result in a decision that was based on an unreasonable determination of the facts or was contrary to or an unreasonable application of Supreme Court precedent. Accordingly, Sutton is not entitled to any habeas relief on his rebuttal evidence claim, and this claim will be **DISMISSED.**

### 2.     Last Person Seen Instruction

Sutton also claims the trial court erroneously refused to instruct the jury that guilt could not be based solely on being the last person seen with the victim while he was alive. The state supreme court observed that the trial court refused to give this special instruction because it concluded the charge clearly set forth what had to be proven to establish guilt, and agreed with the trial court's assessment:

> Indeed, the charge clearly instructs the jury that it can only convict [Sutton and his co-defendant] of an offense if the State proves the elements of that offense beyond a reasonable doubt. In addition, the charge clearly instructs the jury on the elements of first degree murder and its lesser included offenses and the charge also instructs the jury about criminal responsibility for the conduct of another. In short, the charge accurately and correctly instructs the jury on burden of proof, presumption of innocence, elements of the offenses, and the nature of different kinds of evidence. "When the instructions given by the trial judge are a correct statement of the law, and the instructions fully and fairly set forth the applicable law, it is not error for a trial judge to refuse to give a special instruction requested by a party." *State v. Bohanan*, 745 S.W.2d 892, 897 (Tenn. Crim. App. 1987).  This issue has no merit.

*State v. Sutton,* 79 S.W.3d at 497.

Instruction of the jury is generally a matter of state law, absent a showing that the alleged improper instruction infected the entire trial and thus violated due process.  *See Estelle v. McGuire*, 502 U.S. at 72 (1991); *Henderson v. Kibbe,* 431 U.S. 145, 154 (1977).

128

"[T]he fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief." *Estelle v. McGuire*, 502 U.S. 62 at 72. When deciding whether habeas relief is warranted, a court must determine "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.* When making this evaluation, the instruction "'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *Id.* (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973).

Here, Sutton complains that an instruction was not given. However, as the state court concluded, the instructions given by the trial judge are a correct statement of the law, and the instructions fully and fairly set forth the applicable law. Thus, the refusal to give the requested instruction did not "so infect the entire trial that the resulting conviction violates due process." *Id.* Consequently, it was not error for the trial judge to refuse to give the special instruction requested by Sutton that guilt could not be based solely on being the last person seen with the victim while he was living.

Accordingly, in light of the trial court's proper and complete charge on first degree murder and its lesser included offenses and the fact that the charge accurately and correctly instructed the jury on the burden of proof, presumption of innocence, the elements of the offenses, and the nature of different kinds of evidence, the Court concurs with the state court's decision that omission of the last-person jury instruction was not constitutional error, based on an unreasonable determination of the facts in light of the evidence presented in the

129

state courts, or contrary to or an unreasonable application of Supreme Court precedent.

Accordingly, habeas relief is not warranted, and this claim will be **DISMISSED**.

### R. Reasonable Doubt Instruction (Claim XVIII)

Sutton challenges the third paragraph of the reasonable doubt instruction given at the guilt phase of his capital trial, claiming it unconstitutionally lowered the burden of proof required for conviction. The trial court instructed the jury as follows:

> The law presumes that the defendant is innocent of the charge against him. This presumption remains with the defendant throughout every stage of the trial, and is not overcome unless from all the evidence in the case you are convinced beyond a reasonable doubt that the defendant is guilty.

> The State has the burden of proving the guilt of the defendant beyond a reasonable doubt, and this burden never shifts but remains on the State throughout the trial of the case. The defendant is not required to prove his innocence.

> A reasonable doubt is a doubt based upon reason and common sense after careful and impartial consideration of all the evidence in this case and an inability after such investigation to let the mind rest easily as to the certainty of guilty.

> It is not necessary that the defendant's guilt be proved beyond all possible doubt, as absolute certainty of guilt is not demanded by the law to convict of any criminal charge.

> A reasonable doubt is just that – a doubt that is reasonable after an examination of all the facts of this case.

> If you find the State has not proven every element of the offense beyond a reasonable doubt, then you should find the defendant not guilty.

> The State must prove beyond a reasonable doubt all of the elements of the crime charged, that the crime, if in fact committed, was committed by the defendant in Blount County, Tennessee, and that it was committed before the finding and returning of the indictment in this case.

130

[Addendum No. 1, Vol. 4-6, pp. 679-80].

Sutton contends this claim was raised on direct appeal. Sutton refers the Court to Addendum Number 18, pages 5466-67. That claim alleged the trial court erroneously failed to consider Sutton's constitutional argument on the reasonable doubt jury charge after the motion for new trial was overruled. Respondent claims that although the State argued this issue was waived because it was not raised until after the trial court ruled on Sutton's motion for new trial, the state appellate court determined the instruction was proper and denied relief. The state supreme court extensively addressed the reasonable doubt instructions given at the sentencing phase, but only addressed the instructions given at the guilt phase in a more cursory fashion. In a footnote added to its discussion of the reasonable doubt instruction during the sentencing phase, the state supreme court observed that "the trial court did not err when it refused to consider the motion that was filed after the hearing on the motion for a new trial. In any case, [Sutton's] challenge to the jury charge has no merit." *State v. Sutton,* 79 S.W.3d. at 502, n.19.

Without any analysis, Sutton relies upon *Cage v. Louisiana*, 498 U.S. 39 (1990). His reliance on *Cage*, however, must be viewed in light of subsequent Supreme Court precedent. Specifically, the Supreme Court has disapproved of the standard of review language in *Cage* and has concluded that the correct standard is "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the constitution." *See Estelle v. McGuire*, 502 U.S. at 72 (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)). To obtain habeas relief, Sutton must demonstrate the alleged incorrect jury instruction was

131

more than undesirable, erroneous, or universally condemned, but rather, taken as a whole, the instruction must be so infirm that it rendered the entire trial fundamentally unfair. *Estelle v. McGuire*, 502 U.S. at 72. Therefore, "only if 'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process,' " will petitioner be granted habeas relief. *Baze v. Parker*, 371 F.3d 310, 327 (6th Cir. 2004) (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)), *cert. denied*, 544 U.S. 931 (2005).

*Cage* offers Sutton no relief, as the instruction in *Cage* specifically instructed that a reasonable doubt is an actual substantial doubt and the doubt must rise to a grave uncertainty. The instruction in *Cage* was substantially different from the instruction before the Court. The Supreme Court explained:

> [The instruction] equated a reasonable doubt with a "grave uncertainty" and an "actual substantial doubt," and stated that what was required was a "moral certainty" that the defendant was guilty. It is plain to us that the words "substantial" and "grave," as they are commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable-doubt standard. When those statements are then considered with the reference to "moral certainty," rather than evidentiary certainty, it becomes clear that a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause.

*Cage v. Louisiana*, 498 U.S. at 40-41.

Also without any analysis, Sutton cites *Victor v. Nebraska*, 511 U.S. 1 (1994), wherein the Supreme Court explained:

> The beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course. *Cf. Hopt v. [People]*, 120 U.S. 430, 440-441, 7 S.Ct. 614, 618-20, 30 L.Ed. 708 (1887).

