UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

GARY WAYNE SUTTON        )
                                 )
       *Petitioner,*       )
v.                         )    No.:   3:06-CV-388
                                 )            (VARLAN/SHIRLEY)
RICKY BELL, WARDEN,    )
                                 )            DEATH PENALTY
       *Respondent.*     )

## <u>MEMORANDUM OPINION</u>

On September 1, 1996, a Blount County, Tennessee jury found Gary Wayne Sutton ("Sutton" or "Petitioner") and James Dellinger ("Dellinger"), Sutton's co-defendant and uncle, guilty of the first degree murder of Tommy Griffin ("Griffin"). Petitioner, now awaiting execution on Tennessee's death row, filed this amended petition for writ of habeas corpus against Warden Ricky Bell ("Respondent"), pursuant to 28 U.S.C. § 2254, challenging the legality of his confinement and raising more than twenty-five claims, including a claim of actual innocence [Doc. 24].

## I.    Introduction

The procedural and factual histories of this case are summarized in this Court's Order granting partial summary judgment [*See* Docs. 127, 128]. *See also Sutton v. Bell*, 683 F. Supp. 2d 640 (E.D. Tenn. Jan. 22, 2010). The Court previously granted Respondent's motion for summary judgment on all but two claims, pending an evidentiary hearing. The claims remaining for disposition are: (1) Claim II, raised under the authority of *Giglio v. United States*, 405 U.S. 150, 153-54 (1972), *Brady v. Maryland,* 373 U.S. 83 (1963), and *Napue v.*

*Illinois*, 360 U.S. 264, 269 (1959), pertaining to Dr. Charles Harlan, the forensic pathologist

who testified at the initial trial in rebuttal as to the victim's time of death,[1] and (2) Claim

---

[1] This claim also includes a claim that counsel was ineffective for failing to utilize an appropriate expert and failing to present evidence to rebut Dr. Harlan's testimony. In full, Claim II provides:

II. Confidence in the outcome of the guilt phase of Mr. Suttons's trial is undermined by the State's concealment of exculpatory evidence, the state's presentation of false evidence and/or argument, and trial counsel's ineffectiveness.

   A. Introduction

      1. The testimony of Dr. Harlan was essential to the prosecution's case against Mr. Sutton.

      2. Dr. Harlan's testimony regarding the time of death was false.

      3. Dr. Harlan intentionally misrepresented his qualifications.

   B. The State of Tennessee either failed to reveal evidence to Mr. Sutton's counsel which would have impeached Dr. Harlan's credibility or presented Dr. Harlan's testimony knowing it was false.

      1. The State of Tennessee knew that Dr. Harlan testified falsely regarding his qualifications and failed to reveal that information to the defense.

      2. The State of Tennessee knew that Dr. Harlan's opinion that Tommy Griffin was killed at the time the evidence established he was with Mr. Sutton was false, failed to reveal it's falsity to Mr. Sutton, presented that false evidence to the jury and argued that the evidence established Mr. Sutton's guilt.

   C. Trial Counsel failed to utilize an appropriate expert to establish the time of Tommy Griffin's death.

   D. Trial counsel failed to present competent expert testimony to rebut Dr. Harlan's false testimony regarding Tommy Griffin's time of death.

   E. Petitioner was denied his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments because the prosecution withheld exculpatory evidence and/or knowingly presented false evidence. *Brady, supra; Giglio, supra; Napue, supra.*

XXV, a claim of cumulative error.[2]  Following a three-day evidentiary hearing on these issues, the parties submitted their proposed findings of facts, conclusions of law, and post-hearing briefs [Docs. 142, 143, 145, 146].

The Court of Criminal Appeals rejected both of these claims [Addenda 41-45].  *See Sutton v. State*, No. E2004-02305-CCA-R3-PD, 2006 WL 1472542 (Tenn. Crim. App. May 30, 2006).  However, because the Dr. Harlan claim was raised in a motion to remand the petition for post-conviction back to the trial judge and because the motion was denied without a full examination of the issues, the Court concluded, and Respondent agreed, that there were genuine issues of fact pertaining to the Dr. Harlan claim which merited an evidentiary hearing [Doc. 80].  Given the necessity of an evidentiary hearing on Claim II, the Court reserved ruling on the interrelated ineffective assistance of counsel claims in Claim II and the cumulative error claim in Claim XXV [Docs. 127, 128].

Petitioner presented new evidence at the evidentiary hearing, including testimony from three experts—all of whom disagreed with Dr. Harlan's opinion as to the time of death [Docs. 137-139].  In addition, Petitioner presented his lead trial attorney, Mr. F.D. Gibson, III ("Gibson"), who testified, *inter alia*, that Dr. Harlan was a surprise witness, that the Tennessee Bureau of Investigations ("TBI") had substantial involvement in the investigation of this murder case, that the State Attorney General's Office handled the appeal of Petitioner's murder conviction and death sentence, that he had no knowledge of any

---

[2]  Claim XXV provides: The Foregoing errors, while each sufficient to justify relief, also justify relief when viewed cumulatively.

investigation or misconduct of Dr. Harlan, and that, if he had been provided the documents relating to the investigation of Dr. Harlan, he would have used them to impeach Dr. Harlan [Doc. 139, pp. 74-89].

Respondent called two witnesses. Respondent's first witness was Michael Flynn, District Attorney General for the Fifth Judicial District of the State of Tennessee and one of the prosecutors who prosecuted Petitioner, who testified that he had no knowledge concerning the Harlan investigation [Doc. 139]. Respondent's second witness was Dr. Bruce Phillip Levy ("Dr. Levy"), Chief Medical Examiner for the State of Tennessee and County Medical Examiner for Davidson County [Doc. 138].[3] Dr. Levy testified that he reviewed the materials provided to him regarding the death of the victim, and based on that information, along with the fact that the specific temperatures at the exact spot where the victim's body was found are unknown but were below 70 degrees, the victim could have died anywhere between 12 to 64 hours before the body was found [Doc. 138, pp. 8-26].

After careful consideration, and for the reasons explained herein, the Court will dismiss both claims and deny Petitioner's habeas corpus petition.

---

[3] The Court takes note that, after the evidentiary hearing, Dr. Levy was suspended as medical examiner for Davidson County and the Tennessee Department of Health began action to terminate his contract as state medical examiner after he was arrested on felony drug charges. *See* "State Medical Examiner to Lose Job After Drug Bust" NewsChannel5.com, March 17, 2010, *available at* http://www.newschannel5.com/global/story.asp?s=12155327.

## II. Factual Background

### A. Facts Presented at Trial

Although detailed facts surrounding Griffin's murder are contained in the Court's prior memorandum opinion [Doc. 127], a brief synopsis of those facts provides important context to the issues now before the Court.

On February 21, 1992, Petitioner and Dellinger spent the late afternoon and early evening hours drinking with Griffin at a bar [Addendum No. 12, Vol. 1, pp. 2040-2074].[4] The three left the bar together and, at approximately seven o'clock that evening, were involved in an altercation on the side of the road, resulting in Griffin being abandoned there without a shirt [Addendum No. 12, Vol 1, pp. 2079-2112]. The fracas was reported to the police, who arrived to find a shirtless, disheveled, and fearful Griffin standing beside the road [Addendum No. 12, Vol. 1, pp.2132-2172]. The police arrested Griffin and took him to the Blount County jail [Addendum No. 12, Vol. 1, pp. 2132-42; Addendum No. 12, Vol. 2, pp. 2164-92]. At approximately 11:25 p.m., Dellinger and Sutton, one of whom was carrying a blue flannel-type shirt and one of whom was overheard telling Griffin, "we've go [sic] to get you back to Sevier County or something to that effect[,]" were seen bailing Griffin out of jail [Addendum No. 12, Vol. 3, p. 2435]. Griffin was never seen alive after leaving the jail with Sutton and Dellinger.

---

[4] Each page in the Addenda includes two numbers. To prevent confusion, the Court will refer to the number in the bottom right hand corner of the page.

At 11:55 p.m., Jason McDonald, who lived about 500 yards from the Blue Hole on the Little River, was writing in his journal when he heard two or three gunshots coming from the bottom of the hill [Addendum No. 12, Vol. 3, pp. 2442-50]. His mother also heard the shots and discussed them with her son, who noted them in his journal [Addendum No. 12, Vol. 4, pp. 2473-90].[5] Three days later, at approximately 3:00 p.m., a fisherman and his children, who were at the Blue Hole, discovered Griffin's body lying face down, with the back of his head covered in blood [Addendum No. 12, Vol. 4, pp. 2536-43]. According to an officer at the crime scene, Griffin's body was found lying face-down on the ground of a steep embankment pointing toward the river [Addendum No. 12, Vol. 4, pp. 2548-49]. The Death Scene Checklist reflects that the approximate temperature was fifty-eight degrees when the body was located [Petitioner's Habeas Evidentiary Hearing Exhibit #2].