Indeed, so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, *see Jackson v. Virginia*, 443 U.S. 307, 320, n.14, 99 S.Ct. 2781, 2789, n.14, 61 L.Ed.2d 560 (1979), the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. *Cf. Taylor v. Kentucky*, 436 U.S. 478, 485-486, 98 S.Ct. 1930, 1934-1935, 56 L.Ed.2d 468 (1978). Rather, "taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury." *Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954).

In only one case have we held that a definition of reasonable doubt violated the Due Process Clause. *Cage v. Louisiana*, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990) (*per curiam*).

*Id.* at p. 5.

The use of the phrases "moral evidence" and "moral certainty" in the reasonable doubt instruction were the primary objections before the Supreme Court in *Victor*. Neither of these phrases, however, were present in the instructions given in Sutton's case. Moreover, as observed by the Supreme Court in *Victor,* "[W]e made clear that the proper inquiry is not whether the instruction 'could have' been applied in an unconstitutional manner, but whether there is a reasonable likelihood that the jury *did* so apply it." *Victor v. Nebraska,* 511 U.S. at 5-6 (emphasis in original) (citing *Estelle v. McGuire*, 502 U.S. at 72, and n.4).

The instruction in the instant case does not violate *Cage* or *Victor*. This instruction did not include any "moral certainty" language or "substantial doubt" language. The jury was instructed that the State must prove each element of the crime beyond a reasonable doubt and that if their minds were, after a careful and impartial consideration of all the evidence, unable to rest easily as to the certainty of guilt, then they must find Sutton not guilty. This language properly explained the State's burden of proof and does not create a reasonable

133

likelihood that the jury applied the challenged instruction in a way that would lower the State's burden of proof. Moreover, it is not reasonably likely that the jury would have interpreted this instruction to indicate that the doubt must be anything other than a reasonable one. Accordingly, in this case, taking the jury instructions as a whole, the instructions correctly conveyed the concept of reasonable doubt to the jury and the State's burden of proof. There is no reasonable likelihood that the jurors who determined Sutton's guilt applied the instructions in a way that violated the Constitution. No habeas relief is warranted, and this claim will be **DISMISSED**.

### S.    Ineffective Assistance of Counsel (Claim XIX)

Sutton challenges counsel's failure to appeal the instruction that residual doubt was not a mitigating circumstance when residual doubt was the main theme of his sentencing trial. Sutton contends the state court decision is an unreasonable application of federal law because it penalizes him for exercising his Fifth Amendment right to remain silent. Sutton supports this contention with his allegation that the court held that relief was not warranted because Sutton "did not testify in his own defense at trial" and because he "failed to note any particular evidence supporting a residual doubt instruction." *Sutton v. State*, 2006 WL 1472542, at *25-26.

The trial court charged the jury:

> Any other mitigating factor which is raised by the evidence produced by either the prosecution or defense at either the guilty or sentencing hearing; that is, you shall consider any aspect of the defendant's character or record, or any aspect of the circumstances of the offense favorable to the defendant which is supported by the evidence.

134

Lingering doubt about the guilt of the defendant is not a circumstance to be considered in mitigation.

The defendant does not have a burden of proving a mitigating circumstance. If there is some evidence that a mitigating circumstance exists, then the burden of proof is upon the State to prove beyond a reasonable doubt, that mitigating circumstances does not exists.

[Addendum No. 1, Vol. 4-6 p. 707].

When the issue was offered to the Tennessee Court of Criminal Appeals, it denied

relief, reasoning:

The Tennessee Supreme Court has stated that residual doubt is a nonstatutory mitigating circumstance. *State v. Thomas*, 158 S.W.3d 361, 403 (Tenn. 2005) (citing *McKinney*, 74 S.W.3d at 307 (Tenn. 2002); *State v. Hartman*, 42 S.W.3d 44, 55-56 (Tenn. 2001)); see T.C.A. § 39-13-204(e)(1). "Thus, where the issue of residual doubt is raised by the evidence, a jury instruction is appropriate." *Id.* (citing *State v. Odom*, 928 S.W.2d 18, 30 (Tenn.1996)). Such evidence "may consist of proof . . . that indicates the defendant did not commit the offense, notwithstanding the jury's verdict following the guilt phase." *McKinney*, 74 S.W.3d at 307. In *Thomas*, the defendant testified that he did not commit the charged murder, and our supreme court determined that based on the defendant's testimony the trial court should have provided the jury an instruction on residual doubt. *Thomas*, 158 S.W.3d at 403. In the present case, the petitioner did not testify in his own defense at trial. He fails to note any particular evidence supporting a residual doubt instruction.

Our supreme court has also concluded that a convicted defendant's right to have the jury instructed on nonstatutory mitigating circumstances is not constitutional in nature and the failure to instruct the jury on nonstatutory mitigating circumstances when raised by the evidence is therefore subject to harmless error analysis. *See State v. Hodges*, 944 S.W.2d 346, 351-52 (Tenn. 1997), cert. denied, 522 U.S. 999, 118 S.Ct. 567 (1997); *see also* Tenn. R. Crim. P. 52(a); T.R.A.P. 36(b). A charge should be considered prejudicially erroneous if it fails to submit the legal issues fairly or if it misleads the jury as to the applicable law. *Hodges*, 944 S.W.2d at 352. "However, if 'by their breadth, the instructions on nonstatutory mitigating circumstances encompassed all the evidence presented by the defense,' the omission of an

135

instruction on a specific mitigating circumstance is harmless." *Thomas*, 158 S.W.3d at 403 (quoting *Hodges*, 944 S.W.2d at 356). In the petitioner's case, as in *Thomas*, the trial court instructed the jury to consider in mitigation "any aspect of the circumstances of the offense favorable to the defendant which is supported by the evidence." This "catch-all" mitigating evidence instruction "served to give the jury the opportunity and duty to consider any residual doubts about his culpability." *Id*. at 403-04.

Based on the foregoing, we conclude that the trial court did not err in denying the requested residual doubt instruction and that, even if the evidence supported such an instruction, its omission was harmless in view of the trial court's general instruction encompassing any lingering doubt of the petitioner's guilt. Accordingly, the petitioner cannot establish prejudice as to this allegation that counsel provided ineffective assistance.

*Sutton v. State,* 2006 WL 1472542, at *25-26.