Dr. Eric Patrick Ellington ("Dr. Ellington"), the pathologist who conducted the autopsy on the remains of Griffin on February 25, 1992 testified that he does not make time-of-death determinations. Therefore, he did not provide a time of death [Addendum No. 12, Vol.6, pp. 2881-2901]. Dr. Ellington also clarified that the date on his report—February 24, 1992—was the date the body was discovered, and not the date or time of death [Addendum No. 12, Vol. 6, pp. 2881-91].

---

[5] Three days later, McDonald learned Griffin's body had been found and, the following day, called law enforcement to report the gunshots he had heard [Addendum No. 12, Vol. 4, pp. 2453-62].

Although Dr. Ellington did not make a time-of-death determination, he was questioned about the factors that are considered when making such determinations. He explained that rigor mortis begins somewhere within 30 minutes to an hour after death and lasts up to 24 to 36 hours and then goes away [Addendum No. 12, Vol. 6, p. 2897]. He specifically clarified that the time frames are not strict, but are an average length of time and are dependent on the ambient temperature and climatic conditions to which the body is exposed [*Id.*]. Other facts which assist in determining the time of death, Dr. Ellington explained, are core body temperature, chemical test results on eyeball fluid, and the presence or absence of the stage of insect larvae. Dr. Ellington did not observe any injuries to Griffin's body which could be attributed to carrion eaters or carnivores, did not take or have taken the core body temperature, and did not order any chemical tests performed on the fluid from the eyeball [Addendum No. 12, Vol. 7, pp. 2904-2906].

Dr. Ellington then detailed some of his autopsy findings. Griffin's pancreas had gross features of autolysis, meaning it had started to digest itself which happens shortly after death occurs. Both of Griffin's lungs, his left adrenal gland, and his liver showed signs of decomposition, with the latter organ being more extensively decomposed and containing cystic areas which did not appear to be a postmortem change. Dr. Ellington also pointed out that the rate of decomposition is variable—the colder the climate the slower the rate of decomposition [Addendum No. 12, Vol. 7, pp. 2907-11].[6]

---

[6] It is unclear whether Dr. Ellington is saying the extensive decomposition in the liver or the cystic areas or both did not appear to be postmortem changes.

The defense presented Dr. Larry Elmo Wolfe ("Dr. Wolfe"), the medical examiner and coroner in Union County, as its expert to testify about the victim's time-of-death. Dr. Wolfe, a licensed medical doctor, though not board certified in any field of medicine, testified that Griffin died 24 to 36 hours before his body was discovered, thus placing his time of death between 3:00 a.m. and 3:00 p.m. Sunday February 23, 1991. But the doctor conceded that, conceivably, Griffin died on Friday when the shots were heard [Addendum No. 12, Vol. 13, pp. 3853-55; 3914-15; 3923-25; 3941].

The State did not present any expert-time-of-death testimony during its case-in-chief given Dr. Ellington's reluctance to determine a time of death [Addendum No. 12, Vol. 6, pp. 2881-2901], and the disqualification of its intended expert on the subject, Dr. Cleland Blake ("Dr. Blake"), due to a conflict of interest [Addendum No. 12, Vol. 7, p. 3047].[7] Rather, on rebuttal, the State combated Dr. Wolfe's estimate as to the time of death by presenting the testimony of Dr. Charles Harlan ("Dr. Harlan") as to that issue [Addendum No. 12, Vol. 14, pp. 4014-4066].

Dr. Harlan, a board-certified forensic pathologist, testified that he considered the reports from the first responders, the autopsy report, the photographs, the tissues on the microscopic slides, and the fact the victim was last seen alive around 11:30 p.m. on Friday,

---

[7] As Gibson testified during Petitioner's state post-conviction hearing, the defense had spoken with Dr. Blake, had chosen not to use him, and thereby, "effectively prevented him from being used by the State" [Addendum No. 35, pp. 7020-21]. In addition, during the habeas evidentiary hearing, trial counsel admitted that he briefed Dr. Wolfe, rather than requesting a report, because the defense did not want to turn over its expert's report to the prosecution [Doc. 139, p. 93-95].

February 21, 1992, and estimated that Griffin died between 11:30 p.m. on Friday, February 21, 1992 and 8:00 a.m. on Saturday, February 22, 1992 [Addendum No. 12, Vol., 14, pp. 4018-20].[8]

## B. Facts Presented During the Federal Habeas Evidentiary Hearing

### 1. Dr. Neal Haskell

Petitioner's first witness, Dr. Neal Haskell ("Dr. Haskell"), a board certified forensic entomologist,[9] testified how insect activity assists in determining a person's time of death [Doc. 137, pp. 23-24]. Relying upon his observation of the crime scene years after the crime was committed, as well as reports by the first responders, investigators, and medical examiners, crime investigation and autopsy pictures, climatological data from the McGhee Tyson Airport in Knoxville, Tennessee and the Gatlinburg weather station in Sevier County, and the lack of any evidence of insect activity, Dr. Haskell testified, based upon a reasonable degree of medical certainty, that the body was not there any longer than 24 to 48 hours prior to when the body was found. He further testified within a reasonable degree of medical certainty that Griffin was not killed on Friday, February 21, 1992 [Doc. pp. 53-54].

---

[8] Subsequent to Sutton's state post-conviction proceedings, but while his post-conviction case was pending on appeal, it came to light that Dr. Harlan's medical license had been revoked.

[9] Dr. Haskell explained that forensic entomologists "use the insect biology, behavior and growth and development in determining the estimate of when a person most likely died," though he also acknowledged that it is difficult to pinpoint a time of death [Doc. 137, p. 26].

### 2.    Dr. Stanton Coleman Kessler

Dr. Stanton Coleman Kessler ("Dr. Kessler"), a forensic pathologist and medical examiner, was Petitioner's second witness at the evidentiary hearing.  Dr. Kessler disagreed with Dr. Harlan's time-of-death opinion and most of his testimony.[10]  For example, Dr. Kessler testified that he does not believe that time of death can be determined by looking at slides of organs, as organs decompose at different rates, that he has never heard of anyone determining time of death by looking at slides of organs, and that, in his opinion, the slide method of determining a time of death lacks a scientific basis [Doc. 137, p. 114-115].

Testifying that it is customary for forensic pathologists to look at weather data when forming a time-of-death opinion, Dr. Kessler testified he could not give an exact time of death, but in his opinion the body was 12 to 24 hours old, but not 64 hours old [Doc. 137, p. 129].  Dr. Kessler, who did not know the temperature at the site where the body was found, explained that, without knowing the actual temperature at that location, he could not be one-hundred percent accurate, but he gave his "best guestimate" [Doc. 139, p. 10].

Dr. Kessler explained that there were tests—vitreous from the eye fluid, body temperature, and serum testing for potassium levels—which could have been performed and which would have provided more information and, perhaps, a more accurate time-of-death opinion [Doc. 139, pp. 14; 20-22].  Even though this expert previously testified during the state post-conviction proceedings of Petitioner's co-defendant that more testing was

---

[10]  When asked what he based his disagreement on, he responded, "personally knowing him, and also my experience and training" [Doc. 139, p. 7].

desirable, when asked during the habeas evidentiary hearing if he agreed that the information available would not permit a "100 percent . . . perfectly-clear picture of when the death" occurred, he answered that, while more testing was preferable, he knew 100 percent "that the body was fresh. . . . within about 24 hours" [Doc. 139, pp. 21-22].

### 3. Dr. Darinka Mileusnic-Polchan

Petitioner's third witness, Dr. Darinka Mileusnic-Polchan ("Dr. Mileusnic-Polchan"), Chief Medical Examiner for Knox and Anderson Counties and a pathology professor, reviewed the first responder reports, crime scene photographs, Dr. Harlan's trial testimony, and the slides of the organs of the victim's body [Doc. 139, pp. 40-41; 43-45]. Dr. Mileusnic-Polchan initially testified she was "comfortable with this individual being dead for about a day; or maybe two days, or three days. Depending, of course, on the circumstances where the body was found" [Doc. 139, p. 48].

Contrary to Dr. Harlan's testimony that he saw decomposition on the slides, Dr. Mileusnic-Polchan testified she saw no decomposition. Although she initially testified an estimate of death based on the examination of microscopic slides is not recognized science, Dr. Mileusnic-Polchan subsequently testified it was proper for her to draw conclusions from the slides as to the time of death, but improper for Dr. Harlan to do so because Dr. Harlan "looked at actual hours[,] . . . stating that whatever he was seeing in the tissue is telling him

that this individual had been dead for 72 hours or longer. You cannot put an hour to it" [Doc. 139, p. 49].[11]

Dr. Mileusnic-Polchan conceded that determining time of an unwitnessed death is "a very complex topic, and we still don't have answers. We have to rely on a lot of data [and] it would be impossible to put the time - - an exact time to his death" [Doc. 139, p. 60]. Thus, while offering testimony that she was at ease with the victim being dead between one and three days, Dr. Mileusnic-Polchan further testified that she was "comfortable with this body being dead 24 hours. I can maybe even push it to a day and a half. But beyond that, I'm very uncomfortable. And I don't - - I would never really support the time of death - - the time being more than 48 hours" [Doc. 139, p. 60].