At the time of Sutton's trial, a residual doubt was apparently considered a nonstatutory mitigating circumstance under Tennessee law that could be charged to the jury if such an issue was raised by the evidence. *See State v. Thomas*, 158 S.W.3d 361, 403 (Tenn. 2005) (acknowledging that the court had previously determined residual doubt is a nonstatutory mitigating circumstance). In *Thomas*, the Tennessee Supreme Court found that a jury instruction is appropriate where the issue of residual doubt is raised by the evidence. *Id.* The *Thomas* court concluded that the Eighth Amendment of the United States Constitution does not require a lingering or residual doubt instruction, and failure to give such an instruction did not amount to constitutional error. *Id.*

Likewise, the United States Supreme Court has ruled that the Eighth Amendment of the United States Constitution does not require a lingering or residual doubt instruction. In *Franklin v. Lynaugh*, 487 U.S. 164, 173-74 (1988), the Supreme Court addressed a claim that

136

the jury should have been instructed that it consider any doubt it had as to the petitioner's identity as the murderer, the extent to which petitioner's actions actually caused the victim's death, and the extent to which petitioner's actions were intended to result in the victim's death. The Supreme Court noted it had not previously recognized a constitutional right to have such doubts considered as a mitigating factor, and even if it decided to discern such a right in the Eighth Amendment, it would not do so in this case because the petitioner was not prevented from pressing the residual doubt question with the sentencing jury. *Id.* at 174. Justice O'Connor's concurring opinion, with whom Justice Blackmum joined, noted the Supreme Court had "never held that a capital defendant has a constitutional right to an instruction telling the jury to revisit the question of his identity as the murderer as a basis for mitigation," and further stated:

> Our decisions mandating jury consideration of mitigating circumstances provide no support for petitioner's claim because "residual doubt" about guilt is not a mitigating circumstance. We have defined mitigating circumstances as facts about the defendant's character or background, or the circumstances of the particular offense, that may call for a penalty less than death. *See California v. Brown*, 479 U.S., at 541, 107 S.Ct., at 839; *id.*, at 544, 107 S.Ct., at 840 (O'Connor, J., concurring); *Eddings*, 455 U.S., at 110, 112, 102 S.Ct., at 874, 875; *id.*, at 117, 102 S.Ct., at 878 (O'Connor, J., concurring); *Lockett*, 438 U.S., at 605, 98 S.Ct., at 2965. "Residual doubt" is not a fact about the defendant or the circumstances of the crime. It is instead a lingering uncertainty about facts, a state of mind that exists somewhere between "beyond a reasonable doubt" and "absolute certainty." Petitioner's "residual doubt" claim is that the States must permit capital sentencing bodies to demand proof of guilt to "an absolute certainty" before imposing the death sentence. Nothing in our cases mandates the imposition of this heightened burden of proof at capital sentencing.

> In sum I agree with the plurality's conclusion that, on the facts of this case, the Texas capital sentencing procedure did not prevent the sentencing

137

jury from giving mitigating effect to any evidence relevant to petitioner's character or background or to the circumstances of the offense. Moreover, while the capital sentencing procedure may have prevented the jury from giving effect to any "residual doubts" it might have had about petitioner's guilt, this aspect of Texas procedure violated no Eighth Amendment guarantee. For these reasons, I concur in the judgment.

*Franklin v. Lynaugh*, 487 U.S. 164, 188 (1988) (O'Connor, J., concurring); *see also Mason v. Mitchell*, 320 F.3d 604, 639-40 (6th Cir. 2003) ("Because Supreme Court precedent clearly establishes that Mason cannot support his residual doubt argument, we deny habeas relief with respect to this claim.")

Consequently, because *Franklin v. Lynaugh*, *supra*, clearly establishes that Sutton has no right to demand a residual doubt instruction at sentencing, the state court decision is consonant with such decision and is not contrary to or an unreasonable application of that Supreme Court precedent. This claim will be **DISMISSED**.

### T.     Jury's Misperception About Sutton's Release Eligibility Date (Claim XX)

The trial court instructed the jury that "[a] defendant who receives a sentence of imprisonment for life shall not be eligible for parole consideration until the defendant has served at least twenty-five (25) full calendar years of such sentence." [Addendum No. 1, Vols. 4-6, p. 702]. Sutton contends that, during deliberations, the jury submitted a written question, asking "[i]f James Dellinger and Gary Sutton were given life in prison from Sevier County and they are give [sic] life in prison in Blount County-will the prison terms be

138

consecutive and/or concurrent?"[40]  The trial court refused to answer the jury's question,

which, according to Sutton, left the erroneous impression that Sutton would only serve 25

years in prison, in violation of Mr. Sutton's right to due process and a fair trial in violation

of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

The state supreme court addressed this issue and noted, contrary to Sutton's

allegation, that the trial court did, in fact, respond to the jury's written question with a written

response stating, "you should concern yourself with the sentences in these cases only." *State*

*v. Sutton*, 79 S.W.3d at 474.  The state court analyzed the issue as follows:

> The United States Supreme Court has held that the Federal Constitution
> neither requires nor prohibits instructions to capital sentencing juries on the
> possibility of commutation, pardon, or parole. *California v. Ramos*, 463 U.S.
> 992, 1013-14, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983) ("the wisdom of the
> decision to permit juror consideration of possible commutation is best left to
> the States"). "It is true that *Ramos* stands for the broad proposition that we
> generally will defer to a State's determination as to what a jury should and
> should not be told about sentencing." *Simmons v. South Carolina*, 512 U.S.
> 154, 168, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994).

> This Court has previously addressed a similar question in *State v. Smith*,
> 857 S.W.2d 1 (1993). In *Smith*, the jury sent a note to the trial judge during
> sentencing deliberations asking that the court define life sentence, define
> consecutive and concurrent life terms and explain which would apply if a
> second life sentence were given, and explain when parole would apply. *Id.* at
> 10. The trial court declined to answer the jury's questions and instructed the
> jury to resume deliberations. *Id.* This Court approved the trial court's response
> to the jury's question. We held that instructions on the nature of life sentences,
> concurrent and consecutive sentencing, and parole eligibility create the
> possibility of jury speculation on the length of time a defendant would have to
> serve and could "breed irresponsibility on the part of jurors premised upon the

---

[40]Sutton failed to identify the location of the question and the Court has been unable to locate
the question or any reference to it in the record.

proposition that corrective action can be taken by others at a later date." *Id*. at 11. This Court held that instructing the jury on such specific sentencing information could result in sentences of death based on sheer speculation and on factors not enumerated by statute and not sanctioned under the United States Constitution or the Tennessee Constitution. *Id*. We continue to adhere to this proposition and agree with the trial court's refusal to answer the jury's question in this case. *See also State v. Burns*, 979 S.W.2d 276, 295-96 (Tenn. 1998) (approving trial court's instructions to the jury to refer to the charges and instructions and continue deliberations in response to jury's specific sentencing questions).

*State v. Sutton,* 79 S.W.3d at 474-75.

Whether a sentence is to run concurrently or consecutively is discretionary with the sentencing judge. *See* Tenn. Code Ann. § 40-35-115[41] and Tenn. R. Crim P. Rule 32 (according discretion to the trial court). It seems odd that Sutton would insist on an instruction concerning concurrent and consecutive sentencing when the decision as to how the sentences would be served could not have been made before the jury had determined what his sentence would be and the factors which govern concurrent and consecutive sentencing in Tennessee had been determined. Also, had the trial court responded to the jury's question, indicating whether Sutton's sentences would be consecutive or concurrent, the jury might well have based its decision upon speculation regarding how the trial judge would rule.

---

[41]Section four permits the court to run the sentences consecutively if the court concluded Sutton was a dangerous offender. The statute, however, provides that "[t]he court *may* order sentences to run consecutively if . . .[,]" thus, not mandating whether the sentence is consecutive or concurrent. Tenn. Code Ann. § 40-35-115 (emphasis added).