Dr. Mileusnic-Polchan then added that "a lot of things can impede . . . anybody's ability to give the time of death . . . . Because under no circumstances can anybody really give you the exact time of death" and that none of the techniques used to determine time of death "can give you a with full certainty answer to the time of death[,]" and "any self-respecting pathologist cannot really put the exact time of death" [Doc. 139, p. 63-65]. Finally, on cross-examination, acknowledging that no one knows the temperature at the

---

[11] Although Dr. Harlan testified he reviewed most of the same materials as Petitioner's experts who testified at his habeas evidentiary hearing, he also testified that he primarily relied upon the presence of rigor mortis and an examination of the microscopic slides. In addition, Dr. Harlan explained that the presence of livor mortis at the time the body was examined shortly after its discovery indicated the death occurred within the previous 72 hours (after 5:50 p.m. on February 21, 1992) [Addendum No. 12, Vol. 12, pp. 4017-18]. Dr. Harlan was asked what the decomposition in certain of the organs reveal and he stated "[i]t tells me that the time window for the time of death is going to be 72-96 hours prior to the time that those samples were collected" [Addendum No. 12, Vol. 14, p. 4019-24].

location of where the body was found, Dr. Mileusnic-Polchan testified that weather temperatures play a role in the rate of decomposition of a body and the colder it is the less decomposition you would see in the body [Doc. 139, pp. 69-70].

### 4.    District Attorney General Michael Flynn

Respondent's first witness, District Attorney General for the 5th Judicial District of the State of Tennessee, Michael Flynn ("General Flynn"), co-prosecutor to Assistant District Attorney Bailey ("ADA Bailey") in Petitioner's trial, explained that the prosecution had intended to call Dr. Blake–whose opinion was consistent with Dr. Harlan's opinion–to testify as to the time-of-death issue, but the trial court granted the defense's motion to exclude him because defense counsel had consulted him [Doc. 139, pp. 109-113].  General Flynn and ADA Bailey scrambled to find a rebuttal witness, ultimately choosing Dr. Harlan whose name had been provided by the Attorney General's Conference [Doc. 139, pp. 110-11]. General Flynn was not aware of any investigations of Dr. Harlan at that time [Doc. 139, p. 11].

In response to a question inquiring about the general involvement of General Flynn's office with the TBI, he explained that a resident TBI agent, assigned to his county and Knox County, investigates cases at the direction of the Attorney General [Doc. 139, P. 112].  He also testified that, generally, other than dealing with the resident agent, the only contact the prosecution has with the TBI involves receiving reports from their lab personnel and on occasion having lab personnel testify at trials [Doc. 139, p. 112-13]. General Flynn did not clearly explain the extent to which the TBI participated in Petitioner's investigation and trial

13

but he did explain that the two TBI agents who sent him reports in this case were agents assigned to another district and were working with the Blount County Sheriff as they participated in the investigation of Petitioner's other case [Doc. 139, p. 119-121]. General Flynn received copies of reports and correspondence from the TBI on the other case, but did not recall directing the TBI to conduct any investigation of Petitioner's case [Doc. 139, p. 120].

### 5. Dr. Bruce Phillip Levy

Respondent's second witness, Dr. Bruce Phillip Levy ("Dr. Levy"), Chief Medical Examiner for the State of Tennessee and the County Medical Examiner for Davidson County, explained that, when making a time-of-death determination, a forensic pathologist establishes a "window of death[,]" which begins with the time the person is last seen alive. Dr. Levy reviewed materials relative to the time of death of Mr. Griffin, including the first responders report, the ambulance report, the autopsy report, and the official Gatlinburg climatology readings, before concluding Mr. Griffin could have died 12 to 64 hours prior to being found [Doc. 138, pp. 4-18].

Dr. Levy testified the official temperature readings vary across regions and, contrary to Dr. Haskell's opinion, wooded areas tend to be a little cooler than the surrounding open areas [Doc. 138 p. 15]. Dr. Levy agreed with the other experts' opinions regarding the standard length of time it takes a body to go through rigor mortis, but clarified that these general standards are based on bodies being maintained at temperatures between 70 to 72

degrees [Doc. 138, p. 16].[12] Therefore, based on the material he reviewed, his experience and training, and due to the body being exposed to cooler conditions than 70 and 72 degrees, Dr. Levy concluded the victim could have died at any point from the time he was last seen to approximately six hours before he was found [Doc. 138, p. 25-26].[13]

## III.    Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA"), when a habeas court conducts an evidentiary hearing on claims, the deference afforded to the state court's determinations under section 2254(d) applies to adjudicated claims and *de novo* review applies to those claims the state court refused to address. *Bray v. Cason*, No. 08-1922, 2010 WL 1610320 (6th Cir. April 21, 2010) (unpublished). With respect to the issues relating to Dr. Harlan, the Court need not determine whether the deference afforded to the state court's determinations under section 2254(d) applies or whether *de novo* review applies because the result is the same under both standards. With respect to the Petitioner's actual innocence claim, the Court will apply *de novo* review as such claim previously has not been raised. Finally, with respect to the ineffective assistance of counsel and cumulative error claims, the Court will apply the AEDPA deference standard because the state courts previously adjudicated those claims.

---

[12] The Court observes that there is no testimony contradicting this fact.

[13] Although he initially said from the time he was last seen until approximately twelve hours before he was found, when offering this final opinion, he explained, "[t]he reason I exclude that six hours was he was in rigor mortis and that does take some hours to develop and be noticeable" [Doc. 138, p. 136].

**IV.    Analysis**

   **A.    Claims Related to Dr. Harlan (Claim II)**

      **1.    False Testimony Claims (Claims II.A.1-3)**

Petitioner contends Dr. Harlan testified falsely as to both his status as the State's Chief Medical Examiner and Griffin's time of death. Had the jury been informed of this false testimony, Petitioner posits, it would have discredited his testimony. Petitioner raises his claim as violations of *Napue*, *Brady*, and *Giglio*. Respondent maintains that the proof demonstrates that the prosecution had no knowledge of any such material or its alleged falsity, and that Petitioner has not proven that any testimony was false.

A prosecutor's knowing presentation of false evidence violates a defendant's right to due process. *Napue*, 360 U.S. at 269. A conviction obtained with the use of testimony which the prosecutor knows or should know is false must be set aside if there is any reasonable likelihood the testimony could have affected the judgment of the jury. *United States v. Agurs*, 427 U.S. 97, 103 (1976). Likewise, if the prosecutor, although not soliciting false testimony, allows false testimony to go uncorrected, the conviction must be set aside. *Napue*, 360 U.S. at 269.

To prevail on such a claim, a petitioner bears the burden of showing that (1) the testimony was actually false, (2) the prosecution knew or should have known the testimony was actually false, and (3) the false testimony was material. *Napue*, 360 U.S. at 269-71. *See also United States v. Griley*, 814 F.2d 967, 971 (4th Cir. 1987) (section 2255 defendant seeking to vacate a conviction based on perjured testimony must show testimony was false

and mere inconsistencies in testimony of witnesses do not establish government used false testimony).

Simply showing that an expert's opinion is inaccurate or wrong, however, does not violate due process or demonstrate that the expert lied. *Fuller v. Johnson*, 114 F.3d 491, 496-97 (5th Cir. 1997) (use of incorrect methods by expert does not demonstrate testimony was false), *cert. denied*, 522 U.S. 963 (1997). Rather, an attack on an expert's opinions and the methodology used to reach that opinion goes to the sufficiency of the evidence and the weight the jury should award that testimony, not the truth of it. *Id.* at 497. Likewise, the burden of proving indisputable falsity is not fulfilled with evidence of a difference of opinion or merely a hypotheses or inference that testimony could be false. *See Rosencrantz v. Lafler*, 568 F.3d 577, 586 (6th Cir. 2009) (hypothesis and inferences that during a pretrial meeting the prosecution procured testimony from a witness to change the time of the assault did not meet burden of proving indisputable falsity), *cert. denied*, 130 S.Ct. 2401 (2010).

The burden is on Petitioner to demonstrate Dr. Harlan's testimony was false. With respect to Petitioner's claim that Dr. Harlan testified falsely as to the time of Griffin's death, Petitioner relies upon the fact that his experts relied upon different scientific proof than Dr. Harlan in reaching their opinions as to this issue, as well as the fact that his experts disagreed with Dr. Harlan's time-of-death opinion. With respect to Petitioner's claim that Dr. Harlan testified falsely about his credentials, Petitioner relies upon Dr. Harlan's testimony which, according to Petitioner, implies that the physician was the State's Chief Medical Examiner when he was not.