140

Sutton contends that *Simmons v. South Carolina*, 512 U.S. 154 (1994), which held that capital defendants have a due process right to require that their sentencing juries be informed of their ineligibility for parole, required the judge to answer the question. *Simmons*, however, is inapposite to the facts in Sutton's case. *Simmons* involved a case where, under state law, a life sentence in a capital case was non-parolable, and this ruling has not been extended "to cases where parole ineligibility has not been established as a matter of state law." *Ramdass v. Angelone*, 530 U.S. 156, 165 (2000). At the time of Griffin's murder, there were only two possible sentences in Tennessee – death or a life term with the possibility of parole after serving twenty-five years of the sentence. *See* Tenn. Code Ann. §§ 39-13-202(a); 39-13-204 (1955-92).[42] Further, *Simmons* does not address the order in which a sentence is served, but instead, addresses parole eligibility. Thus, since Sutton's case does not involve a parole-ineligibility instruction, his reliance on *Simmons* is misplaced.

Accordingly, the state court's decision denying Sutton relief on his claim relative to a concurrent or consecutive jury instruction was neither contrary to nor an unreasonable application of clearly established federal law as determined by the Supreme Court. Accordingly, this claim will be **DISMISSED**.

---

[42]In 1993, the Tennessee Legislature amended Tennessee Code Annotated §§ 39-13-202 and 39-13-204, by adding a sentence of life without the possibility of parole as a possible punishment for first degree murder, mandating the act shall apply to all offenses committed on or after July 1, 1993.

## U.    State's Closing Argument (Claim XXI)

Sutton contends that the State's closing argument was a thinly veiled appeal for vengeance and retaliation for Ms. Branam's murder.   According to Sutton, the State discounted his mitigating evidence during closing argument and urged the jury to impose the death sentence because of Ms. Branam's murder conviction.

During his closing argument, the prosecutor, referring to mitigating and aggravating proof  introduced during the sentencing phase of the trial, argued:

> [S]ince when is it really something that should be given any weight in mitigation that the person doesn't work, drinks a lot, drinks and drives, distrusts others, is not very bright, and doesn't have a good employment history, or is afraid of others but wants things from others, not very bright, can work but doesn't work.
>
> . . . .
>
> [T]his is the second conviction of premeditated murder, and weigh that against the so-called mitigating factors and decide which is worth the most. It's a hard decision.  We're talking about capital punishment.  Ladies and gentlemen, I say to you that is the only appropriate sanction in this case.  For this crime and these factors, the only appropriate reasonable measured response is the penalty of death.

[Addendum No. 16, Vol., 3, pp. 5113-20].   In final closing argument, the State argued Sutton's two prior convictions, one of which was a premeditated murder conviction, outweighed any mitigating evidence [Addendum No. 16, pp. 5119-20].

When this issue was offered to the state supreme court, it found that Sutton did not make a single objection to anything that either of the two prosecutors argued at the sentencing phase.  Therefore, by failing to make a contemporaneous objection, the issue had

142

been waived, though the court also concluded the claim was without merit. *State v. Sutton*, 79 S.W.3d at 500.

Sutton, relying upon state cases, argued before the state court that the closing arguments of both prosecutors were improper because they included references to the fact that he and Dellinger had been previously convicted of first-degree murder. The state supreme court distinguished the state cases relied upon by Sutton from Sutton's case, in finding that the prosecutors did not argue that the jury would be imposing no punishment at all if it imposed another life sentence for Griffin's murder since Sutton received a life sentence for Ms. Branam's murder. *Id.* Furthermore, according to the state supreme court, the prosecutors did not imply that imposition of a death sentence for Griffin's murder conviction would be appropriate to punish him for Ms. Branam's murder conviction, for which he received life. *Id.*

The state supreme court found that the prosecutors only mentioned Ms. Branam's murder in the context of arguing that the death sentence was the appropriate sentence in this case since the State had proven the aggravating circumstance and had also proven that it outweighed the mitigating circumstance. Therefore, the court concluded there was nothing improper about arguing that the existence of the prior conviction as an aggravating circumstance supported imposition of a death sentence. *Id.*

In analyzing a claim of prosecutorial misconduct, the "relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)

143

(quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). In order to satisfy the standard for prosecutorial misconduct, the conduct must be both improper and flagrant. *Bates v. Bell*, 402 F.3d 635, 641 (6th Cir.), *cert. denied*, 546 U.S. 865 (2005).

The Court finds nothing improper about the State's argument and that the State, contrary to Sutton's allegation that the State's argument was a call for vengeance for Ms. Branam's death, merely argued that a death sentence was warranted because the State had proven the aggravating circumstance and had also proven the circumstance outweighed any mitigating circumstances. The prosecutor's comments asking whether such things should be allowed to shield one from accepting full responsibility for one's actions did not constitute prosecutorial misconduct which deprived Sutton of a fair trial. The comments were underscoring what weight should be given to the evidence and did not tell the jury to ignore the evidence. True, the prosecutors were critical of Sutton's mitigating evidence, but they did not tell the jury it could not consider such evidence. Finally, the prosecutors' argument that they proved the aggravating circumstance was not an argument to sentence Sutton to death for the prior murder conviction. Thus, these were not improper comments.

Additionally, even if the comments were improper, they were not flagrant. The Court has arrived at this conclusion by applying the Sixth Circuit's four-factor test for determining flagrancy. *Bates v. Bell*, 402 F.3d 635, 641 (6th Cir. 2005). The four factors considered in determining whether the challenged conduct is flagrant are: "(1) the likelihood that the remarks of the prosecutor tended to misled the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or

144

accidental made; and (4) the total strength of the evidence against the defendant." *Id.* (citations omitted). In this case it is unlikely that the prosecutor's arguments misled the jury or prejudiced the defendant; the remarks, though deliberate, were isolated; and the evidence against Sutton was great. There was substantial evidence demonstrating the existence of the aggravating factor, *i.e.*, two prior felonies whose statutory elements involved the use of violence to the person, Tenn. Code Ann. § 39-13-204, and relatively little evidence establishing mitigating circumstances.

The Court finds that this claim is procedurally barred from federal review and, alternatively, that it provides no basis for relief since Sutton has not shown that the state court's denial of his closing argument claim was an unreasonable application of *Darden*, *supra*, and *Donnelly, supra*. Accordingly, this claim will be **DISMISSED**.

### V. Sentencing Instructions Reasonable Doubt and Aggravating Circumstance (Claim XXII)

In this claim Sutton contends the reasonable doubt instruction given by the trial court during the sentencing phase of the trial was an unreasonable application of and is contrary to *Cage v. Louisiana*, 498 U.S. 39 (1990), and *Victor v. Nebraska*, 511 U.S. 1, 6 (1994). Sutton also alleges two more jury-instruction claims regarding an aggravating circumstance in the body of his discussion, though there is no hint of these claims in the heading of Claim XXII. Be that as it may, Sutton's claim is that the trial court refused to instruct the jury that before it could find the prior felony conviction an aggravating circumstance, the identity of Sutton and his co-defendant in the prior conviction for Ms. Branam's murder must be proven

145

beyond a reasonable doubt. Finally, Sutton contends there was insufficient evidence of the prior violent felony conviction because the crime actually occurred subsequent to the Griffin murder. The Court will address these claims individually, beginning with the reasonable doubt instruction.