### a.    Time-of-Death Testimony

Petitioner contends Dr. Harlan's time-of-death testimony was false because his experts concluded that the February 21, 1992, 11:55 p.m. time of death is a scientific impossibility [Doc. 24, p. 29]. First, contrary to Petitioner's contention, Dr. Harlan did not testify the victim's time of death was 11:55 p.m. on February 21, 1992.[14] Rather, using the time the victim was last seen alive (*i.e.*, around 11:30 p.m. on February 21, 1992) as the beginning of the window of time in which the murder occurred, Dr. Harlan testified the window of time in which the murder could have occurred was between the time the victim was last seen alive and 8:00 a.m. on February 22, 1992 [Addendum No. 12, Vo. 14, pp. 4019-20]. Second, although Petitioner's habeas experts disagreed with Dr. Harlan's time-of-death opinion, none of his experts testified Dr. Harlan's time-of-death opinion was scientifically impossible.

In addition, Petitioner contends that his experts used a different methodology than Dr. Harlan in reaching their time-of-death opinions. Petitioner claims his experts would testify Dr. Harlan's use of the slides of internal organs in determining time of death is not based on any recognized scientific principles.

The first flaw with this claim is that Dr. Harlan did not testify he based his opinion solely on the examination of the slides. Instead, Dr. Harlan testified that he reviewed Dr. Ellington's autopsy report, the slides of the tissue samples, the photographic exhibits, and considered "the fact that rigor mortis was present at 5:50 p.m. on February 24, 1992[,]" and

---

[14] There, however, was testimony that shots were heard at 11:55 p.m. on Friday, February 21, 1992 [Addendum No. 12, Vol. 3, pp. 2242-2250].

that "livor mortis was present in the body at the time of examination by medical personnel at 5:50 p.m., on February 24, 1992" [Addendum No. 12, Vol. 14, pp. 4017-18].[15] Dr. Harlan explained there are three stages of the autopsy procedure and that the examinations conducted during those three stages assist in determining the time of death. Dr. Harlan also explained that "[t]he microscopic examination is important in that there are certain features of the external examination, which include examination of such things as rigor mortis, livor mortis, et cetera, which play a significant role" [Addendum No. 12, Vol. 14, p. 4015-16]. Dr. Harlan further testified that the primary factors he relied upon in determining the range of time in which the death occurred were the presence of rigor mortis and his review of the slides, and he explained:

> The information that was derived is that there was livor mortis present in the body at the time of examination by medical personnel at 5:50 p.m., on February 24th, 1992. And the conclusion reached with that is that death had to have occurred within the previous 72 hours; that is, death had to have occurred at sometime after 5:50 p.m. on February 21st, 1992.

> Examination of the tissues on the microscopic slides reveals that death would have occurred at some time 72 to 96 hours prior to the time of the collection of those organs and placing those organ samples in formaldehyde, which means that death would have occurred at some time between 8:00 a.m. on February 21st, 1992, and 8:00 a.m. on February 22nd, 1992. Putting those two pieces of information together, it is possible to narrow the window to a time range of from approximately 6:00 p.m. on February 21st, 1992, to February 22nd, 1992, at 8:00 a.m. I'm unable to narrow the window any closer than that.

---

[15] Although this testimony is somewhat confusing, the Death Scene Checklist reflects "rigor" was "complete" and "livor" was on the "front" [Petitioner's Habeas Exhibit #2].

[Addendum No. 12, Vol. 14, pp. 4018-19].  When asked if the additional fact that the victim

was last seen alive was around 11:30 p.m. on February 21, 1992, would assist him in making

his opinion, he responded it would modify the window to 11:30 p.m. on February 21, 1992,

until 8:00 a.m. on February 22, 1991 [Addendum No. 12, Vol. 14, p. 4019].

Although Petitioner's habeas expert Dr. Mileusnic-Polchan testified an estimate of

death based on examination of such slides is not the recognized science, she nevertheless

reviewed what, essentially, are replicas of the slides Dr. Harlan reviewed and considered

those slides when forming her opinion regarding the time of death in this case.  Contrary to

Dr. Harlan's testimony that there was some decomposition in the tissues in the slides, Dr.

Mileusnic-Polchan's testified that "there was no decomposition[]" in the tissues in the slides

[Doc. 139, pp. 45-46, 48].  Dr. Mileusnic-Polchan also testified that there was only "very

mild autolysis," which one would normally expect to see in autopsy material, even in "the

freshest body" [Doc. 139, p. 47].

Dr. Harlan testified he saw decomposition present in the pancreas, the liver, the

adrenals, and a small amount which is very difficult to see in the brain [Addendum No. 12,

Vol. 14, p. 4024].  Dr. Harlan's testimony is supported to some extent by the Autopsy Report

which reflects that the microscopic examination revealed both lungs showed changes of

decomposition, that sections of the liver showed "rather extensive decomposition[]" and

cystic areas,[16] that sections of the left adrenal glad showed some decomposition, that sections

---

[16]  As previously stated, it is not clear whether Dr. Ellington testified the liver, the cystic
areas in the liver, or both did not appear to be a postmortem change [Addendum No. 12, Vol. 7,
p.2907-2911].

of the pancreas showed extensive autolysis, and that sections of the stomach and intestines showed autolysis [Evidentiary Hearing Plaintiff's Exhibit #50].

Although these experts disagree about the interpretation of the slides, disagreement between experts does not transform an expert's opinion into a falsehood. *See Hoover v. Newland,* 307 F. App'x 56 (9th Cir. Jan. 6, 2009) (expert's opinion was not rendered false because it differed from testimony and opinions of all other experts in case); *Sistrunk v. Armenakis*, 292 F.3d 669, 675 & n.7 (9th Cir. 2002) (en banc) (clearly inaccurate testimony by expert was not found to be false), *cert. denied*, 537 U.S. 1115 (2003); *United States v. Workinger*, 90 F.3d 1409, 1416 (9th Cir. 1996) (disagreement with analysis did not transform opinion into falsehood); *Campbell v. Gregory*, 867 F.2d 1146, 1148 (8th Cir. 1989) (finding an expert's opinion which differed from that of another expert and the treatise cited by the other expert was not false). Therefore, a difference in opinion and disagreement among the experts is not a legally sufficient basis to establish falsity of a fact. Indeed, when an assertion that testimony is perjured rests on mere speculation, it is insufficient to establish a claim under *Napue. See United States v. Aichele*, 941 F.2d 761, 766 (9th Cir. 1991).

The issue with which the Court is concerned is not one of objective fact but one of differences in experts' time-of-death opinions which, quite frankly, are based on subjective interpretations of several factors. Simply because Petitioner's experts disagree with the State's experts does not mean the State knowingly presented false evidence in violation of Petitioner's due process rights. None of the experts testified that Dr. Harlan's testimony was false, and the evidence before the Court does not include an affidavit, a deposition, or any

testimony from Dr. Harlan regarding the truthfulness or falsity of his trial testimony. Furthermore, the Court notes that Dr. Blake's proposed testimony would have supported Dr. Harlan's opinion.

The experts disputed, to some extent, the validity of the methodology used by Dr. Harlan, and they disagreed with his estimated time of death. But opposing experts who criticize the prosecution's expert witness and the basis of his testimony falls far short of proof of false testimony. *See Workinger*, 90 F.3d at 1416 (holding disagreement between experts did not transform an expert's testimony into a falsehood). Certainly, the record reveals that determining time of death is not an exact science and that the accuracy of that determination might have been improved had other scientific tests been performed. However, absent any evidence that Dr. Harlan actually made any false statement of fact or that he did not honestly and conscientiously arrive at the opinions he expressed at Petitioner's trial, habeas relief is not warranted. Accordingly, the conflicting expert opinions, which amounted to nothing more than a mere disagreement among the experts, does not demonstrate Dr. Harlan's testimony was false. Therefore, habeas relief is not warranted on this claim.

### b. False Credentials Claim

Petitioner claims the prosecutor and/or defense counsel should have known Dr. Harlan's testimony regarding his qualifications was false. Petitioner contends that, at the time Dr. Harlan testified at Petitioner's capital trial, he was not allowed to enter the TBI lab because of professional misconduct and was being investigated by the TBI about his gross incompetence [Petitioner's Evidentiary Hearing Exhibit 20]. Petitioner further argues that

Dr. Harlan knew when he testified during the 1996 trial that he was no longer the State Medical Examiner and that he was being investigated by the TBI[17] because Dr. Harlan's contract as State Medical Examiner expired on June 30, 1995, and was not renewed [*Id.*, at B, p. 238].

Respondent does not contest Petitioner's factual assertions that Dr. Harlan was no longer the State Medical Examiner or that he was being investigated by the TBI at the time of Petitioner's trial. Rather, Respondent argues that the prosecution had no knowledge of this information and that Petitioner has not proven that any of Dr. Harlan's testimony was false.