### 1.  Reasonable Doubt Sentencing Phase Jury Instruction

During the sentencing trial, the court gave the following reasonable doubt instruction:

> The burden of proof is upon the state to prove any statutory aggravating circumstance or circumstances beyond a reasonable doubt. A reasonable doubt is a doubt based upon reason and common sense after careful and impartial consideration of all the evidence in this case, and is an inability after such investigation to let the mind rest easily.
>
> It is not necessary that the aggravating circumstance or circumstances be proved beyond all possible doubt, as absolute certainty is not demanded by the law.
>
> A reasonable doubt is just that - - a doubt that is reasonable after an examination of all the facts of this case.

[Addendum No. 1, Vol. p. 702].

The state appellate court concluded the instruction was proper and sufficiently informed the jury about the standard against which it was to examine the evidence. The court observed that the jury instruction was to be examined as a whole, without considering particular phrases out of context, and concluded:

> It is absolutely obvious that when the phase "let the mind rest easily" is considered in context, it is referring to the jury's determination, based on a consideration of all the evidence, that the State has satisfied its burden of establishing the existence of the aggravating circumstance and establishing that the aggravating circumstance outweighs the mitigating circumstances beyond a reasonable doubt. In short, the trial court's instruction on reasonable doubt

properly reflects the evidentiary certainty required by principles of due process. This issue has no merit.

*State v. Sutton*, 2001 WL 220186, at *40.

The constitutionality of Tennessee's reasonable doubt instruction has been approved by *Alley v. Bell*, 101 F. Supp. 2d 588 (W.D. Tenn. 2000), *aff'd* 307 F.3d 380 (6th Cir. 2002), *cert. denied,* 540 U.S. 839 (2003). The only difference in the instruction given in *Alley* is that the court therein instructed that "moral certainty" was required as to every proposition of proof requisite to constitute the verdict. The moral certainty language was challenged on appeal. Here, the instruction did not include any moral certainty language and did not lower the burden of proof to convict Sutton.

To warrant habeas relief, jury instructions must have been erroneous and also, taken as a whole, be so infirm that they rendered the entire trial fundamentally unfair. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991). If an instruction is ambiguous and not necessarily erroneous, it violates the Constitution only if there is a reasonable likelihood that the jury has applied the instruction improperly. *Id.* at 72. There is nothing in the instruction that makes it reasonably likely that the jury applied the instruction in a way that would lower the State's burden of proof because it does not alter the "reasonable doubt" measure, and this claim will therefore be **DISMISSED**.

### 2.    Omission of Jury Instruction

Next, Sutton contends that the trial court erroneously refused to instruct the jury that the identity of the defendants in the prior convictions must be proved beyond a reasonable

147

doubt. Sutton contends that the Georgia conviction reflected his date of birth was February 24, 1964 [Addendum No. 16, p. 5073]. Mr. Muncy, the crime scene technician in this case, testified Sutton told him his date of birth was February 24, 1965 [Addendum No. 16, Vol. 3, p. 5077]. Regardless of the discrepancy, the Court observes that Sutton's brother testified and confirmed Sutton was convicted in the Georgia case [Addendum No. 16, pp. 5080-82].

The Sixth Circuit has "held that a district court's refusal to give a requested jury instruction is not reversible error so long as 'the jury charge as a whole . . . fairly and adequately submits the issues and the law to the jury.'" *Latimer v. Burt,* 98 F. App'x 427, 432 (6th Cir. 2004) (quoting *United States v. Carr*, 5 F.3d 986 (6th Cir. 1993) (omission in original)). "A refusal to give requested instructions is reversible error only if three conditions are met: (1) the instructions are correct statements of the law; (2) the instructions are not substantially covered by other delivered charges; and (3) the failure to give the instruction impairs the defendant's theory of the case." *Id.* Moreover, the Supreme Court teaches that a party attacking the alleged failure to give a jury instruction carries an "especially heavy burden because no erroneous instruction was given" and that "an omission, or incomplete instruction is less likely to be prejudicial than a misstatement of the law." *Henderson v. Kibbe*, 431 U.S. 144, 155 (1977). Thus, a court must determine whether the omission of a jury instruction substantially affected the jury deliberations such that the omission "so infected the entire trial that the resulting conviction violated due process." *Id.*

In the instant case, the instructions directed the jury that the burden was on the State to prove any statutory aggravating circumstance beyond a reasonable doubt. The only

148

aggravating circumstances presented against Sutton were his two prior convictions. Since the jury was instructed that the State must prove any statutory aggravating circumstance beyond a reasonable doubt, the requested instruction was covered by the delivered instructions. Therefore, the jury's determination that Sutton had been convicted of the prior crimes beyond a reasonable doubt necessarily included a determination that the defendant identified in the prior conviction was Sutton. Consequently, although the requested instruction was a correct statement of the law, the requested instruction was covered by the charge given to the jury, and the failure to give the instruction did not impair the defendant's theory.

As to Ms. Branam's murder, the State introduced certified copies of the prior judgments and presented the testimony of Assistant District Attorney General for Sevier County, Scott Greene, who testified he knew Sutton, was present at his trial when he was convicted of first degree murder in 1993, and prepared the judgment forms. He then identified Sutton as the same defendant convicted in the Sevier County murder [Addendum No. 16, Vol. 1, pp. 4765-70]. Therefore, the Court cannot conclude that the failure to give the requested instruction amounted to a violation of due process. The state supreme court found the specific jury instruction was not required since the general instruction stated that the State was required to prove each aggravating factor beyond a reasonable doubt. *State v. Sutton*, 79 S.W.3d at 473. Sutton has not demonstrated this conclusion was contrary to or an unreasonable application of federal law. Thus, he is not entitled to relief on this claim, and the claim will be **DISMISSED**.

### 3.    Aggravating Circumstance [Insufficiently Supported and Manufactured]

Sutton contends there is insufficient evidence of the prior violent felony conviction aggravating circumstance because Ms. Branam's death occurred after that of Griffin. This argument fails by its own terms.

The statutory aggravating circumstance applicable in Sutton's case provides that, "The Defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person[.]" Tenn. Code Ann. § 39-13-204(i)(2).

The Tennessee Supreme Court has recognized:

> The language in the statute, "previously convicted" clearly indicates that the date of conviction, not of the commission of the crime, is the important factor. The order in which the crimes were actually committed is irrelevant, as long as the convictions have been entered before the sentencing hearing at which they are introduced into evidence.

*State v. Caldwell*, 671 S.W.2d 459, 465 (Tenn. 1984), *cert. denied*, 469 U.S. 873 (1984). Thus, Tennessee law only requires that the State prove prior criminal convictions, not prior criminal activity.