Dr. Harlan testified that he held various positions with the State of Tennessee, including serving as the most recent Chief Medical Examiner. Dr. Harlan explained that his "curriculum vitae is correct, except it does not list my tenure as Chief Medical Examiner" [Addendum 12, Vol. 14, p. 4013-14]. On cross-examination the following colloquy took place between defense counsel and Dr. Harlan:

| Mr. Goergen: | Dr. Harlan, you stated you were the Chief Medical Examiner for the State of Tennessee? |
|---|---|
| Dr. Harlan: | Yes, sir, I have been. |

---

[17] To the extent Petitioner claims this knowledge should be imputed to the prosecutors, the Court observes the *Brady* rule applies to evidence possessed by the prosecution team, which includes both the investigators and prosecutors. *See United States v. Meros*, 866 F.2d 1304, 1309 (11th Cir. 1989), *cert. denied*, 493 U.S. 932 (1989). Dr. Harlan, the expert rebuttal time-of-death witness who testified on the prosecution's behalf, is not considered a member of the prosecution team and his knowledge of his own alleged incompetence is not properly imputed to the prosecution team. *See Avila v. Quarterman*, 560 F.3d 299, 308-309 (5th Cir. 2009) (when witness acts only in capacity of expert witness for state and not as "fully functioning member of the prosecution team, . . . expert's knowledge should not be imputed to the prosecutors") (citation and internal quotation marks omitted), *cert. denied*, 130 S.Ct. 536 (2009).

| Mr. Goergen: | You have been or you are now? |
| Dr. Harlan: | That's a matter of debate. |
| Mr. Goergen: | Oh, okay. |
| Dr. Harlan: | Between lawyers. |

Defense counsel did not pursue this line of questioning further [Addendum No. 12, Vol. 14, pp. 4034].

To prevail on this claim, Petitioner must first demonstrate the challenged statement was actually false. *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998), *cert. denied*, 528 U.S. 842 (1999). Petitioner "must show that the statement in question was 'indisputably false,' rather than merely misleading." *Byrd v. Collins*, 209 F.3d 486, 517 (2000), (quoting *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989)), *cert. denied*, 531 U.S. 1082 (2001). Mere inconsistencies or conflicting testimony do not establish such testimony is false. *See United States v. Croft*, 124 F.3d 1109, 1119 (9th Cir. 1997).

Based on the testimony at trial and the testimony in the evidentiary hearing, Petitioner has not sustained his burden of proof that Dr. Harlan made a false statement regarding his credentials. Although Dr. Harlan's response was somewhat ambiguous, it was not "indisputably false." The Court finds that it was, at most, misleading.

As Petitioner has not established Dr. Harlan presented false testimony, the Court need not reach the second and third prongs of the *Napue* test. The failure to demonstrate Dr. Harlan testified falsely necessarily eliminates Petitioner's claim that the prosecution

knowingly offered perjured testimony. Accordingly, relief is not warranted on Petitioner's false-testimony claims.

### 2. *Brady* Claim (Claim II.B.)

Petitioner contends the prosecution violated due process by failing to disclose that Dr. Harlan was no longer the State's Chief Medical Examiner and that he was being investigated for multiple instances of professional misconduct by the Tennessee Department of Health and certain agents of the TBI. Petitioner contends the State's failure to disclose this information amounted to a violation of *Brady*, which holds that "[t]he suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or punishment irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Petitioner maintains it was the prosecutor's duty to obtain this impeachment evidence and the failure to take any steps to fulfill this obligation entitles Petitioner to a new trial.

Respondent counters that the prosecutors had no actual or imputed knowledge of this material because the Harlan investigation was being conducted by TBI and Department of Health employees who were uninvolved in the investigation of Petitioner's case and because the Harlan investigation did not involve any member of the prosecution team or anyone else acting "on the government's behalf in the petitioner's case" [Doc. 144, p. 5]. Moreover, Respondent argues that, based on *Goff v. Bagley*, 601 F.3d 445 (6th Cir. 2010), the prosecution was not obligated to learn of information possessed by other government agents who were not involved in the investigation or prosecution at issue.

Petitioner did not explicitly address the "prosecution team" argument, but seemingly suggests that, because two TBI agents worked to some extent on his case and because the TBI Laboratory conducted lab tests on some of the evidence, any knowledge the TBI possessed about Dr. Harlan should be imputed to the prosecutor.

If the government knows of material evidence favorable to the defendant in a criminal prosecution, it is obligated to disclose that information to the defendant. *See Kyles v. Whitley*, 514 U.S. 419, 431 (1995). *Brady* material encompasses exculpatory evidence (*i.e.*, pertinent to the defendant's guilt or innocence) as well as impeachment evidence (*i.e.*, pertinent to a key prosecution witness's credibility). *See Giglio*, 405 U.S. at 154-55 (nondisclosure of evidence affecting credibility of government's star witness warranted new trial irrespective of good faith or bad faith of prosecution).

A *Brady* claim has three components: (1) "the evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching;" (2) "that evidence must have been suppressed by the State, either willfully or inadvertently;" and (3) "prejudice must have ensued . . . ." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Not only does *Brady* prohibit the prosecution's actual concealment of exculpatory or impeachment evidence, but it imposes an affirmative duty on the prosecution to disclose to the defense all such evidence in the possession of those "acting on the government's behalf." *Strickler*, 527 U.S. at 281; *Kyles*, 514 U.S. at 433. In *Kyles*, the Supreme Court expressly extended the concept of constructive possession to all government agencies when it held that "the individual prosecutor has a duty to learn of any favorable evidence known to the others

acting on the government's behalf in the case, including the police." *Id.* at 437. Thus, the *Brady* rule compels the prosecution to make a reasonable effort to discover favorable evidence for the defendant to ensure a fair trial.

It is undisputed that Petitioner has met the first prong of the *Brady* analysis: the information regarding the Harlan investigation qualifies as impeachment evidence that could have been used to discredit Dr. Harlan's credibility as a forensic expert.

The second prong of the *Brady* analysis is more complicated. To meet his burden of proof, Petitioner must demonstrate that the State withheld or suppressed the impeachment evidence. Petitioner attempts to do so in two ways. First, Petitioner contends that the impeachment evidence relative to Dr. Harlan should be imputed to the prosecution because the Tennessee Attorney General and Reporter, John Knox Walkup, prosecuted Petitioner's case on direct appeal and at the same time was litigating on behalf of the Department of Health against Dr. Harlan to stop him from misrepresenting himself as the State's Chief Medical Examiner. Second, Petitioner contends that the prosecution bore responsibility for the disclosure of the Harlan investigation because the TBI was investigating and documenting almost all of the *Brady* material relating to Dr. Harlan. Petitioner submits that he has shown "constructive possession" by submitting his Habeas Evidentiary Hearing Exhibit 18—which reveals 87 pages of TBI documents admitted at Petitioner's Blount

County trial—and Exhibit 19—which reveals 53 pages of TBI documents related to his Blount County trial but not specifically admitted at trial.[18]

Respondent disagrees, maintaining that the prosecution had neither actual nor imputed knowledge of the any investigation of Dr. Harlan as such information was not gathered in connection with the prosecutor's investigation of this murder case. Relying upon *Goff*, Respondent argues that "a prosecutor has no obligation under *Brady* to learn of information possessed by other government agencies having no involvement in the investigation or prosecution at issue" [Doc. 144, p. 4 (citing *Goff*, 601 F.3d at 476)].

### a.    Tennessee Department of Health/Attorney General

There is no evidence demonstrating that the Tennessee Department of Health played any role in the investigation or prosecution of Petitioner. As to Petitioner's theory that knowledge of these matters should be imputed to the prosecution merely because the Attorney General and Reporter was representing the Department of Health against Dr. Harlan and at the same time seeking to persuade the state appellate courts to affirm Petitioner's conviction, Petitioner has not pointed to any Supreme Court precedent, and the Court is unaware of any precedent, supporting this proposition and extending *Brady* this far.

---

[18] The documents in Exhibit 18 consist of the following: an interview with Linda Dellinger, which was admitted at a motion hearing; five lab reports; Petitioner's interview; and a request to have a .303 shotgun and shotgun shells examined. It is not clear to the Court that all of the documents contained in Exhibit 19 are related to the Blount County trial as the first report reflects "[t]his investigative report was predicated upon an oral request by the Honorable Al Schmutzer, Jr., DAG, Fourth Judicial Circuit[,]" the district attorney in charge of the investigation of the murder of the victim's sister. In addition, some of the memoranda reference statements given to Sevier County officials who were investigating the other murder case. Nevertheless, because both murders were intertwined, law enforcement shared information.

Accordingly, habeas relief is not warranted as to the claims involving those two state agencies.