Sutton claims Ms. Branam's murder conviction was not an aggravating circumstance because it was committed after the Griffin murder. Sutton contends the prosecutor waited three years to prosecute the instant murder, so that a prior conviction for the subsequent murder of Ms. Branam, could "be manufactured." [Doc. 24 at 70-71]. Sutton contends the state court's definition of "prior" allows the prosecutor unlimited discretion to manufacture

150

aggravating circumstances. Sutton supports this claim with the fact that the State prosecuted the Sevier County case, which occurred second in time, in 1993, and waited to prosecute the instant case, which occurred first in time, until 1996. Sutton contends the state court did not even acknowledge the constitutional challenge that such practice was arbitrary, and thus its opinion is an unreasonable application of or is contrary to Supreme Court precedent.

The state supreme court rejected Sutton's argument that Ms. Branam's murder did not constitute a prior violent felony under the definition of Tennessee Code Annotated § 39-13-204(i)(2) because it occurred after Griffin's murder and explained that it had repeatedly denied relief on this claim under established Tennessee case law. *State v. Sutton*, 79 S.W.3d at 472. Sutton argues that the prosecutor's discretion in determining the order of prosecutions permits prosecutors to manufacture aggravating circumstances and selectively choose who will be subject to the death penalty. Sutton argues this practice is arbitrary and the Tennessee Supreme Court's resolution of this claim violates *Furman v. Georgia*, 408 U.S. 238 (1972), and *Gregg v. Georgia*, 428 U.S. 153, 187 (1976).

In *Tuilaepa v. California*, 512 U.S. 967 (1994), the Supreme Court found that states are permitted to focus the jury's attention on a capital defendant's prior criminal record. The issue in *Tuilaepa* was the constitutionality of an aggravating circumstance which permitted the sentencer to consider the defendant's prior criminal activity. Although the challenge was based on the allegation that the circumstance was unconstitutionally vague, the Supreme Court explained that the circumstance rested in part on a determination whether certain events occurred, thus requiring the jury to consider matters of historical fact. The Supreme

151

Court in *Tuilaepa* pointed out that "[b]oth a backward-looking and a forward-looking inquiry are a permissible part of the sentencing process" and that states have considerable latitude in determining how to guide the sentencer's decision in this respect. *Id*. at 976-77.

Sutton's sentencing jury was permitted to conduct a backward-looking and forward-looking inquiry when looking at the prior convictions for crimes committed after the Griffin murder, and Sutton has not directed the Court's attention to any Supreme Court precedent prohibiting this inquiry. Indeed, state courts that have addressed this issue have permitted use of the felony aggravator for a subsequent crime. *Knight v. State*, 770 So.2d 663, 670 (Fla. 2000), *cert. denied*, 532 U.S. 1011 (2001) (determining it was proper to consider a subsequent crime as a prior violent felony since the statute referred to previous convictions and not previous crimes); *Daugherty v. State*, 419 So.2d 1067 (Fla. 1982) (finding prior conviction for subsequent crime qualified as previous conviction); *King v. State*, 390 So.2d 315, 320 (Fla. 1980), *cert. denied*, 450 U.S. 989 (1981) ("The legislative intent is clear that any violent crime for which there was a conviction at the time of sentencing should be considered as an aggravating circumstance."); *State v. Steelman*, 612 P.2d 475 (Ariz. 1980) (rejecting a claim that out-of-state murder and robbery convictions should not have been considered as an aggravating circumstance since they were committed after the murders for which the defendant was sentenced to death); *see also People v. Hendricks*, 737 P.2d 1350 (Cal. 1987) (holding that the order of the commission of the homicides was immaterial for implementation of a prior murder convictions special circumstance statute).

Furthermore, state courts and courts in this circuit have found that the term "previously convicted," which is used in state statutes to establish prior violent felony convictions as an aggravating circumstance, refers to a time prior to the sentence, as opposed to prior to the date of the commission of the capital offense. *Hodges v. Bell*, 548 F. Supp. 2d 485, 549 (M.D. Tenn. 2008); *Ex Parte Coulter*, 438 So.2d 352 (Ala. 1983); *see also State v. Nichols*, 440 F. Supp. 2d 730, 837-38 (E.D. Tenn. 2006) (finding an aggravating circumstance consisting of prior convictions for crimes committed after the murder); *Coulter v. State*, 438 So. 2d 336 (Ala. Crim. App. 1982) (finding the state court ruling that an offense and conviction occurring after instant offense could be used as aggravating circumstance was reasonable).

Here, the two cases at issue were tried in two different counties and there is no proof before the Court that the respective prosecutors purposely engineered the trial of the Griffin case to take place after Ms. Branam's murder conviction. Even presupposing that two different prosecutors planned the chronological order of the two separate trials, it remains that Sutton has not cited any Supreme Court precedent finding such actions to be unconstitutional.

Thus, the state court's resolution of Sutton's claim, namely the conclusion that trying Sutton's cases out of chronological order did not violate his constitutional rights, was neither contrary to or an unreasonable application of clearly established federal law. Accordingly, this claim will be **DISMISSED**.

153

## W.  Refusal to Instruct on Non-Statutory Mitigation Evidence (Claim XXIII)

Sutton complains that the state court did not allow the jury to consider his humanity as a mitigating factor in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  Because the prosecutor argued Sutton's mitigating evidence was insubstantial in comparison to the value of the victim's "human life," Sutton maintains that his humanity was relevant mitigating evidence [Doc. 24 at 71-72].

The state supreme court concluded:

> The fact that Dellinger and Sutton are human beings is not relevant mitigating evidence.  All criminal defendants are human beings.  That fact, therefore, does not relate to the uniqueness of the individual defendant.  Moreover, the species of the defendants does not bear on their character or prior record, or the circumstances of the offense.  Nor did the prosecutor in any way question the fact that the defendants are human beings . . . . The instruction that the defendants are human beings was not relevant to mitigation and therefore was properly refused by the trial court.

*State v. Sutton*, 79 S.W.3d at 473.

As previously discussed, a court must determine whether the omission of a jury instruction substantially affected the jury deliberations such that the omission "so infected the entire trial that the resulting conviction violated due process." *Henderson v. Kibbe*, 431 U.S. at 156-67.  Sutton is unable to meet his burden for the reasons expressed above by the state supreme court.  In addition, contrary to Sutton's claim that the jury was denied the opportunity to consider his humanity as a mitigating circumstance, the instructions did not prohibit the jury from considering the fact that Sutton was a human being when sentencing him.  Indeed, the trial court instructed the jury that they were authorized to consider and

154

weigh any mitigating circumstance which may have been raised by the evidence throughout the entire course of the guilt and sentencing phase [Addendum No. 1, Vol. 4-6, p. 702]. Therefore, the instructions did not prevent the jury from giving effect to evidence of Sutton's humanity as a mitigating factor.

Accordingly, Sutton has failed to demonstrate that the state court decision was contrary to or an unreasonable application of federal law. Therefore, this claim will be **DISMISSED**.

### X.     Other Constitutional Errors (Claim XXIV)

Sutton includes several other alleged constitutional errors, which will be addressed separately.