### b.    The Tennessee Bureau of Investigation

While the record is unclear as to the extent of the TBI's involvement in the instant case, for purposes of this discussion, the Court assumes TBI Special Agents David Davenport ("SA Davenport") and David Griswold ("SA Griswold") were part of the prosecution team.[19] The record, however, establishes that the evidence to impeach Dr. Harlan was in the possession of TBI Special Agents G. Richard Wright, Roy Copeland, and Jim Taylor—TBI agents with no connection or involvement in the investigation of Petitioner's case. Petitioner has not offered, and the record does not contain, any evidence of a collaborative effort between TBI Agents Wright, Copeland, and Taylor and Petitioner's prosecution team. Indeed, the proof is to the contrary as the prosecutors in Petitioner's state criminal case aver they had no knowledge of any investigation into Dr. Harlan at the time he testified [Doc. 81, Attachments #1-5; Doc. 139, p. 112].[20]

---

[19] TBI Special Agents David Davenport and David Griswold were the agents involved in the criminal investigation of Petitioner's other case, and to some unknown extent, it appears they may have been involved in this case [Petitioner's Habeas Evidentiary Hearing Exhibit, No. 20].

[20] The prosecutors in Petitioner's case denied any knowledge that Dr. Harlan was being investigated or of the reasons his contract as the State's Medical Examiner was not renewed. The prosecutors testified the hiring of Dr. Harlan to present as a rebuttal expert witness was a last minute decision which was made only after the defense presented Dr. Wolf who testified about the time of death. The prosecutors directed their victim-witness coordinator to contact the Attorney General's Conference who provided Dr. Harlan's name as a forensic expert, along with others. Neither prosecutor knew Dr. Harlan before meeting him the day they put him on the stand [Doc. 81].

Nevertheless, Petitioner contends the prosecutors in this case had a constitutional duty to discover and disclose the Harlan evidence. Respondent counters that under the facts of this case, the prosecutor was under no such duty.

Although *Brady* and its progeny undoubtedly have recognized a duty on the part of the prosecutor to disclose exculpatory and impeachment evidence that is favorable to the defendant over which the prosecution team has control, "*Brady* clearly does not impose an affirmative duty upon the government to take action to discover information which it does not possess[,]" *United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2007), *cert. denied*, 552 U.S. 1280 (2008) (citation and internal quotations marks omitted), or to disclose information which it does not know, *see Hollman v. Wilson*, 158 F.3d 177, 180-81 (3rd Cir. 1998) (finding no *Brady* violation where prosecutor, who failed to disclose, had no actual or constructive possession of information), *cert. denied*, 525 U.S. 1143 (1999).

The *Brady* rule has been expanded over the years, producing a mix of decisions from the circuit courts regarding the production of documents not in the files of the prosecution, but in the possession of other agencies. In this mix of decisions, however, the Court has not found, nor has Petitioner identified, a case finding a *Brady* violation where an expert witness was being investigated in a totally unrelated matter by agents who are not members of the prosecution team and of which the prosecutors had no knowledge.

Rather, the Supreme Court and circuit court cases reflect that *Brady's* disclosure duty extends to evidence known only to investigating agents or officers assigned to the prosecution team. *See United States v. Avellino*, 136 F.3d 249, 255 (2nd Cir. 1998)

("Nonetheless, knowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor, for the imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require us to adopt 'a monolithic view of government' that would 'condemn the prosecution of criminal cases to a state of paralysis.'") (quoting *United States v. Gambino*, 835 F.Supp. 74, 95 (E.D. N.Y. 1993), *aff'd*, 59 F.3d 353 (2d Cir. 1995), *cert. denied*, 517 U.S. 1187 (1996)).

In *Strickler*, the Supreme Court reiterated that "the [*Brady*] rule encompasses evidence 'known only to police investigators and not the prosecutor.' In order to comply with *Brady*, therefore, 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in *this* case, including the police.'" 527 U.S. at 280-81 (quoting *Kyles*, 514 U.S. at 437, 438) (emphasis added). And, in *United States v. Locascio*, 6 F.3d 924 (2d Cir. 1993), *cert. denied*, 511 U.S. 1070 (1994), the Second Circuit refused to impute knowledge of reports prepared by FBI agents who were "uninvolved in the investigation or trial of the defendants-appellants" to the Assistant United States Attorneys who were prosecuting the case. *Id*. at 948. The court declined to "infer the prosecutors' knowledge simply because some other government agents knew about the report." *Id*. at 949. Likewise, in *Goff*, the Sixth Circuit specifically noted that there is federal law "that *Brady* and its prodigy do not impose a duty on the prosecutor's office to learn of information

possessed by other government agencies that have no involvement in the investigation or prosecution at issue." *Goff,* 601 F.3d at 476 (citations and quotation marks omitted).[21]

The Second Circuit addressed a somewhat similar situation to the instant case in *United States v. Quinn*, 445 F.2d 940 (2d Cir. 1997), *cert. denied*, 404 U.S. 945 (1971), where the New York Times announced after trial that the government's witness had been indicted in Florida in connection with a fraud case. The indictment had been sealed but the defense moved for a new trial arguing such was newly discovered evidence. As described by the Second Circuit, the defendant took the "completely untenable position that knowledge of any part of the government is equivalent to knowledge on the part of this prosecutor" and that the New York prosecutor must be deemed to have had constructive knowledge of the evidence possessed by the Florida prosecutor. 445 F.2d at 944 (quotation marks omitted).

As in the *Quinn* case, the Court concludes Petitioner has taken the "completely untenable position" that knowledge by any part of the TBI equates to knowledge on the part

_____

[21] The Court is aware that in certain cases courts have found knowledge outside the prosecution team's files may be imputed to the prosecutor or a duty to search may be imposed where a search for readily available background information is routinely performed, such as routine criminal background checks of witnesses. *See Carriger v. Stewart*, 132 F.3d 463 (9th Cir. 1997) (prosecutor had duty to obtain and review the corrections file of its star witness, who was known by the prosecutor and police as career burglar and six-time felon, with a criminal record going back to adolescence), *cert. denied*, 523 U.S. 1133 (1998); *United States v. Perdomo*, 929 F.2d 967 (3rd Cir. 1991) (prosecution failure to conduct search of local records to verify key witness's criminal background was *Brady* violation); *United States v. Auten*, 632 F.2d 478 (5th Cir. 1980) (remanded case for determination of whether Government's failure to disclose information available to it that key witness had been convicted more than one time). These cases, however, usually concern conducting criminal background checks on the government's key cooperating witnesses which is not the case here. Rather, Dr. Harlan was a rebuttal expert witness, and Petitioner does not cite, and the Court is not aware of, a case compelling the prosecution to investigate the backgrounds of its expert witnesses.

of the prosecutor. This position is untenable because the prosecutors did not know about the Harlan investigation and because the TBI unit in charge of that investigation and in possession of that information was not involved in, or interested in the prosecution of Petitioner. Indeed, the prosecutor could not reasonably have had knowledge of, or access to, information concerning the Harlan investigation as it does not appear that the Tennessee Attorney General or the Health Department ever notified the District Attorneys of Tennessee, or anyone else, that they were investigating Dr. Harlan.

In sum, because Petitioner has not demonstrated the State suppressed any evidence, his *Brady* claim fails and will be dismissed.

### 3. Ineffective Assistance of Trial Counsel (Claims II.C. and II.D.)

Petitioner presents two arguments under his ineffective assistance of counsel claim. First, Petitioner contends counsel ineffectively presented "'limited evidence' suggesting the State's time of death was erroneous" [Doc. 24, p. 35, Claim II. C.]. According to Petitioner, trial counsel should have hired a competent forensic pathologist to testify to the time of death. In this claim, Petitioner attacks the state court's decision that it would not second guess counsel's strategic decision but omits any serious discussion of the state court's conclusion that Petitioner failed to demonstrate he was prejudiced by counsel's decision.

Second, acknowledging this claim was not presented to the state court but claiming his default is excused because he has presented a credible claim on actual innocence under *Schlup v. Delo*, 513 U.S. 298, 327 (1995), Petitioner contends that trial counsel failed to utilize an appropriate expert to rebut Dr. Harlan's time-of-death testimony [Doc. 24, p. 39,

Claim II. D.].  According to Petitioner, trial counsel failed to investigate the competence, basis of knowledge, background, and qualifications of Dr. Harlan.  In addition, Petitioner complains that counsel failed to present compelling forensic evidence rebutting the State's theory of the case.

Respondent contends Petitioner's ineffective assistance of counsel claims fail for three reasons: (1) trial counsel's decision to use Dr. Wolfe was strategic, thus not deficient; (2) Dr. Wolfe's testimony was substantially similar to testimony proffered by the forensic pathologists presented during the habeas evidentiary hearing; and (3) the claim is barred from federal habeas review because the proffered pathologist testimony was not presented in state courts.

### a.    Applicable Law

The criteria for analyzing a claim of ineffective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  *Strickland* requires a defendant to demonstrate two essential elements: (1) counsel's performance was deficient (*i.e.*, counsel was not functioning as counsel guaranteed the defendant by the Sixth Amendment), and (2) counsel's deficient performance prejudiced the defense (*i.e.*, deprived the defendant of a fair trial rendering the outcome of the trial unreliable).  466 U.S. at 687-88.