### 1.     Mandatory Death Sentence

Sutton contends that in Tennessee the jury is required to impose the death sentence if the aggravating factors outweigh the mitigating factors, resulting in a mandatory death sentence in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. *See Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (finding death sentences imposed under a mandatory death sentence statute violated the Eighth and Fourteenth Amendments). Sutton contends that the Tennessee statute effectively requires an unconstitutional mandatory death sentence because the jury must have discretion to impose a life sentence.

The state supreme court reviewing Sutton's appeal concluded this issue had no merit because it had previously considered and rejected this same claim in *State v. Smith*, 857 S.W.2d 1 (Tenn. 1993). *State v. Sutton*, 79 S.W.3d at 479. *State v. Smith* stated that

155

Tennessee's death penalty statutes "do . . . not in any way constitutionally deprive the sentencer of the discretion mandated by the individualized sentence requirements of the constitution." 857 S.W.2d at 22.

The United States Supreme Court has never held that a state must affirmatively structure, in a particular way, the manner in which juries consider mitigating evidence. *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998). In addition, the Supreme Court has concluded that if a death sentence "is imposed only after a determination that the aggravating circumstances outweigh the mitigating circumstances . . . or that there are no mitigating circumstances[,]" the statute is not impermissibly "mandatory" as that term was understood in *Woodson. Blystone v. Pennsylvania*, 494 U.S. 299, 305 (1990) (explaining that the presence of the aggravating circumstances serves the purpose of limiting the class of death-eligible defendants and that the Eighth Amendment does not require that these aggravating circumstance be further refined or weighted by a jury.)

Unlike the statute in *Woodson,* the Tennessee statute does not make death the mandatory sentence for all persons convicted of first-degree murder. In *Woodson*, the Supreme Court expressed its concern with a mandatory death sentence statute due to "its failure to allow the particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition upon him of a sentence of death." 428 U.S. at 303. In contrast, the sentence imposed on Sutton complies with the Supreme Court's holding in *Blystone, supra*, that a death penalty is constitutional if it "is imposed only after a determination that the aggravating circumstances outweigh the mitigating

156

circumstances present in the particular crime committed by the particular defendant, or that there are no such mitigating circumstances." 494 U.S. at 305. In Sutton's case, both the jury at the penalty phase of trial and the reviewing courts specifically considered the aggravating circumstances and mitigating factors presented and determined that capital punishment was appropriate only after such consideration. By the jury's weighing of the specific aggravating and mitigating factors, it cannot be said that a mandatory death penalty was imposed upon Sutton. Therefore, the state court's decision must remain undisturbed since it is not contrary to or an unreasonable application of clearly established federal law. Accordingly, Sutton is not entitled to any relief on this claim, and it will be **DISMISSED**.

### 2. No Specific Findings as to Mitigating Circumstances

Sutton claims the Tennessee death penalty statute is unconstitutional because it does not require the jury to make findings as to what mitigating circumstances it found, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. *State v. Sutton*, 79 S.W.3d 480-81. Sutton contends "[t]his deficiency renders appellate review and proportionality review nugatory and the resulting death sentence arbitrary." [Doc. 24 at 73].

The state supreme court considered this claim and concluded the argument had previously been considered and rejected in *State v. Brimmer*, 876 S.W.2d 75, 87 (Tenn. 1994) (rejecting the argument that there is no meaningful appellate review of death sentences because there is no requirement for written findings concerning mitigating circumstances). *See State v. Sutton*, 79 S.W.3d at 480-81 The Court's research does not reveal any constitutional requirement that a jury which imposes a death sentence must make specific

written findings of mitigating circumstances. *See Martin v. Maggio*, 711 F.2d 1273, 1287 (5th Cir. 1983) (finding that the Constitution simply does not require a sentencing jury to list the mitigating circumstances), *cert. denied*, 469 U.S. 1028 (1984); *Austin v. Bell*, 927 F. Supp. 1058, 1063 (M.D. Tenn. 1996) (holding that specific written findings of mitigating circumstances are not constitutionally required).

Furthermore, to impose the rule Sutton urges on the Court would implicate the doctrine in *Teague v. Lane*, 489 U.S. 288 (1989), which generally bars the application of new procedural rules after a case has become final on direct appeal. Consequently, since Sutton has not demonstrated the state court decision is contrary to or an unreasonable application of Supreme Court precedent, relief is not warranted. Accordingly, this claim will be **DISMISSED**.

### 3.        The Death Penalty as Cruel and Unusual Punishment

Sutton contends the death penalty is cruel and unusual punishment in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. Specifically, he claims that death by electrocution and lethal injection are cruel and unusual and that executing someone who has significantly limited functioning and alleged brain damage violates the Eighth Amendment.

The state supreme court denied Sutton relief explaining that it had previously considered and rejected this argument in *State v. Black*, 815 S.W.2d 166 (Tenn. 1991). *See State v. Sutton*, 79 S.W.3d at 479. In *State v. Black*, the Tennessee Supreme Court explained that the death penalty is not unconstitutional *per se* as cruel and unusual punishment but rather in some cases the death penalty is an appropriate and acceptable punishment. 815

158

S.W.2d at 187-91. In a recent decision, the United States Supreme Court reiterated the principle settled by *Gregg v. Georgia*, 428 U.S. 153 (1976), that capital punishment is constitutional. *Baze v. Rees*, 128 S.Ct. 1520, 1529 (2008). The *Baze* Court observed that "[s]ome risk of pain is inherent in any method of execution– no matter how humane– if only from the prospect of error in following the required procedure. It is clear, then, that the Constitution does not demand the avoidance of all risk of pain in carrying out executions." *Id.* The Supreme Court further observed that it "has never invalidated a State's chosen procedure for carrying out a sentence of death as the infliction of cruel and unusual punishment." *Id.* at 1530. The Supreme Court has instructed that "'[p]unishments are cruel when they involve torture or a lingering death; but the punishment of death is not cruel within the meaning of that word as used in the Constitution. It implies there something inhuman and barbarous,–something more than the mere extinguishment of life.'" *Id.* (quoting *In re Kemmler*, 136 U.S. 436, 447 (1890)).

Sutton does not claim that electrocution or lethal injection or the proper administration of either protocol adopted by Tennessee by themselves constitute the cruel or wanton infliction of pain. Instead, he claims that the death penalty does not comport with evolving standards of decency and that the death penalty is "becoming less and less common and more thus it is unusual." [Doc. 24 at 67].

Sutton, however, has not demonstrated that the state court decision was contrary to or an unreasonable application of Supreme Court precedent; thus, his claim that the death penalty is cruel and unusual punishment will be **DISMISSED**.

Sutton also contends he suffers from significantly limited functioning and significant brain damage and that executing him with his limited capacities violates the Eighth Amendment. Contrary to Sutton's contentions, there has been no credible proof presented in these proceedings and certainly no state court has found that he is of such limited capacity that implementing his death sentence would be cruel and unusual.