In order to demonstrate deficient performance, it must be shown that counsel's representation fell "below an objective standard of reasonableness" in light of the "prevailing professional norms." *Id.* at 686-88.  The Supreme Court has recently reiterated that the objective standard of reasonableness is a general standard:

No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Restatements of professional standards, we have recognized, can be useful as "guides" to what reasonableness entails, but only to the extent they describe the professional norms prevailing when the representation took place.

*Bobby v. Van Hook*, — U.S. —, 130 S. Ct.13, 16 (2009) (quoting *Stickland*, 466 U.S. at 688-89) (citations omitted).

When applying these standards, the Court is cognizant of the fact that there is a strong presumption counsel's conduct was within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689. "Reviewing courts focus on whether counsel's errors have undermined the reliability of and confidence that the trial was fair and just." *Austin v. Bell*, 126 F.3d 843, 847 (6th Cir. 1997), *cert. denied*, 523 U.S. 1079 (1998) (citing *Strickland*, 466 U.S. at 687; *United States v. Cronic*, 466 U.S. 648, 658, (1984), *cert. denied*, 523 U.S. 1088 (1998)). A reviewing court cannot indulge in hindsight but must instead evaluate the reasonableness of counsel's performance within the context of the circumstances at the time of the alleged errors. *Strickland*, 466 U.S. at 690. Trial counsel's tactical decisions are particularly difficult to attack. *District Attorney's Office for Third Judicial Dist. v. Osborne*, 129 S. Ct. 2308, 2330 (2009) ("[I]t is a well-accepted principle that, except in a few carefully defined circumstances, a criminal defendant is bound by his attorney's tactical decisions unless the attorney provided constitutionally ineffective assistance."); *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). A defendant's challenge to such

decisions must overcome a presumption that the challenged actions might be considered sound trial strategy. *O'Hara*, 24 F.3d at 828.

With respect to the prejudice prong of the *Strickland* analysis, the Supreme Court has reiterated what is necessary to establish prejudice:

> [A] "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."

*Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (quoting *Strickland*, 466 U.S. at 694).

When evaluating Sutton's ineffective assistance of counsel claim, the Court must review the state court's decision that Petitioner failed to establish ineffective assistance of counsel as circumscribed by section 2254(d)'s deferential review standards. Therefore, Petitioner will meet his burden of establishing ineffective assistance of counsel only if he demonstrates the state court's finding of no ineffective assistance is contrary to, or an unreasonable application of Supreme Court precedent. *See* 28 U.S.C. § 2254(d). *See also Tibbetts v. Bradshaw*, — F.3d —, 2011 WL 499276, at *5-6 (6th Cir. Feb. 15, 2011) (stating the standard of review).

### b.    Appropriate Expert (Claim II.C.)

Petitioner contends trial counsel's choice of presenting Dr. Wolfe, a non-board certified general practitioner, who was not professionally qualified to perform forensic autopsies amounted to ineffective assistance of counsel. According to Petitioner, a specialist in forensic medicine would have been more persuasive as an expert.

When this alleged attorney shortcoming was offered on appeal, the state appellate court concluded that, given Dr. Wolfe's credentials as a medical doctor and coroner, Petitioner had not shown that he was unqualified to testify regarding the time of death based on the condition of the victim's body when discovered. The state court further concluded Petitioner failed to establish that he was prejudiced by Dr. Wolfe's time-of-death estimate, given that Petitioner had failed to adduce any evidence demonstrating that a board-certified forensic pathologist would have refuted Dr. Harlan's assessment of the time of death of the victim. *Sutton*, 2006 WL 1472542, at *20. Petitioner contends the state court unreasonably denied relief when it concluded it would not second guess counsel's strategic choice of experts and that Petitioner failed to establish prejudice.

### (1)    Performance

Although Dr. Wolfe was not board certified, Goergen testified that they believed that his experience as medical examiner of one of the counties in Tennessee for several years was sufficient experience for their purposes [Addendum No. 35, pp. 6817-22]. According to Gibson, he selected Dr. Wolfe because he was a friend and Gibson had used Dr. Wolfe in the past when counsel needed a medical opinion in a case. When asked if he had any concerns that Dr. Wolfe was not board certified, Gibson explained:

> Well, he was appointed as the coroner of Union County, Tennessee, and I didn't have any concerns about it. Because he was a good witness, he was a conscientious man. I think he was - - at that time, he was, I thought would come across - - he was a country doctor who gave up a very lucrative practice to go into a clinic in the poor folks area, and he was translating the Dead Sea Scrolls, and I felt like this would - - you know, his personality would overcome that. I knew he wasn't Board certified,

but he's a doctor and he was certified as a coroner - - or listed as a coroner in Union County for several years.

[Addendum No. 35, pp. 7010-11].

"The choice of what type of expert to use is one of trial strategy and deserves "'a heavy measure of deference.'" *Turner v. Calderon*, 281 F.3d 851, 876 (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at 691). The Court must "make effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland,* 466 U.S. at 698. The fact that Dr. Wolfe was not certified does not, *ipso facto*, make him unqualified to render an opinion on time of death, and Petitioner has cited nothing indicating otherwise. Indeed, Gibson had used Dr. Wolfe on prior occasions and there is no indication that this medical expert's opinion was inaccurate.[22]

The state court determined that counsel's selection of Dr. Wolfe as his expert was a tactical decision. Strategic choices are virtually unchallengeable if based on a reasonable investigation. *Strickland*, 466 U.S. at 690-91. And there is a strong presumption that counsel performed a reasonable investigation. *Webb v. Mitchell*, 586 F.3d 383, 395 (6th Cir. 2009), *cert. denied*, 130 S.Ct. 2110. Petitioner has submitted nothing to overcome this presumption. Consequently, trial counsel's employment of Dr. Wolfe was not constitutionally deficient,

---

[22] It bears noting that Petitioner's federal habeas experts supported Dr. Wolfe's time-of-death testimony and opinion.

and the state court's decision on that issue was not contrary to or an unreasonable application of *Strickland*.

### (2)    Prejudice

Although post-conviction counsel raised his unqualified-expert issue in state court, the state appellate court concluded Petitioner called no forensic experts to testify and adduced no proof of prejudice, following its review of the record, *see Sutton*, 2006 WL 1471542, at * 20, and that finding is presumed correct, *Brumley v. Winard*, 269 F.3d 629, 637 (6th Cir. 2001) (citing *Sumner v. Matta*, 449 U.S. 539, 546-47 (1981)), because Petitioner has offered no clear and convincing evidence to contradict it.  Without proof of what a certified expert's testimony would have been or how it would have aided the defense, it was impossible for the state post-conviction court to determine whether there is a reasonable probability that Petitioner's guilt-phase proceedings would have been different had counsel presented a certified expert.[23]  Thus, the state appellate court did not unreasonably determine that trial counsels' testimony was not rebutted and did not unreasonably apply *Strickland* in concluding that Petitioner did not demonstrate prejudice.  Therefore, habeas relief is not warranted.

---

[23] Although post-conviction counsel apparently were not aware of the issues surrounding Dr. Harlan at the time they raised and tried this issue, in raising the claim that counsel was ineffective for failing to present a board-certified pathologist to determine the time of death it necessarily required them to present evidence of prejudice.

### (3)     By-Pass AEDPA Deference

Even though Petitioner failed to offer expert testimony in the state post-conviction court to support his claim of prejudice, he has presented that testimony in these habeas proceedings. Before this Court is permitted to consider such testimony in relation to the instant claim, Petitioner is required to establish he was not at fault for failing to develop the factual basis for this claim in state court, *see Williams v. Taylor*, 529 U.S. 420, 430-32 (2000), or that, if he was at fault, the conditions prescribed by section 2254(e)(2) were met, *see Holland v. Jackson*, 542 U.S. 649 (2004). Under Title 28 U.S.C. § 2254(e)(2), a hearing would be warranted on Petitioner's claim if he can demonstrate either "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court" that was previously unavailable or "a factual predicate that could not have been previously discovered through the exercise of due diligence; and the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found [Petitioner] guilty of the underlying offense." *Id.* at 653.

Petitioner has provided no reason for failing to develop the factual basis of his claim of prejudice in the state court. Petitioner raised this claim in state court but failed, for some unknown reason, to present expert testimony to support his claim. Even absent knowledge of the Harlan investigation, Petitioner could have and should have developed the factual basis for this claim in state court. Thus, he is not entitled to habeas relief on this claim.

Assuming Petitioner was faultless for failing to develop the factual basis for this claim (*i.e.*, his lack of knowledge of the Harlan investigation prevented him from developing the factual basis of the claim), which the Court does not find, and even if the Court considered the expert witnesses' testimony given at the evidentiary hearing, the Court would not conclude that Petitioner suffered any prejudice as a result of his trial counsels' decision. This is so because the new expert testimony did not weaken the circumstantial evidence pointing to Petitioner's guilt; all it did was contradict Dr. Harlan's testimony and support Dr. Wolfe's testimony. The expert testimony did not demonstrate Dr. Wolfe was not qualified to testify about his opinion or Mr. Griffin's time of death, nor that Petitioner was prejudiced by trial counsel's decision to present Dr. Wolfe as a defense witness. To the contrary, the new experts' testimony supported Dr. Wolfe's time-of-death testimony.