Further, as Respondent notes, it appears Petitioner's allegation that he is incompetent to be executed is a premature claim. To the extent Sutton is claiming he is incompetent to be executed, this claim is not ripe for review because state court proceedings are available for the determination of competence prior to an impending execution. *See Van Tran v. State*, 6 S.W.3d 257, 264 (Tenn. 1999), *cert. denied,* 529 U.S. 1092 (2000) (establishing the procedure by which a death-sentenced prisoner may raise the issue of incompetence for execution). Once an execution date is imminent, the state courts are entitled to determine this issue in the first instance. 28 U.S.C. § 2254(b)(1); *see also Steward v. Martinez-Villareal*, 523 U.S. 637 (1998) (claim of incompetency premature absent warrant for execution). Accordingly, to the extent Sutton claims he cannot be executed due to his alleged incompetency, this claim will be **DISMISSED WITHOUT PREJUDICE**.

### 4. The Aggravator Did Not Narrow Class of Offenders

Sutton contends the aggravating circumstances in his case, namely the prior violent felony convictions, failed to narrow the class of offenders subject to the death penalty in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. Without any explanation

or analysis, Sutton contends the state court's rejection of this claim is an unreasonable application of federal law.

In the instant case, Sutton was charged and convicted of deliberate and premeditated first degree murder. Sutton claims the duplication of evidence of Ms. Branam's murder at the guilt and sentencing phases of the trial deprived him of a decision resulting from a genuine narrowing of the class of death-eligible defendants. This argument is flawed because Sutton was convicted of premeditated murder and the prior felony conviction did not provide any of the elements of the instant murder conviction. Rather, the facts of the prior violent felony offered proof of the Griffin murderer.

Moreover, in *Lowenfeld v. Phelps*, 484 U.S. 231, 244 (1988), the Supreme Court upheld a Louisiana death penalty statute which permitted a jury to impose a death sentence even if the only aggravating factor found duplicated an element of the offense of capital murder. Contrary to Sutton's argument, the evidence of Ms. Branam's murder did not constitute any of the elements of Griffin's murder, but it was admitted at trial as evidence relevant to the issue of identity of the perpetrators of the Griffin murder. Therefore, the use of the prior conviction narrowed the class of death-eligible murderers.

Sutton has failed to identify any Supreme Court precedent that prohibits the use of such evidence at both phases of a capital murder trial. Accordingly, this claim will be **DISMISSED**.

161

### 5.  Double Jeopardy

Sutton contends the instant death sentence violates double jeopardy because the jury heard all the evidence relating to both murders in the State's case-in-chief.  Although Sutton was tried and convicted of capital murder in 1993 in Sevier County for the death of Ms. Branam, he contends the instant trial provided the State a second bite at the apple in violation of his privilege against double jeopardy because all the evidence of Ms. Branam's murder was introduced at trial.  Importantly, Sutton was not tried or sentenced again for Ms. Branam's murder; thus, there is not a double jeopardy violation.  *United States v. Felix*, 503 U.S. 378, 387 (1992) (observing that introduction of relevant evidence of particular misconduct in a case is not the same thing as prosecution for that conduct).  Nevertheless, the Court need not reach a conclusion to the double jeopardy issue because, as is argued by Respondent, this claim is procedurally defaulted.

On direct appeal, Sutton claimed that the introduction of the evidence from Ms. Branam's murder was double jeopardy.  In support of the claim, Sutton argued "[t]he state was allowed to argue again for the death penalty involving two murders, therefore, it can be said with some justification that this death penalty was the result of Ms. Branam's murder, therefore, would violate double jeopardy.  Constitution of Tennessee, Article I, Section 10." [Addendum No. 18, p. 5466].

The state appellate court concluded that, pursuant to Tennessee Rule of Criminal Appellate Procedure 10(b), Sutton waived the double jeopardy issue because he failed to support his contention with any argument other than a one-sentence conclusory statement

162

that his death sentence violated principles of double jeopardy, failed to cite to the record, and failed to cite any authority in support of his claim. *State v. Sutton*, 2001 WL 220186, at *43.

The Supreme Court has stated that:

> [I]n all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas corpus review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law; or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 749 (1991). A federal habeas petitioner can procedurally default a claim by "failing to obtain consideration of a claim by a state court, either due to the petitioner's failure to raise that claim before the state courts while state-court remedies are still available or due to a state procedural rule that prevents the state courts from reaching the merits of the petitioner's claim." *Seymour v. Walker*, 224 F.3d 542, 549-50 (6th Cir. 2000) (citing *Wainwright v. Sykes*, 433 U.S. 72, 80, 84-87, (1977)).

When the state procedural rule prevents the state court from hearing the merits of the claim, procedural default occurs when 1) a petitioner failed to comply with the rule, 2) the state actually enforced the rule against the petitioner, and 3) the rule is an "adequate and independent" state ground foreclosing review of a federal constitutional claim. *Willis v. Smith*, 351 F.3d 741, 744 (6th Cir. 2003). Failure to comply with well-established and regularly-enforced procedural rules usually constitutes "adequate and independent" state grounds for foreclosing review. *See id.* at 745.

Accordingly, and absent a showing of cause for the default and prejudice flowing therefrom or that a miscarriage of justice will result from enforcing the procedural default in Sutton's case, this claim is barred from habeas review. No such a showing has been made, and this claim will be **DISMISSED**.

### 6. Flawed Proportionality Review

Sutton claims that Tennessee's death penalty proportionality review is flawed and that its application is arbitrary. The Supreme Court has held that the Constitution does not require a proportionality review. *Pulley v. Harris*, 465 U.S. 37, 44-51 (1984) ("[T]he Eighth Amendment, applicable to the States through the Fourteenth Amendment, [does not] require . . . a state appellate court, before it affirms a death sentence, to compare the sentence in the case before it with the penalties imposed in similar cases if requested to do so by the prisoner."); *see Buell v. Mitchell*, 274 F.3d 337, 368 (6th Cir. 2001) (observing "no proportionality review is constitutionally required.") Accordingly, this claim is not cognizable in this habeas proceeding and will be **DISMISSED**.

### Y. Cumulative Error Argument (Claim XXV)

Sutton contends the cumulative errors support his allegations of constitutional deprivation, undermine confidence in the verdict, and constitute a fundamental denial of due process entitling him to habeas relief. The state appellate court found that Sutton failed to establish any individual errors and, therefore, concluded that there were no errors to accumulate for their consideration. *State v. Sutton*, 2006 WL 1472542, at *29. The Court has concluded that an evidentiary hearing is warranted on the allegations pertaining to Dr.

164

Harlan. Therefore, the Court will **RESERVE RULING** on the cumulative error claim pending the resolution of the issues pertaining to Dr. Harlan.

## V.     CONCLUSION

For the reasons stated in this Memorandum Opinion, the Court will **RESERVE RULING** on the Dr. Harlan claims (Claim II) pending an evidentiary hearing and will **RESERVE RULING** on the cumulative error claim (Claim XXV). In addition, Sutton's claim that he cannot be executed because he is incompetent (Claim XXIV in part) is **DISMISSED WITHOUT PREJUDICE**. Respondent's motion for summary judgment is **GRANTED** as to all other claims. The Court will **RESERVE RULING** on a Certificate of Appealabilty as to the dismissed claims pending the conclusion of the evidentiary hearing.

**AN APPROPRIATE ORDER WILL ENTER.**


s/ Thomas A. Varlan_____
UNITED STATES DISTRICT JUDGE