More importantly, the new experts established that time-of-death determinations are not an exact science, involve the exercise of individual judgment within the framework of evaluating certain data, the evaluation of the data is fairly subjective, and the exact time of death of this unwitnessed murder is unknown. As an example of the subjective interpretation of data by these experts, one only need to look at the issue regarding the use and interpretation of the microscopic slides. The expert conducting the autopsy concluded that certain organs evidenced decomposition and autolysis—a conclusion with which Dr. Harlan agreed but with which Petitioner's expert Dr. Mileusnic-Polchan disagreed. In addition, Dr. Kessler testified neither time of death nor change of decomposition could be determined microscopically [Doc. 137, p. 114]. Similarly, Dr. Mileusnic-Polchan testified an estimate

of time-of-death could not be based upon the examination of such slides and was outside the realm of "recognized science," but also acknowledged some consideration of the slides in connection with her time-of-death opinion, but explained the reason it was not proper for Dr. Harlan to do so was because "[h]e was stating that whatever he was seeing in the tissue is telling him that this individual had been dead 72 hours or longer [and] [y]ou cannot put an hour to it" [Doc. 139, p. 48-49].

The evidence Petitioner contends demonstrates he is actually innocent constitutes nothing more than a battle between experts and, rather than demonstrating his actual innocence, it merely reveals that a time-of-death determination is not an exact science, but instead is a fairly subjective opinion. For example, Petitioner's new experts testified as to the importance of knowing the temperature to which the body was exposed when making time-of death determinations, yet all of these new experts used temperatures in locations other than where the victim's body was found to reach their time-of-death opinions [Docs. 137, 139]. Similarly, although all of Petitioner's new experts supported Dr. Ellington's opinion that more scientific tests should have been conducted to ensure a more accurate time of death, they were all comfortable with providing a fairly narrow window in which the murder could have occurred. Finally, although the difference between Dr. Harlan's latest estimated time of death (early morning hours of February 22, 1992) and Dr. Haskell's earliest estimated time of death (late afternoon hours of February 22, 1992), which was substantially based on the lack of documented insect activity, amounted to a difference of approximately

15 hours, Dr. Haskell refused to consider that it was possible the death could have occurred earlier than late afternoon on February 22, 1992 [Doc. 137, pp. 66-68].

It also is important to note that Petitioner's habeas experts differed, to some extent, on their time of death opinions. In Dr. Haskell's opinion, the body was most likely 24 to 36 hours old but "to be conservative and to cover variability" he conceded the possibility that it was 48 hours old [Doc. 137, pp. 53-54]. Dr. Kessler believed the body was 12 to 24 hours old and Dr. Mileusnic-Polchan was initially comfortable with the body being dead 24 to 72 hours but then changed her testimony stating she was comfortable with the body being dead 24 hours, maybe even a day and a half but she was very uncomfortable and "would never really support the time of death - - the time being more than 48 hours" [Doc. 139, pp. 6, 48, 60].

Petitioner's three new experts disagreed with the opinion of the three State experts (*i.e.*, Dr. Blake's proposed testimony, Dr. Harlan, and Dr. Levy). As the weight of the experts testimony is basically equal and as the other evidence implicating Petitioner in the crime has not been weakened, the Court's confidence in the outcome of the trial is not undermined. Accordingly, Petitioner is not entitled to habeas relief on his claim that trial counsel failed to use an appropriate expert to establish the victim's time of death. This claim will be dismissed.

### c. Trial Counsel Failed to Present an Expert to Rebut Dr. Harlan's Testimony (Claim II. D.)

Petitioner contends trial counsel were ineffective for failing to rebut Dr. Harlan's testimony, as qualified expert witnesses would have been able to assist in cross-examining Dr. Harlan, to rebut his testimony, and to show Petitioner's innocence. Admitting this claim was not presented in the State courts, Petitioner maintains he has presented credible evidence sufficient to establish his actual innocence under *Schlup*, thus requiring a *Schlup* hearing and a review of the claim.

A claim of actual innocence may be a procedural gateway to allow consideration of a constitutional claim otherwise procedurally barred from federal review. *Schlup*, 513 U.S. at 327. Thus, before the Court can address Petitioner's claim that trial counsel were ineffective for failing to present expert testimony to rebut Dr. Harlan's testimony, Petitioner must demonstrate that, in light of all the evidence, including the evidence he presented during his habeas evidentiary hearing, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.* at 327-28. In the context of *Schlup*, a petitioner must establish his factual innocence of the crime, and not mere legal insufficiency. *See Bousley v. United States*, 523 U.S. 614, 623 (1998). The *Schlup* exception is limited to "certain exceptional cases involving a compelling claim of actual innocence." *House v. Bell*, 547 U.S. 518, 522 (2006); *see Schlup*, 513 U.S. at 324 (noting that "experience has taught us that a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare").

The cases in which a federal habeas petitioner has met the *Schlup* standard usually consists of credible evidence such as the petitioner's solid alibi, *see Garcia v. Portuondo*, 334 F.Supp.2d 446 (S.D.N.Y. 2004) (several eyewitness accounts of the crime exonerated petitioner), DNA evidence, *see Schlup v. Delo*, 912 F.Supp. 448 (E.D.Mo. 1995) (on remand) (DNA evidence excluded petitioner and identified another potential perpetrator), *House*, 547 U.S. at 38-52 (DNA established semen was not petitioner's), and substantial evidence of a different perpetrator, *Carriger v. Stewart*, 132 F.3d 463, 478 (9th Cir. 1997) (sworn confession by another that he committed crime and framed Carriger).

Here, the Court finds Petitioner has not satisfied *Schlup* because he has not presented new reliable evidence that shows he is probably innocent. The proffered evidence of actual innocence is opinion evidence, in the form of live testimony from three experts expressing their opinions as to the victim's time of death. For the reasons explained above, those opinions, neither individually nor cumulatively, lead the Court to conclude that, in light of all the evidence, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327-28. The expert opinion evidence does not eliminate any of the circumstantial evidence pointing to Petitioner's guilt and does not provide any evidence of his innocence. The proof upon which Petitioner relies does not provide any compelling evidence regarding the commission of the crime, nor does it fundamentally call into question the reliability of his conviction. At most, Petitioner has provided evidence to support his trial expert's opinion, but this is not the kind of evidence to which *Schlup* refers (*i.e.*, actual factual innocence).

Moreover, Petitioner's proffered evidence comes nowhere near the evidence produced in *Schlup, House, Garcia,* or *Carriger.* As stated, the evidence Petitioner has presented merely calls into question the time-of-death opinion of the State's rebuttal expert witness and amounts to nothing more than an attempt to discredit Dr. Harlan rather than affirmatively presenting new exculpatory evidence demonstrating his innocence.

Accordingly, the actual innocence claim does not exempt Petitioner from his procedural default. Petitioner's claim of ineffective assistance of counsel therefore is barred from habeas review.

### B.     Cumulative Error Claim (Claim XXV)

The final claim the Court must address is Petitioner's assertion that, when viewed cumulatively, the errors alleged in his habeas petition justify relief. The state appellate court concluded that because they found no errors to accumulate, the issue was without merit. *Sutton*, 2006 WL 1472542, at *29. Petitioner has not demonstrated the state court's decision was either contrary to or an unreasonable application of clearly established federal law.

Even if cumulative error can form the basis for section 2254 relief, which the Supreme Court has never held, Petitioner is not entitled to such relief in this case as he has not shown the existence of any constitutional error at trial or sentencing. As there are no errors to cumulate, Petitioner's cumulative-error claim fails. *See Evans v. Mitchell*, 344 F. App'x 234 (6th Cir. 2009) (unpublished) (finding no errors to cumulate and observing that neither the Supreme Court nor the Sixth Circuit has recognized "that distinct constitutional claims can be cumulated to grant habeas relief"), *cert. denied*, 130 S.Ct. 1106 (2010). *See also Baze v.*

46

*Parker*, 371 F.3d 310, 330 (6th Cir. 2004) ("Because Baze cannot establish any errors to cumulate and because his theory that errors can be considered in the aggregate depends on non-Supreme Court precedent, this claim is also without merit."). Accordingly, Petitioner's claim of cumulative error lacks merit and will be dismissed.

## V.     Conclusion

For the reasons stated in this Memorandum Opinion, Respondent's motion for summary judgment on Claims II and XXV will be **GRANTED**. Having previously granted Respondent's motion for summary judgment as to all other claims and dismissing without prejudice Petitioner's claim that he cannot be executed because he is incompetent, Petitioner's section 2254 petition [Doc. 24] will be **DISMISSED**.

**AN APPROPRIATE JUDGMENT ORDER WILL ENTER.**


s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE